# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

In The Matter Of The Application Of:  )
FRANK IGWEBUIKE ENWONWU  )
      Petitioner,  )
  )
  )
v.  )
  )
  )
MICHAEL CHERTOFF, Secretary Of  )
Department Of Homeland Security,  )
BRUCE CHADBOURNE, Interim Field  )
Officer Director for Detention and  )
Removal, Boston Field Office, Bureau  )
 of Immigration and Customs  )
Enforcement, DEPARTMENT OF  )
HOMELAND SECURITY, ANDREA J.  )
CABRAL, Sheriff, Suffolk County House )
Of Correction  )
  )
      Respondents.  )

**CIVIL ACTION FILE NO:**

## 05 10511 WGY

RECEIPT #_____
AMOUNT $_____
SUMMONS ISSUED N/A
LOCAL RULE 4.1_____
WAIVER FORM_____
MCF ISSUED_____
BY DPTY CLK_____
DATE 3/17/05

MAGISTRATE JUDGE_____

## PETITION FOR A WRIT OF HABEAS CORPUS
## PURSUANT TO 28 U.S.C. § 2241

    **NOW COMES** Frank Igwebuike Enwonwu (hereinafter "Mr. Enwonwu" or

"Petitioner"), through undersigned counsel, and hereby petitions this Court for a Writ of

Habeas Corpus to remedy his unlawful detention, to enjoin his continued unlawful

detention by the Respondents and ALLOW for other forms of relief as stated in his

"Prayer for Relief", infra, Petitioner's Brief, at 28-29.  Moreover, Mr. Enwonwu

respectfully requests this Honorable Court to issue a Stay of Removal and restrain the

Department of Homeland Security from deporting him pending the final result of this

Petition.  In support of this petition and complaint for injunctive relief, Mr. Enwonwu

alleges as follows:

1

## PARTIES

Petitioner, Frank Igwebuike Enwonwu has been physically and continuously present in the United States since 1986, and is a native and citizen of Nigeria. On or about May 30, 2003, he was ordered removed back to Nigeria. On or about September 13, 2004, he was taken into immigration custody by members of the Bureau of Immigration and Customs Enforcement (hereinafter "ICE"). He has now been held in detention for **over** six (6) months.

Respondent Michael Chertoff is the Secretary of the Department of Homeland Security of the United States of America (hereinafter "DHS"), and is responsible for the administration of ICE and the implementation and enforcement of the immigration laws. As such, he is the ultimate legal custodian of the Petitioner.

Respondent Bruce Chadbourne is the Interim Field Officer Director for Detention and Removal, Boston Field Office, Bureau of Immigration and Customs Enforcement, Department of Homeland Security. As such, he is the highest ranking local ICE official who has immediate custody of the Petitioner.

Respondent Department of Homeland Security is the agency charged with implementing and enforcing the immigration laws.

Respondent Andrea J. Cabral, Sheriff of Suffolk County, has immediate custody of the Petitioner.

2

## CUSTODY

Petitioner is detained at the Suffolk County House of Correction in Boston (hereinafter "SCHOC"). ICE has contracted with the SCHOC to house immigration detainees. Mr. Enwonwu was previously detained at the Plymouth County Correctional Facility in Plymouth, Massachusetts which also contracted with ICE to house immigration detainees. Throughout his prolonged detention (six months and counting), Petitioner has always been under the direct and complete control of the Respondents and their agents.

## JURISDICTION

This action arises under the Constitution of the United States, the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 et seq., as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, 110 Stat. 1570, and under 28 U.S.C. § 2241, Art. 1 § 9, Cl. 2 of the United States Constitution ("Suspension Clause"), and 28 U. S. C. § 1331, as the Petitioner is presently in custody under color of the authority of the United States, and such custody is in violation of the Constitution, laws, or treaties of the United States. See Zadvydas v. Davis, 533 U.S. 678, (2001); Carranza v. INS, 277 F.3d 65 (1st Cir. 2002) (Following enactment of IIRIRA, federal courts retain subject matter jurisdiction over habeas corpus petitions).

## VENUE

Venue lies with the District of Massachusetts because Mr. Enwonwu is currently detained at SCHOC in Boston, Massachusetts. Venue is also proper because Petitioner is in the custody of Respondent Bruce Chadbourne, ICE Interim Field Officer Director for Massachusetts. See 28 U.S.C. §1391.

3

## EXHAUSTION OF REMEDIES

Petitioner has exhausted his administrative remedies to the extent required by law, and his only remedy is by way of this judicial action. After the Supreme Court decision in Zadvydas, supra, the Department of Justice (hereinafter "DOJ")[1] issued regulations governing the custody of aliens ordered removed. Petitioner was ordered deported on May 30, 2003 after the Board of Immigration Appeals (hereinafter "BIA") sustained the DHS' appeal of a deferral of removal by the Executive Office for Immigration Review (hereinafter "EOIR" or "Immigration Court"). Mr. Enwonwu (who did not know of the government's appeal) was taken into ICE custody on September 14, 2004 as he went to renew his Employment Authorization Document (hereinafter "EAD"). On or about October 8, 2004, Mr. Enwonwu filed a motion to reopen the BIA case.[2] It was denied by the BIA on February 15, 2005. He filed a Motion to Reconsider on March 15, 2005 which also did not result in his release.

---

[1] The DOJ initially had authority over the Immigration and Naturalization Service (hereinafter the "INS") until March 1, 2003. On that date, the INS was itself split into three agencies: the Bureau of Citizenship and Immigration Services ("BCIS"), the Bureau of Immigration and Customs Enforcement ("ICE"), and the Bureau of Customs and Border Protection ("BCBP"). All three agencies were then brought under the authority of a new cabinet-level department -- the DHS -- along with other agencies.

[2] Although Mr. Enwonwu ended up filing what the BIA considered to be a late appeal (pursuant to numerical time limitations under 8 C.F.R. §1003 et. seq. even though he filed it in good faith within days after being detained), he should be credited with making every genuine effort in exhausting his administrative remedies. See Sayyah, 382 F.3d 20, infra, at 17.

Mr. Enwonwu requested a Custody Review Determination (hereinafter "CRD") with the local ICE office at the 90-day interval of detention and subsequently with ICE's Headquarters Post-order Detention Unit (hereinafter "HQPDU") at the 180-day interval of his detention.[3] He submitted his first CRD request on or about December 10, 2004 and it was summarily denied. A second application was filed on or about March 14, 2005 with similar negative results, perhaps due to the uneven practice of following the detailed procedures for review. See 8 C.F.R. §1241.13 et. seq.

No statutory exhaustion requirements apply to Petitioner's claim of unlawful detention. Mr. Enwonwu is eligible to file the instant petition by the mere fact that he has been detained for longer than six (6) months without being deported. Zadvydas, supra. See also, Rowe v. INS, 45 F.Supp.2d 144 (D. Mass. 1999). He has exhausted all remedies and is not eligible for nor is he requesting any stay of deportation under INA §241(c)(2), 8 U.S.C. §1231(c)(2). His immigration case was initially denied by the BIA on or about May 30, 3003 and denied once again on or about February 15, 2005, in his response to his Motion to Reopen. As such, he has reasonably exhausted all administrative remedies and is therefore eligible to argue additional arguments as he may deem necessary.

---

[3] A CRD review at the 90-day threshold is very informal. The 180-day review includes language that is *supposed* to provide a more thorough review. In either scenario however, the Petitioner is not entitled to a hearing and the ICE officer handling the file need only make a cursory review before either recommending release or continued detention. Suffice to say, the decision cannot be appealed. If the Petitioner happens to be released, he is given an Order of Supervision (similar to probation) and mandated to report to the ICE unit on a periodic basis. ICE has recently set up telephonic reporting for approved individuals who are: (1) not a danger to themselves or others; and (2) not considered a flight risk. This flexible reporting mechanism also applies for people released due to unreasonably long detentions.

## STATEMENT OF THE FACTS

On January 20, 1986, Mr. Enwonwu arrived at Logan International Airport in Boston, Massachusetts with a tourist visa. He was interrogated and ultimately searched by a customs officer, and was found to be, *inter alia*, in possession of five ounces of heroin. [Exhibit 1]. An agent from the Drug Enforcement Administration (hereinafter "DEA") by the name of Herbert Lemon (hereinafter "Special Agent Lemon") was summoned to arrest and book Mr. Enwonwu. The Petitioner was then arraigned before the U.S. District Court for the District of Massachusetts and charged with various counts, to wit: importing or attempting to import heroin, in violation of 21 U.S.C. §§ 952, 960 and 963, and possession of Heroin with intent to distribute, in violation of 21 U.S.C. § 841(a)(1). [Exhibit 2]. His Nigerian passport was impounded and has been permanently held since the date of arrest. [Exhibit 3].

In the course of investigating the case, Special Agent Lemon promised Mr. Enwonwu that he would be granted asylum in the United States if he cooperated by assisting government agencies in the apprehension and successful prosecution of other persons involved in the drug trafficking ring. The DEA convinced the United States Attorney's Office in Boston (hereinafter "USAO") to consent to Mr. Enwonwu's admission into a pretrial release program in order to continue the ongoing investigation. On or about February 5, 1986, Magistrate Judge Joyce Alexander entered an order at the request of the USAO allowing for Mr. Enwonwu's pretrial relief. [Exhibit 4]. Thereafter, Petitioner not only aided in the apprehension of his New York contacts, but also facilitated the arrest of one of the top members of the drug smuggling group in Ohio.

Ultimately, Mr. Enwonwu assisted with the successful arrest and prosecution of three fellow Nigerian nationals.

On or about March 21, 1986, as part of a plea agreement with the USAO, Mr. Enwonwu pled guilty to the charge of importing heroine in exchange for the dismissal of the other charge (possession with intent to distribute). [Exhibit 5]. He was given a five-year suspended sentence, and placed on probation for a period of three years, with special parole term of three (3) years. [Exhibit 6]. One of the conditions of probation was that he *"must not serve as an informer [sic] while on probation and [he] must promptly and truthfully answer all inquiry directed to [him] by the probation officer."*

Special Agent Lemon then was instrumental in convincing the INS (now DHS) to extend Mr. Enwonwu's stay in the United States and provide him with an EAD. [Exhibit 7]. Special Agent Lemon then helped Mr. Enwonwu get a job as a taxi driver in the City of Boston. He did so by contacting Captain Devine of the Boston Police Hackney department and requesting a waiver of Mr. Enwonwu's criminal conviction so that the latter could obtain a hackney license -- a job prerequisite.

Nevertheless, both Special Agent Lemon and subsequently the DHS equally retained Petitioner as an informant and assigned him another agent for weekly reporting. Both the DEA and the DHS paid Petitioner on a periodic basis. This practice continued until Mr. Enwonwu's Probation Officer delved into his income sources and became aware that Petitioner was serving as an informant for both agencies. Petitioner was reminded in very firm language of the consequences of working as an informant on the terms of his probation and instructed him to inform both the DEA and the DHS agents that he could no longer continue to function in that capacity during his probation. Petitioner complied

7

and was then able to successfully complete his probation in April, 1991.

On or about April 1, 1997, the DHS began to implement IIRIRA's amendment of §241 of the Immigration and Nationality Act (hereinafter "INA") which now retroactively reclassified all past drug-related cases as "aggravated felonies". Consequently, despite having remained trouble-free and working for 10 years, Petitioner was arrested and placed in removal proceedings before the EOIR.[4] Initially, the DHS contended that Petitioner was never admitted into the United States, and as such was an "arriving alien". The DHS altered its stance upon learning that the Petitioner was indeed "paroled" in and authorized to work. [Exhibit 8]. Petitioner still faced removal though because of his prior conviction.

Immigration Judge Leonard Shapiro (hereinafter "Judge Shapiro") presided over the removal hearings. He allowed the parties some time to explore the possibility of the DEA and the DHS affording Petitioner an "S" visa.[5] [Exhibit 9, pp. 9-24]. The negotiations failed because Petitioner could not give the DEA an immediate proffer of pending drug activity. Thereafter, after a summary hearing on August 28, 1997, Judge Shapiro sustained the claims in the charging documents and ordered that Mr. Enwonwu be removed back to Nigeria. [Exhibit 10].

---

[4] After IIRIRA, both "deportation" and "exclusion" proceedings were deliberately folded into "removal" proceedings. This new term was more than a mere sugarcoating of legal terminology. "Removal" denied various forms of relief in what were known as deportation proceedings while prohibiting "exclusion" hearings outright.

[5] An "S" visa is available to an individual in possession of critical reliable information concerning a criminal organization or enterprise who is willing to supply or has supplied information to federal or state law enforcement authorities or court and whose presence in the United States the Attorney General determines is essential to the success of an authorized criminal investigation. INA §101(a)(15)(S); 8 U.S.C. §1101(a)(15)(S). The DHS may also parole a person into the United States where state or federal law enforcement agency is prepared to apply for an "S" visa. 8 C.F.R. §§212.14, 1214.14.

Mr. Enwonwu immediately appealed his removal to the BIA [Exhibit 11]. It was denied on June 10, 1998. [Exhibit 12]. He was thereafter transferred by the DHS to the Krome Detention Center (hereinafter "Krome") in Florida while awaiting deportation. While at the Krome, he filed a Petition No. 5:98cv210/RH-2/MD, seeking a Writ of Habeas Corpus from the United District Court for the Northern District of Florida. The petition was denied upon the Attorney General's contention that the U.S. District Court lacked jurisdiction to entertain a Habeas Corpus proceeding regarding an immigration matter. [Exhibit 13].[6]

Subsequently, Petitioner's case was reopened and remanded to the Immigration Court in order to afford Petitioner the opportunity to pursue relief under the Convention Against Torture provision (hereinafter "CAT").[7] The Record of Proceedings (hereinafter "ROP") -- currently unavailable to Petitioner despite his various applications dating back almost six months -- will show that Petitioner called evidence to show that deporting him to Nigeria would result in his arrest and imprisonment in that country for a term of five (5) years pursuant to the Nigerian National Drug Law Enforcement Agency (Amendment) Decree 1990, Decree No. 33 (October 10, 1990) (hereinafter "Decree No. 33"). Petitioner would be detained at the Kiri Kiri maximum security prison in Nigeria and be

---

[6] Mr. Enwonwu's plight had even been documented in a February 14, 1999 Boston Globe article entitled "As INS jails fill, a release plan surfaces". [Exhibit 14].

[7] Under Art. 3 §1 of the CAT, no signatory country "shall expel, return ... or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture." Under Art. 3 §2 of the CAT, the BIA must "take into account all relevant considerations including, where applicable, the existence in the State concerned of a consistent pattern of gross, flagrant or mass violations of human rights." The CAT is a treaty but still a law of the Unites States, specifically mentioned in section 2241. Builes v. Nye, 239 F.Supp. 2d 518, at fn. 5 (M.D. Pa., 2003).

exposed to serious bodily harm or even death at the hands of the very same persons who the USAO prosecuted as part of his cooperation with the DEA. Additionally, evidence was introduced to establish the fact that the drug lords who remained very influential in Nigeria could easily recruit guards or other inmates to harm, torture and kill the Petitioner once he was housed inside the Kiri Kiri maximum security prison.[8]

On or about December 19, 1999, Judge Shapiro heard the case once again -- this time on the merits. Special Agent Lemon testified at this trial (under subpoena order) about Mr. Enwonwu's substantial cooperation with the DEA. After a full-fledged hearing, Judge Shapiro found said evidence and other factual information credible enough to entitle Mr. Enwonwu to deferral of removal under CAT. [Exhibit 15]. Petitioner was thereafter released and issued another EAD by the DHS.

The DHS reserved the right to appeal Judge Shapiro's ruling. In the meantime, Mr. Enwonwu was required to provide the EOIR with his contact address, which he gave as "c/o of Rose O. Mgbojikwe, 39 Sheridan Drive, Apartment # 8, Shrewsbury, Massachusetts 01545."[9] At some point in 2000, Ms. Mgbojikwe, purchased a condominium at 27 Lebeaux Drive, Shrewsbury, Massachusetts 01545, and both she and Mr. Enwonwu moved to the new address. Ms. Mgbojikwe informed the U.S. Mail of this change of address. Mr. Enwonwu did his part and *personally* informed the DHS of his current address at *all* times, since he had to do so every time he visited the local BCIS

---

[8] Again, such evidence appears in the ROP, which is currently unavailable to the Petitioner.

[9] Rose O. Mgbojikwe is one of Mr. Enwonwu's sisters. She has provided him shelter during the intervals of freedom he previously enjoyed.

office[10] to annually renew his EAD.

Mr. Enwonwu had sought clarification from his counsel at the time -- Anthony Pelino -- of what the DHS meant by reserving the right to appeal. Mr. Enwonwu wanted to know this especially because Attorney Pelino was moving his practice to the State of Arizona and would no longer remain in the Commonwealth of Massachusetts.[11] Attorney Pelino responded by stating that usually the DHS did not appeal rulings of the Immigration Court; however, they had reserved the right to file their notice of appeal within 30 days. With the foregoing in mind, Petitioner counted the seconds until after January 18, 2000, the date that Judge Shapiro had indicated that said Notice of Appeal was due. By the end of January 2000, when Petitioner did not hear from either the DHS or his counsel, he concluded that the DHS was no longer intent on pursuing the matter.

Petitioner began taking steps to regain control of his life. By mid-2003, he had earned his realtor's license. [Exhibit 16]. His outstanding performance earned him recognition as employee of the month at his ReMax office at 398 Pleasant Street, Malden Mass, for Feb. 2004. [Exhibit 17].

Petitioner soon recognized that sale of real property was seasonal. To make ends meet, he needed another job, at the very least, a part time job. As such, on September 13, 2004, Petitioner once again visited Room E-160 to renew his work authorization as he

---

[10] The BCIS office is located at Room E-160 of the John F. Kennedy Building in Boston, Massachusetts).

[11] Attorney Pelino's office is presently located at 680 South Park Street, P.O. Box 1909, Florence, Arizona 85232-1909. He has been in Arizona for a number of years. Petitioner's new attorney has already attempted to contact him via certified mail for a copy of the file.

had done in preceding years. Once more, he was arrested and detained.

Petitioner sought to know why he was being arrested, and was informed that the DHS had successfully appealed the Order of deferral of removal entered by Judge Shapiro on December 16, 1999, pursuant to the CAT. Unbeknownst to Mr. Enwonwu, the BIA had ruled on the DHS appeal back on May 30, 2003 and determined that he had failed to establish his *prima facie* eligibility for CAT. In sum, the BIA had sustained the government's appeal, vacated Judge Shapiro's order, and ordered Petitioner removed from the United States. [Exhibit 18].

Some of Petitioner's other siblings (Leopold O. Enwonwu and Adeline Amazu) frantically called Attorney Pelino, who in turn confirmed to them that he had no knowledge whatsoever that the DHS had pursued the appeal, since he had already moved his practice from Massachusetts to Arizona. Thereafter, Petitioner hired new counsel (Joyce & Zerola, P.C.) to file a motion to reopen the appeal pursuant to 8 C.F.R. §1003.23(b)(4)(iii)(A), and for a very brief stay of deportation under 8 C.F.R. §1003; [Exhibit 19].

It does appear from the brief filed by Mr. Enwonwu's attorneys on October 8, 2004,[12] that the DHS had indeed filed a timely Form EOIR-26 (Notice of Appeal) to the BIA about December 30, 1999. Although the file showed that service had been made to Attorney Pelino, Petitioner was not served personally, and no copy of the notice of appeal was mailed to him. Furthermore, subsequent pleadings sought to be served on Petitioner did not get to him as they were returned because they had been wrongly addressed, and

---

[12] Mr. Enwonwu's attorneys were only permitted to review the ROP of the DHS appeal.

consequently were not forwarded to Petitioner at his proper address being in "c/o Rose O. Mgbojikwe."

On or about February 15, 2005, the BIA issued a Per Curiam order denying the motion to reopen and entered a final order of removal, thereby sealing his fate from maintaining legal status. [Exhibit 20].

## ARGUMENT

### A.    THERE IS NO STATUTORY REQUIREMENT OF EXHAUSTION OF ADMINISTRATIVE REMEDIES WHERE A HABEAS CORPUS PETITION CHALLENGES DETENTION AS OPPOSED TO REMOVAL

With respect to immigration cases, the exhaustion of administrative remedies statutorily applies only to appeals of final orders of removal. 8 U.S.C. §1252(d)(1); Rowe, supra, at 145 (citations omitted). Moreover, most courts have found that constitutional challenges to detention fall under the "futility" exception to prudential exhaustion requirements because the BIA lacks authority to decide constitutional issues. In fact, even when a challenge is to the interpretation of a detention statute and thus within the BIA's authority, courts have found that exhaustion is not required either because the BIA has previously decided the issue (making an administrative appeal futile) or because the time required for an administrative appeal would result in "irreparable injury." See Gonzalez v. O'Connell, 355 F.3d 1010, 1015-18 (7th Cir. 2004) (Habeas petitioner did not have to exhaust constitutional challenge to mandatory detention even though the predicate for the challenge was a statutory interpretation since the BIA had spoken on the statutory issue and it would have been futile). In Petitioner's case, the issue may be moot since the BIA already issued a final removal order, thereby exhausting his administrative remedies.

**B.    THE PETITIONER HAS BEEN DETAINED IN POST-REMOVAL CUSTODY FOR OVER SIX MONTHS -- THE THRESHOLD TIMETABLE IN WHICH DETENTION BECOMES UNREASONABLE AND UNNECESSARY**

The Attorney General[13] is authorized by statute to detain an alien who is

removable for a period of 90 days and to detain an alien who has failed to maintain his

non-immigrant status beyond the 90-day removal period.  8. U.S.C. §1231(a).  However,

the Supreme Court has held that the Constitution requires that an alien's post-removal

period detention be limited to the "period reasonably necessary to bring about the alien's

removal from the United States" of six months.  Zadvydas v. INS, 533 U.S. 678 at 689

(2001) (INA §§ 236(e), 242(a)(2)(B(ii), 242(a)(2)(C), 242(g) do not bar habeas

jurisdiction for challenge to post removal detention); Demore v. Kim, 123 S.Ct. 1708,

1713-14 (2003) (INA § 236(e) does not bar habeas jurisdiction over a constitutional

challenge to mandatory detention in the absence of specific provision barring habeas);[14]

American Arab Anti-Discrimination Comm. v. Reno, 119 S.Ct. 936 (1999) (§242(g) does

not bar review to indefinite detention).  After six months, an alien for whom there is no

significant likelihood of removal in the reasonably foreseeable future must be released

---

[13] As previously stated, as of March 1, 2003, the Attorney General's authority in immigration matters has been supplanted by the Director for the DHS Homeland Security. Any further reading of Attorney General and legacy INS in prior cases should be read to mean that the DHS has sole and exclusive authority as if it were the Attorney General.

[14] The Demore Court actually made three significant rulings germane to this motion: (1) it emphasized that, where review of constitutional issues is said to be precluded, Congress must be clear in its intent, See Webster v. Doe, 486 U.S. 592 (1988); (2) it reiterated its requirement in St. Cyr, infra, that any repeal of habeas review requires a particularly clear statement that such is Congress's intent; and (3) it read the jurisdiction-limiting provision in 8 U.S.C. §1226(e) as applying only to review of the Attorney General's discretionary judgment. Id., at 510. (Rehnquist, C.J.).

14

from custody. Id., at 701. The government bears the burden of disproving the Petitioner's "good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future." See Zhou v. Farquharson, U.S. Dist. LEXIS 18239, *2- *3 (D. Mass. 2001) (quoting and summarizing Zadvydas); Agbada v. Ashcroft, 2002 U.S. Dist. LEXIS 15797 (D. Mass. 2002) (grant of habeas petition if DHS "is unable to present document confirmation that the Nigerian government has agreed to [petitioner's] repatriation).

Moreover, evidence showing successful repatriation of other persons to the country at issue is not sufficient to meet the government's burden to establish that an alien petitioner will be removed within the reasonably foreseeable future. See Thompson v. INS, 2002 U.S. Dist. LEXIS 23936 (E.D. La. 2002) (government failed to show that alien's deportation to a country was reasonably foreseeable where the government offered historical statistics of repatriation but failed to show any response from the country on the application of travel documents that the DHS and the petitioner had requested); Ablabad v. Ashcroft, 2002 U.S. Dist. LEXIS 17405 at *4 (N.D. Ill. 2002) (evidence that aliens have been deported to petitioner's home country is not sufficient to carry the government's burden under Zadvydas).

Petitioner has been found removable after the BIA sustained his CAT claim, thereby eliminating his last form of administrative relief. Petitioner has now been in custody for over the threshold six months. During that period, the DHS has endeavored to procure travel papers for Petitioner in order to remove him from the United States without any significant delay due to Petitioner's filings with this Honorable Court and the BIA. In fact, DHS has for over six months, been unable to obtain the necessary

paperwork to remove Petitioner. Mr. Enwonwu has cooperated in every way with the

DHS' attempts to procure him travel documents.[15] Because there is no reason to believe

that travel papers will be obtained for Petitioner in the reasonably foreseeable future,

Petitioner should be released from detention. See Zadvydas at 687-88; 8 C.F.R. §1241.4.

Furthermore, Mr. Enwonwu meets the criteria for release insofar as no travel documents

are available, he is a non-violent offender, he is not a danger to the community, he has

never violated the conditions of his prior releases, he does not pose a significant flight risk,

and he has been entrusted in the past by the same government agencies (DEA and DHS)

that previously had grounds to arrest or detain him.[16]

## C.    THERE IS A STRONG PRESUMPTION IN FAVOR OF JUDICIAL REVIEW OF ADMINISTRATIVE ACTION AND THE LONGSTANDING RULE REQUIRING A CLEAR STATEMENT OF CONGRESSIONAL INTENT TO REPEAL HABEAS JURISDICTION

The Supreme Court decided two seminal cases in 2001 addressing the question of

habeas corpus review after the 1996 legislation. As cogently laid out in Saint Fort v.

Ashcroft, 329 F.3d 191 (1st Cir. 2003), this Circuit laid out a detailed explanation behind

the allowance of habeas jurisdiction for (other than post-detention) removal issues. The

---

[15] DHS rules in fact mandate the alien to make reasonable efforts to comply with the order of removal by providing truthful, accurate and timely information. 8 C.F.R. §1241.13(d)(2).

[16] Mr. Enwonwu's two prior CRD requests pursuant to 8 C.F.R. §1241.13 and §1241.4 do not toll the time for which he potentially may delay his own detention. These provisions are available as an administrative remedy for release in the short term and have no bearing as to whether he is engaged or not in any other course of action. In fact, no court has come remotely close to confusing them with any form of delay. Sadly, Mr. Enwonwu would be foolish not to pursue this avenue of relief despite the futility involved given the DHS' perfunctory issuance of boilerplate denials.

court brilliantly explained as follows:

> In St. Cyr, 533 U.S. 289 [2001], the Court considered the impact of
> AEDPA's jurisdiction-limiting provision, AEDPA § 401(e), as well as three
> provisions under the permanent rules in IIRIRA, including a zipper clause,
> 8 U.S.C. §§ 1252(a)(1), 1252(a)(2)(C), 1252(b)(9). The Court began with
> the "strong presumption in favor of judicial review of administrative action
> and the longstanding rule requiring a clear statement of congressional
> intent to repeal habeas jurisdiction," Id. at 298, and canons obligating
> avoidance of serious constitutional questions by an alternative construction,
> Id. at 299-300. It concluded that "a construction of the amendments at
> issue that would entirely preclude review of a pure question of law by any
> court would give rise to substantial constitutional questions." Id. at 300.
> Noting that "at the absolute minimum, the Suspension Clause protects the
> writ 'as it existed in 1789,' " the St. Cyr Court then turned to historical
> evidence. Id. at 301 [citations omitted]. It found that the "historical core"
> of the writ of habeas corpus has been review of the legality of executive
> detention, and "it is in that context that its protections have been
> strongest." Id. It also noted that "to conclude that the writ is no longer
> available in this context would represent a departure from historical
> practice in immigration law." Id. at 305. Examining the statutory
> provisions, the Court drew a distinction between "judicial review" and
> "habeas corpus." The term "judicial review" is the focus of each of the
> three IIRIRA jurisdiction-limiting provisions. In the immigration context,
> the Court reasoned, "judicial review" and "habeas corpus" "have
> historically distinct meanings." Id. at 311 (citing Heikkila v. Barber, 345
> U.S. 229 (1953). In Heikkila, the Court noted, preclusion of judicial review
> did not entail cessation of habeas review. Id. at 311. As to the zipper
> clause, the Court held that it was an attempt to consolidate judicial review
> of immigration proceedings into one action, and did not bar habeas
> jurisdiction of orders not subject to judicial review. Id. at 313. The
> absence of an alternative judicial forum also troubled the Court:
>
> > If it were clear that the question of law could be answered
> > in another judicial forum, it might be permissible to accept
> > the INS' reading of §1252. But the absence of such a forum,
> > coupled with the lack of a clear, unambiguous, and express
> > statement of congressional intent to preclude judicial
> > consideration on habeas of such an important question of
> > law, strongly counsels against adopting a construction that
> > would raise serious constitutional questions. Accordingly,
> > we conclude that habeas jurisdiction under §2241 was not
> > repealed by AEDPA and IIRIRA. Id. at (citation omitted).

More recently, this circuit has strongly held that habeas review under §1252(b) allows for court review of final orders of removal. <u>Sayyah</u> v. <u>Farquharson</u>, 382 F.3d 20 (1ˢᵗ Cir. 2004) (alien can bring habeas petition without violating statute that barred court review of final order of removal so long as administrative remedies are exhausted); <u>Hernandez</u> v. <u>Reno</u>, 238 F.3d 50, 54-55 (1ˢᵗ Cir. 2001) (habeas petition allowed despite lack of exhaustion of administrative remedies in particular factual circumstances where deportation is imminent); <u>Sousa</u> v. <u>INS</u>, 226 F.3d 28, 31-32 (1ˢᵗ Cir. 2000) (habeas relief available when faced with immediate deportation). As such, Mr. Enwonwu's remaining habeas petition arguments should march forward unimpeded.

## D. THE BIA'S FEBRUARY 15, 2005 ORDER DENYING THE PETITIONER'S MOTION TO REOPEN VIOLATES HIS CONSTITUTIONAL RIGHT TO DUE PROCESS.

### 1. PROCEDURAL DUE PROCESS VIOLATIONS

In denying Petitioner's motion to reopen the BIA raised three issues:

(a) that the motion to reopen was filed out of time;

(b) that Attorney Anthony Pelino did not revert to the board as per his affidavit; and,

(c) that Petitioner changed his address without completing Form AR-11 (change of address) within ten days thereafter, do not in any way affect the invalidity of the failure of the DHS to properly serve Petitioner with the Notice of Appeal.

The provision of 8 C.F.R. § 1003.23(b)(iv) gives the BIA discretionary power to grant or deny a motion to reopen. In exercising this discretion, the BIA takes into account

whether the error was as a result of failure on the part of the applicant, or the other party. The BIA abused its discretion by relying on the provision of 8 C.F.R. §1003.3(c)(2) as affording a party a statutory right to reopen within 90 days where the fault was that of the applicant as a basis to deny an application alleging denial of due process by way of lack of notice of the appeal. See Salta v. DHS, 314 F.3d 1076 (9th Cir. 2002); Adeyemo v. Ashcroft, 383 F.3d 558 (7th Cir. 2004).

    In support of the contention that Petitioner was not at fault, the following undisputable facts emanate from the BIA record:

    The proof of service filed by the DHS shows that the notice of appeal was mailed to Petitioner's former attorney (Attorney Pelino) for proceedings at the Immigration Court.[17] Petitioner was neither served personally, nor was a copy mailed to him.[18] This fails to conform with 8 C.F.R. §1003.3(a) as governing the service of notice of appeal and other processes, which in its relevant part provides:

> *"An appeal from a decision of an immigration judge shall be taken by filing a Notice of Appeal from a Decision of an Immigration Judge (Form EOIR-26) directly with the Board, within the time specified in Sec. 3.38.* ***The appealing parties are only those parties who are covered by the decision of an immigration judge and who are specifically named on the Notice of Appeal. The appeal must reflect proof of service of a copy of the appeal and all attachments on the opposing party."*** *[Emphasis supplied].*

---

[17] Attorney Pelion (Petitioner's trial counsel) filed an affidavit stating that he had moved to Arizona, and could not recollect whether he received processes regarding the case or not. It is not for Petitioner to extract from counsel a promise made to the Board that upon reviewing his file, he would revert to the Board.

[18] Furthermore, Petitioner filed an affidavit that he never received the Notice of Appeal (Form EOIR-26) from Attorney Pelino.

The "Notice of Appeal" is an essential part of the record of the appeal, the absence of which vitiates the entire proceedings as service of notice of appeal is *"reasonably calculated, under all the circumstances, to appraise interested parties of the pendency of an action and affording them and opportunity to present their objections."* <u>Mullane v. Center Hanover Bank & Trust Co.</u>, 339 U.S 306, 314 (1950).

Petitioner had been in DHS custody from August 28, 1997, through December 16, 1999. He had no place to return to in his native country. He planned to stay with his sister Rose until he was in a more solid financial footing and consequently provided her domicile for service of process at the following address:

> "c/o Rose O. Mgbojikwe
> 39 Sheridan Drive, Apartment # 8,
> Shrewsbury, Massachusetts 01545."

Well after notice of appeal was due, but not received, Ms. Mgbojikwe moved from 39 Sheridan Drive, to 27 Lebeaux Drive, Shrewsbury, Massachusetts 01545 and notified the United States Postal Service (hereinafter "USPS") of her change of address. While Petitioner did not notify the EOIR of his change of address (believing he did not have to do so after winning his trial), he did personally inform the DHS of his address on *each* occasion he appeared at the BCIS office in Boston to extend his employment authorization.

The BIA erroneously sent the Filing Receipt for Appeal and notice of the requirements of entry of appearance addressed to Frank Enwonwu, *39 Sheridan Drive, Apartment # 8, Shrewsbury, Massachusetts 01545,* without noticing that this Petitioner used this address in *"c/o Rose O. Mgbojikwe,".* As such, it was returned to the BIA on February 25, 2000, marked *"Unknown at above Address."* In contrast, a copy of the

request for extension of briefing schedule filed on September 6, 2001 was mailed to Petitioner in *"c/o Rose O. Mgbojikwe, 39 Sheridan Drive, Apartment # 8, Shrewsbury, Massachusetts 01545,"* yet was returned by the USPS with a forwarding address of 27 Lebeaux Drive, Shrewsbury, Massachusetts 01545, attached.  However, the Notice of Briefing Schedule was forwarded to Petitioner at 27 Lebeaux Drive, Shrewsburry, Massachusetts 01545, without reflecting that he resided therein in *"c/o Rose O. Mgbojikwe,"* thereby precluding its proper delivery and receipt.

In light of the foregoing, Petitioner's failure to comply with his apparent need to file a Form AR-11 (Change of Address Card), does not detract from the fact that the DHS failed to serve notice of appeal on him, and as such, induced a situation where Petitioner relaxed his anticipation of further proceedings in the matter.[19]  Thus, since affirmative evidence available on the face of record confirm non-delivery[20] and/or improper delivery,[21] there exists conclusive rebuttal of the presumption of delivery.  As such, the BIA should have reopened the proceedings and afforded Petitioner the opportunity to be heard on the

---

[19]  The BIA makes the convoluted argument in its denial that Mr. Enwonwu must somehow make a change of address request via Form AR-11 (which is used exclusively with BCIS) even though all *judicial* matters have a *separate* change of address form an alien must use, namely, FORM EOIR-33(c), which may only be submitted to the EOIR or BIA.  Because Mr. Enwonwu reasonably (if erroneously) thought Judge Shapiro's Order for Deferral of Removal under CAT was *not* appealed, he had no duty to submit EOIR-33(c) change of address forms with either administrative court!  As previously stated, Petitioner did comply with the *administrative* change of address submissions when he annually visited the local BCIS office to renew his EAD.  A BCIS officer would prompt Mr. Enwonwu for his latest address during each visit and enter any changes as appropriate.

[20]  See Salta v. DHS, 314 F.3d 1076 (9th Cir. 2002).

[21]  See Adeyemo v. Ashcroft, 383 F.3d 558 (7th Cir. 2004).

merits. See Matter of Grijalva, 21 I&N. Dec. 27, 37 (BIA 1995).

It remains to be said that it was ruled in United States v. Jauregui, 314 F.3d 961

(8th Cir. 2003), that:

> "[Petitioner] is entitled to the due process protections of the Fifth
> Amendment while he is in the United States and before an order of
> deportation is entered. Chew v. Colding, 344 U.S. 590, 596 (1953). In
> the context of an administrative deportation hearing, those protections
> include the right to demand the filing of written notice, obtain legal
> representation, examine the evidence against him, present evidence, cross
> examine the government's witnesses, appeal the immigration judge's
> decision to the Board of Immigration Appeals, and challenge the
> constitutionality of removal procedures and standards. 8 U.S.C. § 1229(a);
> see also United States v. Sentamu, 212 F.3d 127, 131 (2nd Cir. 2000)
> (detailing removal procedure)."

Petitioner therefore prays that he be afforded this right that had been denied by the

BIA, so that his case can hereafter be reviewed by this Honorable Court on its merits.


**2.    SUBSTANTIVE DUE PROCESS VIOLATIONS**

Petitioner was a government informant for the DEA and DHS. Under 8 U.S.C.

§1231(b)(3)(A), "the Attorney General may not remove an alien to a country if the

Attorney General decides that the alien's life or freedom would be threatened in that

country because of an alien's race, religion, nationality, membership in a particular social

group, or political opinion." Although 8 U.S.C. §1231(b)(3)(b) carves out an exception

to this statutory prohibition against removal[22], Mr. Enwonwu's straightforward argument

---

[22] Under 8 U.S.C. §1231(b)(3)(b), an alien who has "been convicted by a final judgment of
a particularly serious crime [is thus] a danger to the community of the United States."
Judge Shapiro had already previously deemed Mr. Enwonwu's single drug importation
conviction a "particularly serious crime" as arguably interpreted under §1231(b)(3)(B)(ii).
Other immigration judges have held contrary views based on similar sets of facts, to wit:

is that his unique situation is one in which the *Constitution*, and **not** the *statutory* prohibitions, directly apply.  See Munger v. City of Glasgow Police Dept., 227 F.3d 1082 (9th Cir. 2000) (adhering to the "danger-creation" exception); Rosciano v. Sonchik, U.S. Dist. LEXIS 25419 (D. Arizona, 2002) (application of prohibition of removal on constitutional grounds for confidential informants); See generally, Evans v. Avery, 100 F.3d 1033 (1st Cir., 1996) (substantive due process violation when government is both indifferent and its conduct shocks the conscience).

If the DHS were to remove Mr. Enwonwu to Nigeria, it would be placing him in a position more dangerous that it found him, and the Constitution prohibits this.  Here, the DEA ran a sting operation in order to place the Petitioner in a position in which he would cooperate.  Second, the DEA and subsequently the DHS refused to assist Petitioner in his effort to ensure that he would not be removed, even though these agencies knew he would be at a high risk.  Third, the DHS is actively trying to remove him, in spite of the known danger to Petitioner.  Rosciano, at *12-*13.  In sum, the DHS is indifferent to Mr. Enwonwu's desperate plight and the mere thought that they would send him to a torturous

Petitioner's full cooperation after his arrest; his reduced sentence compared to the sentence he could have received, and the extent of the cooperation indicating he was a changed man who was not a danger to the community. Mr. Enwonwu clearly fits *all* of these important categories. Unfortunately, Judge Shapiro did not view §1231(b)(3)(B)(ii) in a similar light, only adding to the subjective interpretation of this critical aspect of the law.

and likely death clearly shocks the conscience.

### E.    JUDGE SHAPIRO RIGHTLY GRANTED PETITIONER A DEFERRAL OF REMOVAL PURSUANT TO CAT

INA §241(b)(3) and 8 U.S.C. 1231(b)(3) provision for deferral of removal state that: *"the Attorney General may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion."*

Judge Shapiro granted Petitioner deferral from removal pursuant to CAT because: (1) he found the Petitioner had satisfied his burden to show that the Nigerian government would harm him; (2) he found the Petitioner truthful and convincing; (3) he believed that the DEA indeed had promised the Petitioner a true sanctuary from Nigerian authorities; and (4) was convinced that Petitioner merited relief due to the totality of the circumstances.

In sum, Judge Shapiro recognized that deporting Petitioner to Nigeria was synonymous to imposing a death sentence since those he helped prosecute would have ordered his death, as a "deterrent" to others who cooperate with the U.S. authorities. He also recognized the true scope of the level of abuse of civil rights and corruption prevalent in Nigeria and the increased likelihood that torture or other form of physical harm would await Mr. Enwonwu upon his forced return.

The Petitioner would add that nothing has changed for the better in Nigeria. To the contrary, the continued enforcement of Decree No. 33, supra, at 9, assures that Petitioner

24

upon being deported to Nigeria will be arrested, indefinitely detained under inhuman

conditions such as denial of basic toilet facilities, starvation, extortion from prison guards,

denial of food and his medications, and subsequently convicted and sentenced to a

mandatory term of five (5) years without the option of a fine. See the Nigerian Report on

Human Rights Practices (hereinafter "The Nigerian Report"), issued by the U.S.

Department of State on February 23, 2001,[23] *cited with approval* in Bankhole v. DHS,

306 F.Supp. 2d 185 (D. Conn. 2003) (Conviction of [an American] drug offense within

the meaning of Decree 33 would subject alien to torture and imprisonment upon return to

Nigeria, thereby validating conferral of a CAT claim); see also McDaniel v. INS, 142

F.Supp.2d 219, 223 (D. Conn. 2001); and the concurring/dissenting opinion of panel

member Rosenberg in In re M-B-A, 23 I&N Dec. 474 (BIA 2002), which equally defined

the standard of proof for application of the CAT to be that of the "more likely than not"

standard provided in 8 C.F.R. §208.16(c)(2) (2002).

---

[23] The Nigerian Report provides, in relevant part: "Prison and detention conditions remained harsh and life threatening ... Lack of potable water, inadequate sewage facilities, and severe overcrowding resulted in unhealthy and dangerous sanitary conditions. Disease was pervasive ... inmates had to provide their own food [and] only those with money or whose relatives brought food regularly had sufficient food ... many inmates were forced to sleep on concrete floors, often without a blanket ... prison officials, police, and security forces often denied inmates food and medical treatment as a form of punishment or to extort money from them. Harsh conditions and denial of proper medical treatment contributed to the deaths in detention of numerous prisoners. A reputable human rights organization estimated ... that at least one inmate died per day in the Kiri Kiri prison in Lagos [the economic capital] alone. According to the same nongovernmental organization, dead inmates promptly are buried in mass graves on the prison compounds, usually without their families having been notified. Although the Constitution of Nigeria prohibits torture and mistreatment of prisoners, police and security forces regularly beat detainees and convicted prisoners."

The irony is that Petitioner in all likelihood may not even survive long enough to be put on trial so as to be sentenced, because the various persons he earlier aided the U.S. law enforcement agencies convict will be waiting for him. The wealth of the drug lords will be used to bribe the already corrupt guards to turn a blind eye as Petitioner's life is minute by minute, very slowly, deliberately and painstakingly stifled out of him, so as to serve as an example to others.

Nigeria, a common law country and former British colony, apart from requiring proof to enforce a foreign judgment, equally recognizes the doctrine that no country shall be a tax gatherer for another. Yet, Nigeria pretends to seek to dissuade drug trafficking by promising to impose imprisonment on grounds that can hardly be substantiated. Clearly, the purpose of Decree No. 33 is not to protect the rest of the world. Rather, the decree was designed by the ruling military government to deter any persons who failed in delivering the goods to the agreed recipients, as upon return to Nigeria, the long arm of the drug lords will be ready and waiting.[24]

To the average U.S. citizen, members of the military are very honorable persons who have dedicated their lives to the service of their country. However, the Nigerian armed forces constitute a different breed. They took over the Nigerian government by the force, looted the treasury, dismantled the rule of law, and destroyed any other remaining fabric of a normal society.[25]

---

[24]    If the purpose of Decree No. 33 is to deter drug smuggling, then Nigeria would begin by policing its boarders to ensure that a product it does not produce is not brought into its shores, what more exported elsewhere.

[25]    While Nigeria portends democracy, it remains a fact that President Olusegun

26

Determined to continue enforcement of Decree No. 33, a judge of the Nigerian Federal High Court, (equivalent of the U.S. District Court) has ruled that Decree No. 33 *"does not portend double jeopardy."* Relying on this ruling the present government of President Olusegun Obasanjo had intensified enforcement of Decree No. 33. See In re M-B-A, supra, at 23.

## CONCLUSION

For the foregoing reasons, Petitioner respectfully urges this Honorable Court to ALLOW his Petition for Writ of Habeas Corpus, ORDER his immediate release from detention, and ALLOW all of his remaining prayers for relief.

---

Obasanjo (the Nigerian military Head of State up to 1979 when he retired as a Lieutenant General) was elected into office as a compromise candidate. He was expected to keep the military in their barracks while the country attempted to find its way out of the maze of corruption imposed by years military rule (for which he contributed during his prior days in uniform).

## PRAYER FOR RELIEF

**WHEREFORE,** Petitioner, FRANK IGWEBUIKE ENWONWU, prays that this Honorable Court grant the following forms of relief:

1) Assume jurisdiction over this matter;

2) GRANT Petitioner Writ of Habeas Corpus directing the Respondents to immediately release the Petitioner from custody;

3) ENJOIN and/or Order Respondents to REFRAIN from transferring the Petitioner out of the jurisdiction of ICE Boston District Director during the pendency of these proceedings and while Petitioner remains in Respondents' custody;

4) ORDER Respondents to produce the Record of Proceedings before Judge Shapiro at the Immigration Court pursuant to which Petitioner was granted deferral of removal under CAT on December 16, 1999, within the time allowed under 28 U.S.C. §2243;

5) ORDER Respondents to produce the record of the proceedings before the BIA pursuant to which the earlier Order entered by Judge Leonard Shapiro aforesaid granting Petitioner deferral of removal was vacated, within the time allowed under 28 U.S.C. §2243;

6) ORDER Respondents to produce any and all files maintained by the Department of Homeland Security in the name of the Petitioner, FRANK IGWEBUIKE ENWONWU, within the time allowed under 28 U.S.C. §2243;

7) ORDER Respondents to produce and return to Petitioner his now expired Nigerian passport;

28

8)    GRANT Petitioner bail/conditional release during the pendency of these proceedings upon such terms as this Honorable Court shall deem fit and proper;

9)    GRANT any other and/or further relief which this Honorable Court deems just and proper.

Respectfully submitted,
FRANK IGWEBUIKE ENWONWU,

By his attorney,

Robert B. Carmel-Montes, Esq.
The Carmel Law Group
One Center Plaza, Suite 240
Boston, MA  02108
Tel. 617.227.6355
BBO#: 639476

DATED:    3. 17. 05

29