## AFFIDAVIT OF FRANK I. ENWONWU

I, Frank I. Enwonwu, hereby depose as follows:

1. I am a national and citizen of Nigeria.

2. On or about January 1, 1986 I met Charles, a Lieutenant in the Nigerian Army at the Durbar Hotel in Lagos, Nigeria.

3. I initially arrived at the Durbar Hotel to meet some friends who were celebrating New Year's festivities there.

4. I bumped into my friend Oriwo Irazebor ("Oriwo") at the hotel.

5. I remember Oriwo was from Aba, Nigeria, but I had last seen him ten years ago (1976) in Lagos soon after I had initially returned from studying in the United States.

6. At some point during the festivities, Oriwo took me up to Charles' hotel suite where the latter was staying with his wife and daughter.

7. He introduced me to Charles as a friend who had studied in the United States.

8. Charles took particular interest in me since I had spent four years studying in the United States (1972-1976). I had last studied at Tufts University in Medford, Massachusetts.

9. He told me he was planning to visit the United States but was interested in going with someone who knew the country.

10. I told him that I used to live there and had last visited in 1980. I further explained that I had a valid multiple-entry visa which did not expire until 1988.

11. He was excited about my immediate ability to travel there, and I in turn was pleased to know his interest since the economic situation in Nigeria at the time was particularly tough for me.

12. I had just lost my job at my brother's hotel where I had served as a public relations manager for the past five years.

13. My difficulties were further compounded by marital problems I was experiencing at the time. My wife and I had separated and she had moved in with her parents (at our hometown of Onitsha) along with our three children.

14. The military was in firm control of my country and its members amassed fortunes by enriching themselves. As such, it seemed fortuitous for me at the time to know someone like Lieutenant Charles.

1

15. When Charles proposed to me the very first meeting I met him that he would pay for my round-trip travel to the United States if I just showed him around I was flattered and thrilled at the same time.

16. We became instant friends and remained in frequent contact during that first week.

17. By January 15, 1986, Charles had bought my airfare to Boston, Massachusetts for travel on January 19, 1986.

18. During those first two weeks of that year, I remember accompanying him to many places within Nigeria and visited what turned out to be a lot of drug dealers even though I did not connect the dots at the time.

19. On the eve of the day we were supposed to travel, I recall seeing some Americans at the Durbar Hotel that had recently arrived from Europe. Some were white and one was black.

20. On or about January 19, 1986, at about two hours before flight time -- we were still located at a place Charles and I had visited various times over the previous two weeks. We had arrived in my car as we had on all other previous occasions, since Charles had always asked that we use my vehicle.

21. I recall seeing at least ten other people there and all of these individuals were inserting small packaged materials up their rectum to conceal from detection.

22. Charles approached me, gave me some identical packages, and asked that I do the same. I was shocked and appalled by what was happening, let alone by what I had to do.

23. It was then that I finally realized what I was about to get myself into and I became nervous.

24. I had never done any criminal misdeed and yet all I could think was that there was no turning back now, especially since I was returning to the United States in search of a better life for my estranged family. Besides, I did not want to find out what Charles or anyone else would do if I backed out now.

25. Although I did not know the contents of the materials I inserted in my body, I quickly suspected that it was a controlled substance and that I was apparently recruited for the trip as a courier.

26. Everything was happening suddenly, but I remember Charles handing me $300.00 and a slip of paper with a phone number written in it. He told me to place a call to that number upon my arrival so that I could collect $5000.00 for my troubles.

27. It was at this moment that I also realized that he was not making the trip. It was also at this time that a combination of factors, to wit: my desperate state of financial affairs,

2

the prospect of instantly making a significant amount of money, and the immediacy of the flight -- clouded my judgment and got the better of me.

28. My trip was, suffice to say, uncomfortable. When I arrived at Logan Airport in Boston, Massachusetts, I cleared immigration.

29. However, I did not succeed in clearing Customs. They had asked me to enter and wait in a separate room away from public view.

30. When I entered I saw another Nigerian who had traveled on the same flight and he was visibly upset. I did not recognize him as one of the fellows that departed with me.

31. I was strip-searched and was asked why there was blood in my underwear.

32. Nervously, I told the officers that I suffered from Hemorrhoids, which, although true, was exacerbated by the foreign objects inside me.

33. The officers remained unconvinced and took both the other Nigerian passenger and myself to Winthrop Hospital for observation.

34. While at the hospital, I underwent x-rays which revealed the small packages inside my body.

35. The other suspect was apparently a student who turned out clean and was understandably upset at the treatment he was afforded by these officials.

36. I was induced to pass off the two packages and they were recovered and analyzed by the authorities.

37. They arrested me on suspicion of drug trafficking, seized my passport, and brought me back to the airport. On the ride back, all I could think of was how stupid I had been to trust Charles and how mad I was at him for tricking me into this difficult situation.

38. When I arrived, two agents were waiting for me and identified themselves as belonging to the Drug Enforcement Administration ("DEA"). One of them was named Herbert Lemon ("Agent Lemon").

39. He informed me that they had already run a background check on me and had not detected any suspicious behavior on my past trips to the United States. He also informed me that I had committed a very serious crime and I concurred.

40. I willingly shared my story with Agent Lemon, not only explaining that I had never previously violated the law, but also how Charles had lured me into following through with this illegal act.

41. I explained how Charles was a military officer who had recently befriended me and had arranged for this trip without my immediate knowledge.

3

42. Agent Lemon candidly told me that if my story turned out to be true, that the United States government would protect me from him and his confederates and that I would be able to remain in this country, avoid prosecution, and not be sent back to Nigeria.

43. He also said that if I lied to him then I would be wasting everybody's time and there would be no deal for me.

44. He further added that if I cooperated and my participation turned out to be truthful and reliable, that I would "get paid very handsomely for this job … so if you want to be truthful to me, I will make sure you are protected and won't go to jail … and we will keep you in this country."

45. After listening to Agent Lemon's offer I immediately accepted. There simply was no viable option at this stressful time but to move forward given my dire situation. I distinctly remember that it was now around 11:00 p.m. EST and that's when I gave him Charles' phone number at the Durbar Hotel in Lagos, Nigeria.

46. Agent Lemon promptly dialed the number and instructed me to tell Charles that I arrived in Boston safely.

47. It was now around 4:00 a.m. in Nigeria, and a sleepy-sounding Charles answered the phone. I repeated what Agent Lemon had told me to say.

48. Agent Lemon and his partner were in another room and were eavesdropping on our conversation.

49. I recall Charles telling me to call him the next morning so that he could arrange for some men to come from New York to pick up the packages. I agreed to call him at 10:00 a.m. EST and that in the meantime I would find a hotel room to stay for the night.

50. Agent Lemon and his partner were visibly happy at the prospect that Charles took the bait, since it proved that I was credible and furthermore that their investigation could branch out to other individuals which in turn could possibly lead to other unidentified members of the ongoing conspiracy.

51. Agent Lemon then drove me to the Holiday Inn located on Cambridge Street in Boston. He checked me into a room and placed me under the watch of other DEA agents. He and others then occupied a suite opposite from mine. I estimated that there were about 7-10 officers working there at any one time, and their room was loaded with electronic gadgetry.

52. At about 10:00 a.m. EST -- the established calling time -- Agent Lemon and his men instructed me to contact Charles.

53. I established contact with Charles and he told me that he would have two of his New York contacts come up to see me and pay me for the packages I had brought.

4

54. Agent Lemon gave me a phone number to give to Charles and the latter agreed to have his men contact me within an hour.

55. The DEA then brought me back to my hotel room and kept me there handcuffed to an officer assigned to keep an eye on me.

56. Within an hour, an unidentified male claiming to be one of the men sent by Charles then called the number I had given. He told me he would be in Boston the next morning and instructed me to meet him at noon at a coffee shop located not to far from the hotel I was staying in. Unfortunately, I do not recall the name of it right now. I briefly gave him my physical description and what I was wearing (a blue shirt) so that he could better recognize me when we met.

57. Shortly before noon, a stunningly beautiful black woman was brought into my hotel room by the DEA. They introduced us and I was told that she worked for them and was going to accompany me when I met the New York people.

58. The DEA told me to say that she was an old classmate and friend of mine and that I was staying with her.

59. They further instructed me that she was going to drive the car and that I was to emerge from the front passenger seat and walk by myself into the coffee shop to meet the contact persons.

60. I was to tell these people that "the stuff is in the care" and bring them to the vehicle.

61. The DEA further warned me not to do anything stupid since there were many participating law enforcement officers nearby and that they would be watching my every move.

62. I nevertheless realized that they were gradually beginning to trust me by virtue of the fact that I was not handcuffed now or otherwise sitting in a jail cell and instead allowed to partake in this sting operation.

63. I arrived at the coffee shop in a White Ford Mustang driven by my female companion.

64. She left the car idling while I stepped inside the establishment. I recall seeing someone gesture towards me when I entered. I approached the table where two men were sitting and identified myself. I could tell from their physical appearance that these individuals were African.

65. I told them that the stuff was in my girl's car which was parked outside. They followed me out of the establishment and we got inside the car. Specifically, I sat in the front passenger bucket seat and the two African men sat in the back seat.

66. The female agent accompanying me then engaged the men in conversation and told them that we would like to arrange future deals with them, but at an increased rate of

5

compensation. She whipped out the two packages from within the car and gave them to one of the men.

67. One of the packages had a noticeable tear (presumably from a DEA analysis of its contents) and one of the African individuals became curious and seemingly concerned.

68. He claimed that someone had tampered with the package and I had to come up with a quick response since the situation was about to rapidly turn for the worse.

69. Before I could think of anything to say, we were swarmed by many officers who had pounced on our location.

70. They emerged from surrounding vehicles with their weapons drawn and ordered all of the occupants in our car to come out with their hands up.

71. I complied, pretending to be unaware of the sting operation just conducted. They separated me, the two African men, and presumably the female officer. One of the African men apparently had a firearm but wisely put it down when he realized the futility of the situation.

72. Before long I was back at the hotel room and debriefed me. That night, Agent Lemon then told me I had to talk to someone in Ohio. He instructed me to tell that individual that I have refused to release the drugs unless given more money. He told me to tell this individual that I was now asking $10,000.00 -- double the original $5,000.00 payment.

73. I thought to myself that this would surely enrage that individual and that word of my "greed" would eventually reach Charles. I felt good about this at the time because I wanted to get back to him for what he did to me. Also, I thought that Agent Lemon was going to follow up on his deal not to return me to Nigeria so I felt comfortable with moving forward on the latest request by the DEA.

74. I soon found out that the man in Ohio employed was the men sent from New York. I knew this because Agent Lemon told me that those two African men had confessed as much and were beginning to cooperate with the ongoing DEA investigation.

75. The man from Ohio then confirmed my worst suspicions when he told me that I was blowing my first test by being so greedy on the first deal in the drug business. I soon ended our conversation after Agent instructed me to tell him I would call him the next day.

76. The next day I spoke to that man again, and, even though he sounded upset, feigned compromise on my demand by offering $8,000.00 for the packages. I refused his latest offer and this seemed to infuriate him even more.

77. He became belligerent and was in the middle of a threatening tirade when I heard a commotion on his end of the line and then line suddenly went dead. I believe that he

6

was arrested on the spot just as he was talking to me over the phone.

78. Agent Lemon was very pleased with my performance so far and reassured me yet again that if I continued to follow their instructions then everything would work out as promised. They recognized that I had always been truthful and had further risked life and limb to ensure the continuity of their investigation.

79. I was happy about the fact that our new marriage of convenience was working out. I had played an important role in helping with the arrest of a drug kingpin in Ohio and his two henchmen from New York. I ultimately knew that these men were going away for a long time as a result of my cooperation.

80. Agent Lemon then told me that I would be set free within 1-2 weeks. In the meantime, I had to be placed in a police lock-up facility for the weekend.

81. The next Monday, I was taken to the Lawrence jail in Lawrence, Massachusetts. Their prisoner log should confirm my presence there.

82. Unbeknownst to me, I was eventually taken to the Federal Court and arraigned on two counts. This was not part of the deal I had with the DEA but the situation was clearly beyond my control. See Petition, Exhibits 1-3.

83. Attorney Owen Walker ("Attorney Walker") from the Federal Public Defender's office was appointed to represent me and we appeared before the Hon. Magistrate Joyce Alexander.[1]

84. Attorney Walker instructed me to plead "Not Guilty" when prompted by the court. He further told me that he was in the process of cobbling together an arrangement with the government in which the latter would agree to stipulate to my pre-trial release.

85. This latest news was the boost that kept my hopes up for immediate release and a chance to reclaim my life. I felt that the DEA, the government and my attorney were all on the same page and looking out for my best interests.

86. Again, I had never ever had any criminal case prior to this series of events and did everything that was asked of me.

87. Sometime before my release, I recall being taken to a DEA office and asked to fill out certain documents. I was also requested to answer questions about the people I saw in the company of Charles during the short time he had befriended me.

---

[1] My current attorney has informed me that Attorney Walker still works at the Federal Public Defender's office! However, he is currently on leave and his return status remains uncertain.

7

88. It was clear to me that the DEA had begun to cast a wider net in their investigation that stretched as far away as my Nigeria. This reinforced my concern that my life would be in jeopardy if I ever returned to my native country.

89. I also realized then that my friend Oriwo who had introduced me to Charles was part of that organization and that he knew my entire family dating back to our younger days.[2]

90. Yet, there was no turning back for me and I had to continue my cooperative agreement with the U.S. government since I truly believed they would honor their end of the bargain.

91. During the days prior to my pretrial release, the DEA would make it clear (after each trip back from their office to the jail) that my cooperation was confidential and that I should refrain from speaking about this with any other inmate.

92. On or about February 2, 1986 -- my birthday -- Attorney Walker told me that the Court would set me free if I could demonstrate that I had someone I could stay with in Massachusetts.

93. I tracked down Douglas Clott ("Doug"), an old friend I knew from my days at Tufts University. I did a telephone directory search and found out he lived at 44 Bigelow Street in Cambridge, Massachusetts.

94. Doug was very excited to hear from me after such a long time. I told him my story and gave him Attorney Walker's contact information. He promised to reach him and offer his domicile and patronage to help secure my release. Attorney Walker forwarded this information to the government and the Court.

95. On or about February 5, 1986, Magistrate Judge Alexander issued an Order allowing for my pretrial release. The Court reasoned as follows: "After consideration of he defendant's family ties, financial resources, health, and lack of a prior record, the defendant be released into the custody of Mr. Douglass [sic] Clott ..." See Petition, Exhibit 4.

96. The court instinctively knew about my arrangement with the government since the latter had assented to my release -- a generous treatment not afforded to many defendants.

97. In fact, I had no family ties in the United States at the time. I was also flat broke and therefore devoid of the "financial resources" the court had just elucidated. Clearly, the

---

[2] The Enwonwu family name is well known in Nigeria, principally as a result of my uncle, Ben Enwonwu. He is a famous artist credited with having made some of the better-known works of art in Nigeria as well as the statue of the Queen of England in London.

8

government had made these representations to the court despite their glaring inaccuracies. See Petition, Exhibit 4.

98. I stayed with Doug at his Cambridge residence. He was very supportive and hospitable, especially in light of the fact that he was recently married (to a college classmate) and I felt like a burden to their fledgling relationship.

99. Doug owned a printing company on "D" Street in South Boston and let me come in to do some work (filing) for him before I would go to court to report on a periodic basis.

100. I lived with Doug and his wife up until my case was resolved.[3] See Petition, Exhibit 5.

101. I recall meeting with a probation officer who reviewed the conditions of my release as per the contract I had to sign. See Petition, Exhibit 6.

102. One of the conditions apparently was that I could not serve as an informant. See Petition, Exhibit 6.

103. Agent Lemon nevertheless continued our professional relationship and took care of my immediate financial needs by paying me a sum of $200.00 in cash on at least three (3) separate occasions.

104. He further increased my exposure by introducing me to law enforcement officers from the Immigration and Naturalization Service ("INS").

105. Since the DEA and INS offices were (and still are) in the same building (John F. Kennedy Federal Building at Government Center), I was introduced to some of the senior law enforcement officers there.

106. Agent Lemon told me that the INS would issue me a temporary work authorization document and help me find a job. I was further told that I would be eligible for permanent residence and instructed to fill out the proper form.[4] All of this was offered to me despite the fact that I already had a prior voluntary departure order from the INS in 1976 and an apparent felony conviction in 1986! See Petition, Exhibit 7.

107. A higher-ranking INS officer introduced me to a fellow officer who I had to initially report to on a weekly basis. That officer was also in charge of helping me find a job.

---

[3] As far as I was concerned at the time, my case was dismissed since the Government had dropped the trafficking count and recommended a suspended sentence that assured my immediate freedom.

[4] Form I-485 is the one used for "Adjustment of Status". Since I was a non-immigrant when I last arrived into the United States, I needed to complete and seek approval of this form in order to adjust to an "Immigrant" status and obtain my permanent residency.

9

108. He asked me what I wanted to do. Since I had driven a taxi cab in Cambridge during my school days (circa 1973), I decided to pursue that kind of job again.

109. He said that my choice was acceptable and soon arranged for me to meet with a Captain Devine over at the Boston Police Department's ("BPD") Hackney Division on Berkley Street. See Petition, Exhibit 7.

110. They must have been expecting me over at the BPD because Captain Devine greeted me and instructed a junior officer to immediately process my permit.

111. I was ecstatic at my good fortune, especially because hackney licenses are not issued to individuals with prior criminal records and I had a felony resulting from my federal drug conviction!

112. The only possible way I could have cleared this impossible hurdle was with the blessing and patronage of the INS.

113. I now had two jobs. One was as a cab driver in Boston and the other was as an informant for the government.

114. The INS officer I was reporting to started assigning me cases. He first showed me photographs of six (6) African nationals they were trying to find for further questioning and possible arrest.

115. He gave me some partial addresses for some and not for others. Suffice to say, his assignment was not easy, but I was able to find one of these individuals at the taxi pool at Logan Airport -- ironically the same place I was arrested at months before! I continued to produce monthly reports for him and as part of my ongoing cooperation.

116. I was now well grounded as an informant for *both* the DEA and the INS. I received weekly calls from the DEA in which they periodically asked for information pertaining to their own investigations. In turn, they continued to compensate me to the tune of $200.00 a month.

117. They even gave me a hotline number to call if I suspected anyone was trying to harm me. I used it once when I thought someone was following me and Agent Lemon answered the number I dialed. I soon realized I may have been paranoid and we agreed it was a false alarm.

118. On or about May 1986, I moved from Doug's house and found a place of my own in Quincy, Massachusetts.

119. On or about June, 1986, the INS officer I was also reporting to gave me forms to fill out to process my work authorization card.

120. In the meantime, I was also periodically reporting to my probation officer. I had to report all of my sources of income, and I honestly included the monies given to me by

the DEA.

121. On or about August 1986, the probation officer became concerned at the increased amount of money I was making and asked me to corroborate my sources of income.

122. I told him about my earnings as a cab driver and I also told him about the money I was getting from the government for my assistance. I believe I happened to be paid $400.00 that month by the government agents.

123. The officer expressed surprise and kindly told me to cease my activities as a confidential informant since the probation contract specifically prohibited such conduct and he would report my violation to the court if I continued. He also warned me that these government agencies sometimes use people who are on probation even though it runs contrary to the binding agreements signed by people like myself.

124. I obviously did not want to lose my hard-won freedom and quickly agreed to comply. By doing so however, I would be forced to withdraw from my ongoing relationship with the DEA and the INS. I had no choice to comply especially now that it was out in the open.

125. I managed to keep in touch with Attorney Walker, who promised to help me obtain my green card despite this recent development.

126. I figured I would no longer receive the red carpet treatment from the government if I ceased to continue my work as a confidential informant. In the short term, I did not need their handouts since I was making a decent living driving cabs.

127. I stopped my cooperation with the government per the instructions of my probation officer. As a result, and unbeknownst to me, the INS prepared a "Voluntary Departure" administrative order for me apparently allowing me to leave without penalty by the end of the year.

128. Meanwhile, I was trying to retrieve my previously seized passport from the DEA but nobody seemed to know where it ended up.

129. I remained in the United States still thinking that the government was at peace with the fact that I was no longer serving as their informant.

130. On or about 1988, I tried to apply for an immigration amnesty but recall that I could not do so without my passport information.

131. On or about 1991 I usefully completed the terms of my probation. The probation officer suggested I go back to the INS and petition for my green card. I memorialized this request by writing to them but received no reply.

132. I stayed away and continued with my life here in Massachusetts.

11

133. On or about June 6, 1997 I decided to visit the INS at the behest of the Social Security Administration ("SSA") since I needed to adjust my status in order to qualify for disability benefits.

134. When I arrived there and made inquiries, was told by an information officer to hold on. Shortly thereafter, INS officers arrived and detained me. The INS then immediately initiated deportation proceedings against me. See Petition, Exhibit 8.

135. My attorney at the time, John Udo, made a Freedom of Information Act ("FOIA") petition. He forwarded me a copy of my file and it was only then that I was first able to look at the court documents dating back to my 1986 conviction.

136. Although almost a decade had transpired since my conviction, I knew that the individuals arrested and convicted as a result of my participation were either still confined in the United States or deported back to Nigeria.

137. I came to the chilling realization that my life was now in danger since I stood a realistic chance of being forcibly returned to my native country. These fellows and/or their confederates would inevitably know that I would be sent back into their waiting clutches and the worst would then become a reality.

138. I contacted Attorney Udo and pleaded with him to contact the DEA and inform them that the INS was trying to deport me in contravention of the deal I had with the former.

139. Attorney Udo was able to contact Agent Lemon, but he initially hesitated to deal with my attorney.

140. My sister Adeline Amazu -- who was briefly here in 1986 and had met Agent Lemon a the time of my court case -- met with him once again and relayed my insistence that the DEA keep their end of the bargain struck almost 10 years earlier.

141. After a flurry of additional meetings between Attorney Udo and Agent Lemon -- who I believe was now a high-ranking member of the DEA -- the latter agreed to contact his superiors and the INS to discuss the probability of issuing me an "S" visa (which is reserved for government informants).

142. Agent Lemon contacted Matthew D'Angelo, the Assistant Chief Counsel ("Attorney D'Angelo") prosecuting my case at the time,[5] to jointly request additional time with Attorney Udo at the next EOIR hearing so that the government could further explore this new effort on my behalf.

---

[5] My present attorney informed me that this individual is now an Immigration Judge serving at the Executive Office for Immigration Review ("EOIR") in Hartford, Connecticut.

143. Judge Leonard Shapiro ("Judge Shapiro") presided over my deportation proceedings and agreed to postpone the case for one month until August 28, 1997 in order for the DEA to procure this type of visa and terminate my deportation proceedings. <u>See</u> Petition, Exhibit 9.

144. On or about August 12, 1997, the DEA dispatched an agent by the name of Tony Pettigrew ("Agent Pettigrew") to interview me for the "S" visa. At the time I was in custody at the Hillsborough County Jail in Manchester, New Hampshire ("Hillsborough)".

145. He was a very inhospitable man but I had no choice than to deal with him. He informed me that I better have some very current and reliable information for him that he could take back to Agent Lemon.

146. I gave Agent Pettigrew information on a very good source that I learned about while in custody at Hillsborough. He was satisfied with my latest cooperation and returned back to Boston.

147. I eventually learned (long after my immigration court hearings) that they used this information which I gathered at great peril to arrest and convict another individual.

148. They reneged yet again to help me out as evinced by Attorney D'Angelo's open court assertions (at the subsequent hearing) that the government refused to issue me an "S" visa and therefore was continuing with its prosecution.

149. On or about August 28, 1997, Judge Shapiro ordered my removal from the United States siding with Attorney D'Angelos erroneous contention that did not qualify for any legal form of relief. I appealed my decision. <u>See</u> Petition, Exhibit 10.

150. While my appeal was pending, I wrote numerous letters to both the DEA and the INS pleading with them to remember their promises and reminding them that my life was at stake. My letter went unanswered.

151. On or about October 1997, I was moved to a correctional facility in Panama City, Florida. I spent nine (9) months incarcerated there before learning that the Board of Immigration Appeals ("BIA") had denied my appeal.

152. I filed a motion asking the BIA to consider my request for relief under the Convention Against Torture ("CAT"). <u>See</u> Petition, Exhibit 11. The BIA subsequently ruled on my motion. <u>See</u> Petition, Exhibit 12.

153. On or about July, 1998, I was subsequently moved to the Krome Detention Facility ("Krome") in Miami, Florida.

154. While at Krome, I filed a Writ of Habeas Corpus Petition to complain about the government's betrayal. My case was denied for lack of jurisdiction. <u>See</u> Petition, Exhibit 13.

13

155. During the time I spent at Krome, I single-handedly inaugurated and ran a law library for detainees. I established and published a newsletter entitled "the Krome".

156. On or about January 1999, a correspondent from the Boston Globe by the name of Teresa Mears went down to Krome and interviewed me. See Petition, Exhibit 14.

157. On or about February 14, 1999, her article appeared in the Boston Sunday Globe and shed light on my plight and that of other detainees. My photo appeared next to the article.

158. The DEA publicly denied they ever made any promises to me and the INS claimed that they did not discuss individual cases.

159. I wondered whether the publication of my case would get back to Nigeria and remind those whose criminal enterprises I helped wreck about my existence and inevitable return.

160. I had to immediately concentrate on the task at hand and that was the legal crusade I was currently fighting.

161. On or about July 1999 after my motion to reopen was allowed, I was returned to Boston and allowed to pursue my CAT claim before the EOIR once again before Judge Shapiro.

162. I was once again incarcerated at Hillsborough County Jail.

163. On or about November 20, 1999, the District Director in Boston[6] released me on Parole pending my CAT hearing.

164. On or about December 16, 1999, my new immigration attorney, Anthony Pelino ("Attorney Pelino") subpoenaed Agent Lemon to appear as a witness before the EOIR. See Respondent's Memorandum, Attachment A.

165. Agent Lemon admitted under oath that I had cooperated with the DEA in the arrest and prosecution of various drug dealers with ties to Nigeria. I believe he also testified that he promised to protect me from being forcibly repatriated to my native country.

---

[6] The District Director, Steven Farquharson, was the regional head of the INS in New England. His position was eliminated after the INS was disbanded and reconstituted under the new Department of Homeland Security starting March 1, 2003. If my case were to somehow be reviewed administratively again, I would have no such immediate recourse since all decisions would have to come directly from Washington. Sadly, this "streamlined" approach only offers greater delay and no direct field director who could cut through the red tape.

166. Professor Michael Watts, a professor from U.C. Berkeley[7] who is an expert in Nigerian affairs also testified during my removal proceeding. Specifically, he convincingly and articulately offered testimony about the oppressive human rights situation in Nigeria, especially against those people subject to Decree 33 (additional sentence for those convicted of drug offenses in other countries).

167. I also testified on my behalf. Unfortunately, Judge Shapiro did not place as much weight on my testimony as I thought appropriate.

168. Nevertheless, he concluded after an extensive trial that it was "more likely than not" that I would be subject to torture and/or death if I were deported back to Nigeria, so he granted my CAT claim. See Petition, Exhibit 15.

169. Judge Shapiro strongly believed that I had a deal with the government and that my cooperation was substantiated by Agent Lemon. Furthermore, he also placed a strong emphasis on the professor's testimony and likely based his ruling on a totality of the circumstances favoring my case.

170. I thought I had finally gained a permanent respite from my legal struggle against the government.

171. I tried regaining my life through honest work. I even obtained a Real Estate license. See Petition, Exhibit 16. I even excelled in my new job. See Petition, Exhibit 17.

172. I went to the INS office at Room E-160 of the JFK Federal Building in Boston and even renewed my Work Authorization. See Exhibit A.

173. Back in Nigeria however, my eldest son Francis (who was five years old when I last saw him in 1986) was nearly killed by drug lords in 2000 intent on avenging my betrayal. Fortunately, he escaped serious harm.

174. My other two children there (Christopher and Alexander, ages 3 and 1 respectively when I last saw them in 1986) complained of serious harassment and physical threats as they were growing up.

175. In 2001 I managed to get them to join me in the United States and it was the first time in sixteen (16) years that I was able to reunite with them.

176. In 2002, a cousin of mine who bore a similar resemblance to me by the name of Herbert Enwonwu was brutally murdered as he emerged from a local pub in my hometown. My family and I suspect he was killed by the same group that was looking for me. See Exhibit B.

---

[7] The only way I know to contact Prof. Watts is through his e-mail address, which is:

15

177. In 2004, another cousin of mine named Thomas and his wife Chinwe were savagely murdered on their way home (Onitsha) from Lagos, Nigeria. This was the same cousin whom I stayed with in Lagos (his second house) before meeting Charles at the Durbar Hotel in 1986.

178. I remembered that he met Charles on at least two occasions when I had stopped at the house to change attire. Charles was waiting outside in my car and likely identified the place, marking it for a further eventual "visit".

179. My younger brother Leo Enwonwu -- who is an attorney in Nigeria -- had to abandon a lucrative practice and flee the country after receiving numerous threats to his life. He is now settled with his immediate family in Atlanta, Georgia.

180. On or about September 13, 2004, Leo accompanied me to the Boston's INS office so that I could renew my work authorization card. I was shocked to learn that I was once again being taken into custody because, unbeknownst to me, the INS had successfully appealed my CAT claim and I was apparently ordered removed once again. See Petition, Exhibit 18.

181. The government officers had informed me that Attorney Pelino had been properly served. Yet, Attorney Pelino had moved out to Arizona very shortly after he had won my case and we lost contact. As such, I had no actual knowledge of the government's appeal and their ultimate success.

182. My family hired a third law firm to represent me and participate the latest chapter of my immigration saga.

183. On or about October 9, 2004, Attorney William Joyce, a retired immigration judge now with the firm of Joyce & Zerola, P.C., tried unsuccessfully to reopen my case before the BIA. See Petition, Exhibit 19.

184. On or about February 15, 2005, in a *Per Curiam* decision just one and a half pages long, the BIA denied my motion to reopen stating that my appeal was tardy and that in any event my case was similar to another case in which substantive relief had been denied. See Petition, Exhibit 20.

185. Within days, my family scrambled to find another attorney since they were apparently dissatisfied with the performance of my last advocate.

186. My fourth and current attorney, Robert B. Carmel-Montes ("Attorney Carmel") immediately and timely filed the instant Writ of Habeas Corpus petition to secure my permanent release and prevent my forced deportation back to Nigeria.

187. On or about April 11, 2005, Michael Kunzelman, a reporter from the Associated Press ("AP"), appeared unannounced at my Temporary Restraining Order hearing before this Honorable Court. I learned that he had apparently been trawling the PACER court system, became interested in my case, and independently decided to

appear at my hearing without anyone's prior knowledge.

188. That same evening, a story appeared on the AP news wire and was first published on Boston.com. See Exhibit C.

189. On or about April 12, 2005 a short article did appear in the Boston Globe. The story then appeared at other news sites that same night and the next date, including a web site catering to Nigerians. See Exhibit D.

190. As such, I am concerned about the renewed exposure of my case since more people will learn or remember that I was not only convicted of a drug offense but also that I was a confidential informant.

191. The Nigerian Consul General in New York, Omar Ahmed, is certainly aware of my case and its subsequent coverage. In fact, the Nigerian Ambassador to the United States down in Washington, D.C. is now also aware of my case. As such, I can only fear what would happen to me if I were unceremoniously shipped back to Nigeria and be subjected to Decree 33.

192. A close family friend by the name of George Uduku recently wrote to me and warned me about the dangerous fate awaiting me in Nigeria. See Exhibit E. His identity is confirmed by a very recent article in the Daily Sun, a newspaper published in Nigeria. See Exhibit F.

193. Since my TRO hearing, Attorney Carmel has tried to cobble together my case and sought to obtain my immigration file which is currently at the BIA in Falls Church, Virginia. He already met with Judge Shapiro and reached the Hon. Gutavo Villageliu, who is now the Senior Associate General Counsel for the Office of General Counsel at the EOIR in Virginia. He also reached out to Attorney Pelino, See Exhibit G and Attorney Walker See Exhibit H.

194. However, Judge Shapiro did not immediately recall the particular facts of the case. The Hon. Villageliu has acknowledged but not been able to comply with Attorney Carmel's Request to date despite knowing about my latest deadline.

195. I do know that the U.S. Government has been aware of the danger for me in light of Decree 33 as evinced by information posted on their own web site. See Exhibit I.

196. Lastly, the U.S. State Department has recently released (February 28, 2005) its Country Reports on Human Rights Practices for Nigeria, which objectively bolsters my legitimate claims. See Exhibit J.

Signed under the pains and penalties of perjury,

_____
Frank I. Enwonwu

17

## CERTIFICATES OF SERVICE

I, Robert B. Carmel-Montes, Esq., do hereby certify that I have on this 20th day of April, 2005, served via first-class mail, postage prepaid, a true and accurate copy of the **Affidavit of Frank I. Enwonwu (with attached exhibits)** to:

**Frank Crowley**
**Special Assistant U.S. Attorney**
**Department of Homeland Security**
**P.O. Box 8728**
**JFK Station**
**Boston, MA 02114**

Signed under the pains and penalties of perjury.