UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In The Matter Of The Application Of: )<br>FRANK IGWEBUIKE ENWONWU )<br>            Petitioner, )<br>)<br>v. )<br>)<br>MICHAEL CHERTOFF, Secretary Of )<br>Department Of Homeland Security, )<br>BRUCE CHADBOURNE, Interim Field )<br>Officer Director for Detention and )<br>Removal, Boston Field Office, Bureau )<br>of Immigration and Customs )<br>Enforcement, DEPARTMENT OF )<br>HOMELAND SECURITY, ANDREA J. )<br>CABRAL, Sheriff, Suffolk County House )<br>Of Correction )<br>)<br>            Respondents. )<br>) | CIVIL ACTION FILE NO:<br>05-10511 WGY |

## PETITIONER'S SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF HIS WRIT FOR HABEAS CORPUS RELIEF

### SUMMARY STATEMENT

On April 29, 2005, this Honorable Court allowed the Petitioner and Respondent until May 2, 2005 to submit memorandums of law to address open questions regarding lingering substantive due process issues pertaining to the "state-created danger" as well as the effect current proceedings may have on the outcome of determinations since the case was not sealed. Specifically, this Honorable Court inquired whether or not the DEA-6 form introduced into evidence by the Respondent created a new danger. Lastly, this Honorable Court asked the Petitioner to brief the issue concerning the admissibility of a web page document derived from a government web site.

1

## ARGUMENT

A. **THE GOVERNMENT ASSUMED A DUTY TO PROTECT MR. ENWONWU BY TAKING HIM INTO CUSTODY AND SUBSEQUENTLY CREATED A "STATE-CREATED DANGER" BY TIRELESSLY SEEKING TO DEPORT HIM BACK TO NIGERIA -- A COUNTRY WITH A WELL-DOCUMENTED HISTORY OF FLAGRANT HUMAN RIGHTS ABUSES AND POPULATED BY THOSE SEEKING TO EXTRACT A POUND OF FLESH AFTER LEARNING OF HIS PRIOR PARTICIPATION AS A CONFIDENTIAL INFORMANT FOR THE U.S. GOVERNMENT.**

In considering a motion to dismiss for failure to state a claim, a court must take the allegations in the plaintiff's pleadings as true and must make all inferences in favor of the plaintiff. Rivera v. Rhode Island, 402 F.3d 27, 33 (1st Cir. 2005); see also, Pena-Borrero v. Estremeda, 365 F.3d 7, 11 (1st Cir 2004). The High Court has already held that "It is important ... to focus on the [Petitioner's] allegations describ[ing] the constitutional right[s] at stake." Id., citing Collins v. City of Harker Heights, 503 U.S. 115, 125 (1992). Mr. Enwonwu has already candidly testified about his work on behalf of the Government.[1]

While his testimony fully enjoys the factual acceptance by this Honorable Court for purposes of the Government's prior motion, the following undisputable facts have so far been determined at Mr. Enwonwu's Evidentiary hearing: (1) that his participation as a Confidential Informant was performed at the behest of the Government; (2) that his involvement was at great personal risk; (3) that his participation directly led to the successful investigation, arrest and prosecution of *at least* three Nigerian nationals within

---

[1] The Department of Justice still retains jurisdiction over the Drug Enforcement Administration ("DEA"). It used to control the Immigration and Naturalization Service ("INS") until March 1, 2003, when new legislation re-aligned its functions under the new Department of Homeland Security ("DHS"). Since Mr. Enwonwu worked for *both* the DEA and the INS prior to this reorganization, these agencies shall be collectively grouped and identified as the "Government".

2

the United States during the mid-1980's; (4) that as recently as 1997 he placed his life at risk again by funneling additional information about other Nigerians in the New England area to (DEA) Special Agent Pettigrew during a jailhouse meeting at the Hillsborough County Jail in New Hampshire; (5) that there is some reasonable likelihood that the Nigerians arrested and convicted (i.e. Mr. Brock, Mr. Oguwniran, and the other still-to-be identified gentleman) may directly or through their confederates still seek retribution against Mr. Enwonwu even after all of these years; (6) that he has been held by the Government since September 2004 and that the Government is seeking to deport him back to his native Nigeria; and (7) that the United States Department of State has issued a very recent (February 28, 2005) and stinging report describing the barbaric human rights conditions gripping Nigeria. Thus, the focus properly turns to whether or not the Government would place Mr. Enwonwu in greater danger by seeking his forcible deportation to Nigeria.

The "State-Created Danger" postulate has long since been recognized in our nation's court systems. Bowers v. De Vito, 686 F.2d 616, 618 (7th Cir. 1982) (holding that although "there is no constitutional right to be protected by the state against being murdered by criminals or madmen, ... [i]f the state puts a man in a position of danger from private persons and then fails to protect him, ... it is as much an active tortfeasor as if it had thrown him into a snake pit." (Posner, J.). Our Circuit is also amongst the early pioneers shedding light on the subject. Monahan v. Dorchester Counseling Ctr., Inc. 961 F.2d 987, 993 (1st Cir. 1992) (In a creation of risk situation, where the ultimate harm is caused by a third party, courts must be careful to distinguish between conventional torts and constitutional violations, as well as between state inaction and action); Soto v. Flores,

3

103 F.3d 1056, 1064-65 (1st Cir. 1997) (offering an overview of the development of the state-created danger theory of substantive due process rights).

The Supreme Court weighed in on the subject in the case of DeShaney v. Winnebago County Dept. of Social Servs., 489 U.S. 189, 198-200 (1989). The High Court observed that, absent any claim that the state created the danger, a citizen does not have a constitutional right to be free from the violent acts of third parties, unless the state has restrained the citizen's liberty.[2] Specifically, it acknowledged that in some instances "the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals," id., but that such circumstances were limited to where the state performed an "affirmative act of restraining the individual's freedom to act on his own behalf--- *through incarceration, institutionalization, or other similar restraint of personal liberty*," Id. at 200. (emphasis supplied). The High Court concluded that "it is the State's affirmative act of restraining the individual's freedom to act on his own behalf ... which is the 'deprivation of liberty' triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means." Id.; see also Davis v. Rennie, 264 F.3d 86, 98 (1st Cir. 2001) ("Once the state restrains an individual's liberty, rendering that individual unable to act for himself ... the state does acquire an affirmative duty to

---

[2] The case centered around the custodial transfer of a child by the state's local Department of Social Services to the biological father, who turned out to be commit the ultimate form of abuse by murdering his child. The child's mother then filed a §1983 action against the state Department of Social Services, some of its employees, and the county, alleging that the defendants violated the child's substantive due process rights "by failing to intervene to protect him against a risk of violence at his father's hands of which they knew or should have known." Id. at 193.

4

process." (citation omitted). The implication of the Due Process Clause by affirmative government action was recently cemented in our circuit by both Rivera, 402 F.3d 27 (1st Cir. 2005) (In situations where actors have an opportunity to reflect and make reasoned and rational decisions, deliberately indifferent behavior may suffice to "shock the conscience" for the purpose of a due process claim) and Coyne v. Cronin, 386 F.3d 280 (1st Cir. 2004) (Due Process Clause is triggered where the government affirmatively acts to increase the threat to an individual of third-party private harm or prevents that individual from receiving assistance and such conduct shocks the conscience).[3] The District Courts in our jurisdiction have also collectively spoken with the same voice. Doe v. Town of Bourne, 2004 WL 1212075, at *7 (D.Mass. May 28, 2004) (Woodlock, J.) (acknowledging viability of theory); Coyne v. United States, 270 F.Supp.2d 104, 120 (D.Mass.2003) (Gertner, J.) (same, although remanded on separate grounds); Willhauck v. Mansfield, 164 F.Supp.2d 127, 134-135 (D.Mass.2001) (Saris, J.) (same).

More importantly, another court in our own jurisdiction has astutely framed this issue in the context of its applicability to government informants. In McIntyre v. U.S., 336 F.Supp.2d 87, 111-12 (D. Mass., 2004) (Lindsay, J.), the court interpreted

---

[3] The Government has stupendously misapplied the application of Rivera by failing to recognize the obvious factual and constitutional differences between that case and the instant matter. Unlike Rivera, where the mother of a murdered government witness filed a §1983 civil rights claim to castigate the state for failing to protect the victim, Mr. Enwonwu's case deals with a completely separate set of circumstances: he is a prisoner *in the custody of the United States* and whose deportation to Nigeria -- a known human rights abuser -- remains at the whim of the Government despite clearly violating his substantive due process rights to a degree that "shocks the conscience".

5

DeShaney's ruling to situations where *"the underlying relationship giving rise to a concomitant constitutional duty on the part of the government to protect an individual from private violence is one in which the government has restrained someone against his/her will ... [adding that] First Circuit cases decided after DeShaney unequivocally demonstrate that this "governmental restraint of freedom" exception to the general rule that the Constitution does not protect against private violence is limited to situations where government officials have forcibly restrained an individual in a physical rather than in a figurative sense* (emphasis supplied).

With respect to Mr. Enwonwu's case, this Honorable Court has already confirmed the viability of a substantive due process claim under the Fifth Amendment of the Constitution of the United States, which mandates that "[no] person shall ... be deprived of life, liberty, or property without due process of law." As the McIntyre court recently analyzed, at 107, the "touchstone of due process is protection of the individual against arbitrary action of the government", citing County of Sacramento v. Lewis, 523 U.S. 833, 845 (1998) (quoting Wolff v. McDonnell, 418 U.S. 539, 558 (1974)). It added that due process, in the substantive sense, "protects individual liberty against 'certain government actions regardless of the fairness of the procedures used to implement them.'" Id., citing Collins, 503 U.S. 115, 125 (1992) (quoting Daniels v. Williams, 474 U.S. 327, 331 (1986)).

One can then reasonably conclude from the settled case law in DeShaney and Davis, supra, that once the Government takes *physical custody* of a person it immediately inherits a duty to protect that individual from third-party actors. See, Hasenfus v. LaJeunesse, 175 F.3d 68, 72 (1st. Cir. 1999) (citing DeShaney, and

6

explaining that "[w]here a state official acts so as to create or even markedly increase a risk, due process constraints may exist, even if inaction alone would raise no constitutional concern"). Compare, Butera v. District of Columbia, 235 F.3d 637, 648-51 & n. 10 (D.C.Cir.2001) (noting that the federal circuit courts are unanimous in excepting these sorts of cases from the Deshaney principle). Logically, it follows that once that duty is ascribed, then the burden of proof rests squarely upon the Government to ensure that the individual's safety and general welfare is not compromised. Hasenfus, 175 F.3d at 72. Interestingly, the Government has kept Mr. Enwonwu in its custody since September 2004 -- a generous amount of time to reflect and make reasoned and rational decisions to ensure that its "deliberate indifferent behavior" and obstinate insistence in deporting him to a cesspool of human rights abuses clearly suffices to "shock the conscience" and heartlessly violates his due process claims. See Rivera, 402 F.3d at 36, citing County of Sacramento, 523 U.S. at 851-52. Not only does such reprehensible behavior violate the Constitution, infra, but also creates a scenario whereby it increasingly becomes responsible for the legal fees and costs Mr. Enwonwu has incurred to secure of his freedom.

### 1. Issue of Direct and Present Danger

In the immigration context, the Government must ensure that a person's deportation must not place the person in greater danger than the way he was found. Compare Soto, 103 F.3d at 1064-65 (unambiguously establishing that a state's danger-creation activity not only exists in principle but also is applied at the time of the alleged conduct, therefore leaving the determination of the weight of the evidence of the alleged government misconduct as the only remaining issue to decide).

7

If the state-created danger is only "emerging," then it is not clearly established. See McIntyre, 336 F.Supp.2d at 115, citing Elder v. Holloway, 510 U.S., 516 (1994) ("Whether an asserted federal right was clearly established at a particular time, so that a public official who allegedly violated the right has no qualified immunity from suit, presents a question of law, not one of 'legal facts.' "). In Mr. Enwonwu's case, it is beyond argument that his September 2004 detainer by the DHS happened long after the establishment of the state-created danger postulate within our Circuit in 1991. Id., citing Soto, supra, at 1064-65.

Having established the aforementioned principles, the issue would then turn to whether or not Mr. Enwonwu's intelligence-gathering activities in 1986-87 and 1997 coupled with the recent media coverage creates a direct and present danger to his personal well-being if the Government were to forcibly deport him back to Nigeria. Conversely, the issue of whether or not that danger dissipates is also germane. Again, since the Government has custody and control of Mr. Enwonwu, the burden rightfully falls on its lap -- and one that would be difficult for it to overcome. McIntyre, at 114 (Government's revelation to known criminals that an informant cooperated with the government unquestionably endangers the safety of that informant, thereby creating a substantive due process right to be protected from the danger of the government's own creation so long as said constitutional protection exists at the time the information is divulged.) Although this argument will be further expounded in this brief, infra, Mr. Enwonwu wishes to initially make clear that the danger to his life was created by the Government's recent revelation of his status in open court, and the subsequent dissemination of said participation by the

press present at the hearing.[4] Mr. Enwonwu is not presently challenging previous efforts by the Government to maintain the secrecy of his confidential informant status. He is merely shedding light on Government conduct that now also imperils his safety and well-being.

**B.     THE GOVERNMENT'S POLICY OF DEPORTING ANYONE AND EVERYONE REGARDLESS OF THE PARTICULAR FACTS CONCERNING EACH CASE OR THE RECIPIENT COUNTRY'S HUMAN RIGHTS CONDITIONS EPITOMIZES THE ARBITRARY USE OF EXECUTIVE POWER THAT SHOCKS THE CONSCIENCE OF OUR DEMOCRATIC TENETS TO ITS VERY CORE.**

Again, the McIntyre court, 336, F.Supp.2d 87, at 108, masterfully explains the deeply-rooted concept behind conduct that "shocks the conscience", when it succinctly

---

[4] Any attempt by the Government to establish some type of "comparative negligence" theory due to the Petitioner's conversations with a Boston Globe reporter in 1999 is irrelevant. Firstly, the Government must always preserve the confidentiality of its informants unless "so directed by a court preliminarily to or in connection with a judicial proceeding." United States v. Lilly, 185 F.R.D. 113 (D.Mass. 1999) (Young, C.J.) (quotation omitted). Moreover, disclosure of sealed information in open court is *inappropriate* where the information bears the imprint of the grand jury's work. Id., at 115 (indirectly leaving open the converse argument stated in In re September 1971 Grand Jury, 454, F.2d 580 (7th Cir. 1971). In the instant proceedings, the Government already conceded that Mr. Enwonwu's participation was presented at the 1986 grand jury proceedings yet took no action to continue to preserve his identity. As previously stated by this Honorable Court, "The United States may not ... 'recklessly remain ignorant' of its own informants, nor may it [profess innocence] as though the right hand knows not what the left hand does." In re Application For Interception Of Wire Communications, 2 F.Supp.2d 177, 178 (D.Mass. 1998) (Young, C.J.), quoting United States v. Sullivan, 586 F.Supp. 1314, 1318 (D.Mass. 1984). Although that case dealt primarily with the application of a wiretap order, the thrust behind the court's admonition of the government for its professed ignorance resonates to this very day. In Mr. Enwonwu's case, the Government's left hand (DEA) clearly remains clueless about its right hand's (DHS) actions. Once he began working for both agencies, it became woefully apparent that neither hand knew what information the other possessed, irrespective of what parochial disputes may have emerged.

9

explained that:

> The touchstone of arbitrariness of conduct is of necessity different from that of legislation. Because "only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense,'" County of Sacramento, 523 U.S. at 846 [quoting Collins v. City of Collins, 503 U.S. 115, 129 (1992)] "the substantive component of the Due Process Clause is violated by executive action only when it 'can properly be characterized as ... conscience shocking,'" Id., at 846 (quoting Collins, 503 U.S. at 128)....
>
> Admittedly, the term "conscience-shocking" is far from self-defining. The Supreme Court has observed that "the measure of what is conscience shocking is no calibrated yard stick, [although] it does ... 'poin[t] the way.'" County of Sacramento, 523 U.S. at 847 [quotations omitted]. There are, however, some clear markers on the measuring stick: "liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process" while "conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." Id. at 849. . . . Official acts falling somewhere between these two benchmarks "may be actionable" depending on the circumstances. Id.

In Mr. Enwonwu's case, the Government keeps harping on the fact that it is entitled to deport him based on the Board of Immigration Appeals' ("BIA") overturning of his Convention Against Torture ("CAT") grant by the Executive Office for Immigration Review ("EOIR") in Boston. Although the BIA's shoddy and thoughtless analysis remains hotly contested, the fact remains that the Government is fighting equally hard to preserve the ability and uniformity of the executive branch to deport non-citizens away from its shores. While their ultimate philosophy is understandable, its methods clearly are not, since they "shock the conscience" of our civilized, democratic society when the life and liberty of an imprisoned individual is at stake if deported to a country (like Nigeria) with a documented penchant for human

rights abuses. Evidently, the Government is desperately pulling out all of the stops[5] to convince this Honorable Court to endorse the undefined and inhumane policy of deporting people to countries that obviously disregard human life, limb and liberty. Simply put, any interest the Government may have in enforcing its executive authority to deport someone must always give way to the Constitutional concerns raised by the likely loss of life and limb that an individual would experience if transferred to the hands of his new custodians. Washington v. Glucksberg, 521 U.S. 702, 721 (1997) (it is implicit in the concept of ordered liberty that neither liberty nor justice would exist if they were sacrificed). In one were to devise a conversion table for democratic ideals amongst all the countries of the world, American ideals would substantially be devalued if transformed into judicial currency under present Nigerian law. Those fundamental rights apply to *every* person within our shores regardless of their national

---

[5] The Government has so far dribbled out discovery to the Petitioner at the *beginning* of *each* stage of this evidentiary hearing despite this Honorable Court's limited time and rightful need to make a balanced determination. Who is to know whether they are cherry-picking what information to give since they only provide what the Court asks for (under the guise of cooperation) and not what the Petitioner alleges to exist! This sordid custodial arrangement allows the government fox to guard the discovery coop and ultimately control the fate over which chickens (read: information) survive and see the light of day. Ordinarily, this practice may be frowned upon in other adversarial instances where opposing sides are sparring over financial documents, but here we have the case where a man's life is literally at stake! As such, this Honorable Court should exercise its supervisory powers to ensure that Mr. Enwonwu's due process rights are in no way compromised by any of the Government's acts or omissions.

Interestingly, the Government never offered the testimony of a DHS official to deny the fact that: (a) it had also recruited Mr. Enwonwu's participation as a Confidential Informant or (b) that it had generated paperwork to establish that he was going to be allowed to adjust as a Legal Permanent Resident despite his felony conviction and his two separate offers of Voluntary Departure!

origin. Glucksberg, 521 U.S. at 720-21 (individual liberties are protected by the guarantee of substantive due process which are "deeply rooted in this Nation's history and tradition"). As such, the Government's actions would not serve society's greater interest in preserving its civilized ideals. Olmstead v. United States, 277 U.S. 438, 470 (1928) ("It is a less evil that some criminal should escape than that the government should play an ignoble role") (Holmes, J., dissenting).

C. **THE GOVERNMENT HAS NEEDLESSLY ENDANGERED THE SAFETY AND WELFARE OF THE PETITIONER AND TAINTED THE ONGOING PROCEEDINGS AND POSSIBLE OUTCOME OF THIS HONORABLE COURT'S DETERMINATION BY FAILING TO INITIALLY REQUEST THAT THIS CASE BE PLACED UNDER SEAL AND BY ITS IMMEDIATE INTRODUCTION OF A GOVERNMENT DOCUMENT (DEA-6) ALERTING THE GENERAL PUBLIC OF MR. ENWONWU'S PARTICIPATION AS A GOVERNMENT INFORMANT.**

The Government has previously made the feeble argument that Mr. Enwonwu is solely responsible for the open publication of his situation by granting media interviews to trumpet his "notoriety". See Respondent's Supplemental Memorandum of Law in Support of Motion to Dismiss, at 23. The motivation behind this red herring argument is not only disingenuous at best, but also is designed to move the focus away from the Government's own serious procedural shortcomings.

Clearly, court proceedings were not sealed at *any* time (e.g. 1986 drug case, 1997 immigration case, 1999 Writ of Habeas Corpus claim, 1999 immigration case, subsequent 1999 appeal by Government of CAT grant, and the present 2005 Writ of Habeas Corpus claim). The Government only allegedly moved to partially preserve the identity of the Petitioner through DEA-6 forms allegedly introduced in 1986 as part of grand jury proceedings against the two previously named Nigerian nationals. The Government has

12

not proffered any concrete information so far to either confirm or deny their naked claim.[6]

Ironically, the Government never asked to seal the instant proceedings and made matters worse by immediately calling in as a witness the retired DEA agent (who recruited Mr. Enwonwu as a Confidential Informant) to confirm the latter's identity *prior* to the Petitioner's testimony, thereby officially "outing" him regardless of his prior "deactivated" status. See, In re American Cont'l Corp./Lincoln Sav. & Loan Sec. Litig., 102 F.3d 1524, 1537 (9th Cir. 1996) ("[M]atters of public record, including court records in related or underlying cases which have a direct relation to the matters at issue, may be looked to when ruling on a 12(b)(6) motion to dismiss."), rev'd on other grounds sub. nom. Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach, 523 U.S. 26 (1998). Edwards v. John Hancock Mut. Life Ins.Co., 973 F.2d 1027, 1030, n.1 (1st. Cir. 1992) (recognizing that certain items in the record and in the public record may be considered in a Rule 12(b)(6) motion without converting it to a motion for summary judgment) (citation omitted);

### D.  A WEB PAGE FROM A GOVERNMENT WEB SITE IS ADMISSIBLE AS EVIDENCE UNDER VARIOUS HEARSAY EXCEPTIONS.

Government reports are admissible as government documents. Lorillard Tobacco Co. v. Reilly, 84 F.Supp.2d 180, (D.Mass., 2000) (Young, C.J.) (remanded on other grounds); Beech Aircraft Corp. v. Rainey, 488 U.S. 155 (1988); see also, Fed.R.Evid. 803(8)(c). With respect to legal documents reprinted from web pages, this Circuit has

---

[6] The Government would also not be able to dispute that Mr. Enwonwu made calls to Lieutenant Charles in Nigeria at the behest of (DEA) Special Agent Herbert Lemon which ultimately lured the two Nigerians from New York into the "sting" operation in Boston. In other words, knowledge of Mr. Enwonwu's "snitching" had a ripple effect far beyond the two individuals arrested.

13

generally held that "there is no reason to eschew judicial notice" if both the "accuracy" and "authenticity" of said documents is established. Getty Petroleum Marketing, Inc. v. Capital Terminal Co., 391 F.3d 312, 324 (1st Cir., 2004). The purported document imported from the United States Citizenship and Immigration Services ("USCIS") web site is an official source of information available for mass consumption. The USCIS is a branch of the DHS and has exclusive dominion and control over the contents of its own official web site. Its web pages are presumed to be both accurate and authentic. Any potential tampering of the site would result in the immediate withdrawal of said submission.

Alternatively, a court may ultimately admit the document under the residual hearsay exception, Fed.R.Evid. 807, formerly known as Fed.R.Evid. 803(24)[7]. United States v. Benavente Gomez, 921 F.2d 378 (1st Cir. 1990). In the instant case, the Government has had ample notice of Petitioner's intent to introduce the DHS' own web page into evidence. In fact, the Government has already explicitly stated its objection in

---

[7] Under Fed.R.Evid. 807, the following evidence is not excluded by the hearsay rule:

A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, the proponent's intention to offer the statement and the particulars of it, including the name and address of the declarant.

open court to the document's admissibility on hearsay grounds. The Petitioner believes his submission is not only an authentic representation of the DHS web page but also an accurate official government response that is publicly available for review and dissemination. In sum, this Honorable Court has the discretionary power to admit said document under either the Fed.R.Evid. 803(8)(c) or the 807 exception to the hearsay rule.

## CONCLUSION

For the foregoing reasons, this Honorable Court should GRANT Mr. Enwonwu's Writ of Habeas Corpus petition pursuant to his proposed findings enumerated in his original motion and DENY the Petitioner's Motion to Dismiss.

Respectfully submitted,
FRANK IGWEBUIKE ENWONWU,

By his attorney,

Robert B. Carmel-Montes, Esq.
The Carmel Law Group
One Center Plaza, Suite 240
Boston, MA 02108
Tel. 617.227.6355
BBO#: 639476

DATED: 5-2-05

## CERTIFICATE OF SERVICE

I, Robert B. Carmel-Montes, Esq., do hereby certify that I have on this 2nd day of May, 2005, served via in hand delivery, a true and accurate copy of the **PETITIONER'S SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF HIS WRIT FOR HABEAS CORPUS RELIEF** to:

Frank Crowley
Special Assistant U.S. Attorney
Department of Homeland Security
P.O. Box 8728
JFK Station
Boston, MA  02114

Signed under the pains and penalties of perjury.



16