UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

FRANK IGWEBUIKE ENWONWU,       )
                               )
            Petitioner         )
                               )        Civil Action No.
       v.                      )        05cv10511-WGY
                               )
MICHAEL CHERTOFF, SECRETARY    )
OF DEPARTMENT OF HOMELAND      )
SECURITY, ET AL.               )
                               )
            Respondents        )


RESPONDENT'S SECOND SUPPLEMENTAL MEMORANDUM OF LAW

**PRELIMINARY STATEMENT**

Respondent hereby complies with the Court's previously ordered briefing schedule, and draws the Court's attention to respondent's position that jurisdiction for resolution of all claims and issues in this case -- except to the extent petitioner's claim of unlawful detention under Zadvydas v. Davis, et al., 533 U.S. 678 (2001) may be still unresolved -- is now exclusively at the First Circuit Court of Appeals as a consequence of the judicial review amendments wrought by the Real ID Act of 2005, H.R. 1268, 109th Cong. (2005)(enacted), Pub. L. No. 109-13, Div. B, 119 Stat. 231 ("RIDA"). See ARGUMENT, Part I, infra.

By the below compliance with the Court's earlier briefing order respondent does not recede from these jurisdictional defenses.

The Court has asked for briefing regarding two questions:

First, assuming that petitioner has established a "state created danger" as a result of his cooperation with the federal Drug Enforcement Administration ("DEA"), which party to the litigation bears the burden of proof as to whether that assumed danger still exists or whether it has dissipated over the ensuing 19 years?

Second, what effect do the instant habeas corpus proceedings and news media coverages have on any assessment as to whether the assumed danger continues to exist after 19 years?

Respondent provides unsolicited briefing on yet a third, but fundamentally dispositive threshold, issue, viz., whether such danger as may have been generated by petitioner's cooperation with the Drug Enforcement Agency ("DEA") in 1986 was even "state created".

**ARGUMENT**

I.   PETITIONER'S CLAIMS ARE NOW REVIEWABLE ONLY IN THE FIRST CIRCUIT COURT OF APPEALS UNDER THE TRANSFER PROVISIONS OF SECTION 106(c)OF THE REAL ID ACT OF 2005.

For the reasons already set out in respondent's Motion to Transfer Case to First Circuit Court of Appeals Pursuant to Section 106(c) of the Real ID Act of 2005, and respondent's Reply to Petitioner's Opposition to Respondent's Motion to Transfer Case to First Circuit Court of Appeals Pursuant to Section 106(c) of the Real ID Act of 2005, all claims and

issues presented in this action -- save any remaining
unresolved pure detention challenge under Zadvydas v. Davis, et
al., 533 U.S. 678 (2001) -- are reviewable now only in the
First Circuit Court of Appeals.[1]

II.  THE BURDEN IS UPON PETITIONER TO ESTABLISH THE EXISTENCE
     OF THE CLAIM HE MAKES ON PETITION.

     The burden of proof rests with petitioner to establish
that his habeas corpus petition states a claim[2] upon which
relief may be granted.

     In Rivera v. State of Rhode Island, 402 F.3d 27, 33-4 (1st
Cir. 2005), the First Circuit held that in order to establish a
substantive due process claim "the plaintiff must first show a
deprivation of a protected interest in life, liberty, or
property." (Emphasis added).  In this connection, the court
remarked that "[I]t is not enough to claim the government
action shocked the conscience." Id. at 34.  And even if
deprivation of a protected interest is established, then "the

---

[1] Although Petitioner's Opposition takes an additional
opportunity to attack the removal order of the Board of
Immigration Appeals ("BIA"), see Petitioner's Opposition at pp.
1-4, respondent establishes no error of law, and respondent has
already responded to the claim.  See respondent's Return and
Memorandum in Support of Motion to Dismiss and Opposing Stay
Request, Argument, Part IV. Also, petitioner inaccurately
describes the BIA as "but an appendage of the Department of
Homeland Security".  Petitioner's Opposition, p.3, n.2.  In
fact however, characterization aside, the BIA is a component of
the Executive Office for Immigration Review, which is an agency
of the Department of Justice. 8 C.F.R. § 1003.1(a)(1) (2004).

[2] See 28 U.S.C. § 2241(c)(3) (habeas writ shall not issue for a
prisoner "[u]nless . . . [h]e is in custody in violation of the
Constitution or laws or treaties of the United States."

plaintiff must next show that the deprivation of this protected right was caused by government conduct." Id. (emphasis added). See also Ansong v. District Director of Immigration, 596 F.Supp. 882, 887 (D. Me. 1984), aff'd 732 F.2d 140 (1st Cir. 1984) (Table) (A federal habeas petitioner "has the burden of proving all facts entitling him to a discharge from custody.").

For the reasons set out in respondent's Return and Memorandum of Law in Support of Motion to Dismiss and Opposing Stay Request, and in respondent's Supplemental Memorandum of Law in Support of Motion to Dismiss, petitioner has failed to state any claim establishing the recognition or existence of a "state created danger" due process violation in his case.  See Rivera, 402 F.3d at 33 (1st Cir. 2005)("[i]n substantive due process cases, the Supreme Court has held that such claims must be carefully scrutinized to determine if the alleged facts support the conclusion that the state has violated an individual's constitutional rights.").

Although the Court has assumed for analysis that that such exposure to danger as may have been created by petitioner's cooperation with DEA 19 tears ago was "state created", respondent submits respectfully that this is a major analytical threshold assumption that has not been established.

It is plain that petitioner's cooperation with the DEA 19 years ago in January of 1986 was to the benefit of both the government and petitioner.  Petitioner was not under any

4

compulsion to cooperate, but did so voluntarily and sensibly in a wholly successful effort to avoid any sentence to incarceration that otherwise would be thought reasonably to follow on his Importation of Heroin prosecution.[3]  For its part, the DEA was presumably content to accept petitioner's assistance in order to successfully pursue further its investigation of the Heroin-smuggling and distribution system petitioner was party to.

While it cannot be said that there was *no* possibility that the two criminal confederates whose arrest and prosecution in January 1986 was facilitated by petitioner's controlled delivery of the Heroin might conceivably have developed a motive for revenge against petitioner, petitioner has established nothing beyond that mere plausibility.  In particular, petitioner has not established that 19 years after exposure, such initial risk as may have existed in 1986 has not dissipated. And "[m]erely alleging state actions, which render the individual more vulnerable to harm, under a theory of state created danger, cannot be used as an end run around Deshaney's core holding."[4] Rivera, 402 F.3d at 38.

Said another way: because petitioner himself voluntarily chose to assist the DEA in January 1986 in a controlled delivery that foreseeably would bring him face-to-face with

---

[3] There has been no suggestion by petitioner of any factual or legal defense to that charge.

criminal confederates who would be arrested and prosecuted because of petitioner's assistance, petitioner's own voluntary actions were the proximate cause of any risk of danger to himself. This Court has already determined that petitioner has failed to shoulder his burden of the existence of any promise by the government of non-deportation.  Transcript of Hearing ("TR."), Volume 2, p. 80.

It should be recognized too that the element of foreseeability of petitioner's eventual removal from the United States was complete upon petitioner's own apprehension at Logan Airport on January 20, 1986, for unlawfully Importing Heroin. At that time petitioner became immediately classifiable as a removable alien[5] petitioner immediately faced the foreseeable prospect of eventual removal from the United States.

What is more, "[e]ven if there exists a special relationship between the state and the individual or the state plays a role in the creation or enhancement of the danger, under a supposed state created danger theory, there is a further and onerous requirement that the plaintiff must meet in order to prove a constitutional violation: the state actions

[4] See Deshaney v. Winnebago County Dep't of Social Servs., 489 U.S. 189, 200, 109 S.Ct. 998, 1006, 103 L.Ed.2d 249 (1989)

[5] See former 8 U.S.C. § 1182(a)(23) (1986)(alien who "immigration officers know or have reason to believe is or has been" an illicit trafficker or a knowing assistor, abettor, conspirator, or colluder with others in the illicit trafficking of controlled substances, is excludable from the United States).

must shock the conscience of the court." Id. (emphasis added).

In fact, "[t]he state action must be 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'" Id. at 36, quoting County of Sacramento v. Lewis, 523 U.S. 833, 847 (1998). See also Coyne v. Cronin, 386 F.3d 280, 287 (1st Cir. 2004) (First Circuit finding no substantive due process claim was stated, because "in order to prevail on any such [danger creation] theory (assuming arguendo its viability), [plaintiff] would have to show that [defendant's] conduct was 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'". Id. at 287, quoting Lewis, 523 U.S. at 847 n.8 (1998).[6]

Petitioner has failed utterly to satisfy any "onerous" requirement that any action by the government in this case was 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'" Rivera, 402 F.3d at 36, quoting County of Sacramento v. Lewis, 523 U.S. 833, 847

---

[6] Petitioner mistakes the mere fact of his being in respondent's custody as creating a blanket affirmative duty to protect petitioner against all private harm. Petitioner's Second Supplemental Memorandum, p.8. However, it is only that harm which petitioner's custody renders himself unable to defend against that is the government's responsibility to defend against. Otherwise, every removable alien in government custody who has been denied all relief but whose removal is arguably nonetheless to a more dangerous country or set of circumstances could make the same argument petitioner makes. Petitioner's line of argument, then, argues for repeal of the statutory scheme put in place by Congress. See ARGUMENT, Part IV, infra.

(1998). At most, it was undisputed that petitioner's voluntary controlled delivery of the Heroin occurred against two Africans in January, 1986, and that petitioner's assistance in this regard led to the arrest and conviction of these two men, over 19 years ago. TR., Volume 2, pp. 19-20. Petitioner testified he does not know what became of them after their convictions or where they are now.[7] Id.; Exhibit 6, Transcript of Hearing Before the Immigration Judge, p. 132. Petitioner can not name any other individual with whom he had face-to-face contact that could identify him as a former cooperating source for DEA. TR., Volume 2, p. 20. Nor has petitioner heard anything about anyone in Nigeria who was ever arrested and convicted as a result of his cooperation with United States law enforcement. Exhibit 6, Transcript of Hearing Before the Immigration Judge, p. 132.

Rivera said too that "conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience shocking level." Rivera, 402 F.3d at 36, quoting Sacramento v. Lewis, at 849 (emphasis added by Rivera). In the instant matter of course there has been no allegation of intention to injure petitioner, and at any rate the intent to execute petitioner's removal order is obviously justified by the government's considerable

---

[7] It appears from a post trial record review of DHS records that one of the men was deported, re-entered illegally, and was

interest in complying with the statutory directive to remove
criminal aliens from the United States convicted of very
serious drug crimes, such as Importation of Heroin.  Herrera-
Inirio v. INS, 208 F.3d 299, 309 (1st Cir. 2000)(Executive
compliance with statutory commands cannot afford basis for
substantive due process claim).

Nor was any danger to petitioner "caused by the
government". Rivera, 402 F.3d at 33-4.  Petitioner's
cooperation with DEA, though it did result in the arrest and
conviction of two criminals and the exposure of petitioner as a
cooperating individual over 19 years ago, was a voluntary
cooperation agreed to by the petitioner with the hope that he
might receive a mitigated sentencing, which in fact came to
pass when he received no sentence to actual confinement.  The
fact that the DEA proposed the cooperation and gladly accepted
petitioner's assistance within days of petitioner's arrest at
Logan Airport for Importation of Heroin in order to pursue its
Heroin smuggling investigation, does not detract from the fact
that it was petitioner's cooperation was of his own volition.

Granted, petitioner may not have had many attractive
alternatives to ready cooperation with DEA in January 1986 when
he was intercepted and arrested.  But that says less about
whether the government implicitly "caused" petitioner any
exposure to danger than it does about the plainly foreseeable

_____

deported again, most recently to Ghana.  The location of the

consequences of getting caught at an international airport with 5 ounces of Heroin concealed inside one's rectum.  It was petitioner himself who made the choice to Import Heroin inside his body, and naturally to risk detection and apprehension by United States law enforcement agents. That petitioner gambled and lost in his drug smuggling bid and then attempted to make the best of it does not convert the foreseeable consequences of his cooperation into some kind of "state-created" action that secures a Constitutional exemption from what otherwise would be the prescribed consequences of his criminal activity: removal from the United States as ordered by the BIA.

The only affirmative act of the government in this connection was to exploit the potential for further law enforcement investigation relating to petitioner's Heroin smuggling attempt, and courts should be slow to expect a less energetic Federal law enforcement pursuit of international drug-smuggling schemes. Cf. Rivera, 402 F.3d at 37 (recognizing "necessary law enforcement tools [that] cannot be the basis to impose constitutional liability on the state."  The necessarily foreseeable exposure of petitioner's role in the controlled Heroin delivery in January 1986 is the direct consequence of petitioner's own choice to voluntarily cooperate with DEA rather than face the full unmitigated consequences of a Federal prosecution on his  Heroin Importation offense.

---

other is unknown at present.

It was always open to petitioner to decline to cooperate
with law enforcement, to "stand up", do his time, and so by his
own election eliminate entirely any possible stigma, exposure,
or danger to himself as a cooperating or assisting source to
Federal law enforcement.  But petitioner himself instead chose
not unreasonably to cooperate with law enforcement in order to
improve the prospects for a favorable sentencing outcome.  By
so doing he consciously exposed himself to whatever risks might
attend that chosen course of action.

Petitioner himself then is the proximate cause of any risk
of danger that he claims flows from his assistance to the DEA
in January 1986.

III. PETITIONER BEARS THE "ONEROUS" BURDEN OF ESTABLISHING A
PRESENT DANGER, THAT THE PRESENT DANGER WAS CAUSED BY THE
GOVERNMENT, AND THAT THE EXECUTION OF PETITIONER'S REMOVAL
ORDER UNDER SUCH CIRCUMSTANCES IS A DEPRIVATION OF A
PROTECTED INTEREST IN LIFE, LIBERTY, OR PROPERTY.

In answer to this Court's question as to who bears the
burden of proof of *continuing* danger, petitioner asserts that
the burden of proof upon a state created danger theory of
recovery rests with the *government*, and cites to Kneipp v.
Tedder, 95 F.3d 1199 (3rd Cir. 1996) as support for this
position.  Petitioner's Second Supplemental Memorandum of Law
in Support of His Writ for Habeas Corpus Relief ("Petitioner's
Second Supplemental Memorandum"), p.6 ("[w]ith respect to the
burden of proof at the present *judicial* level, at least one
circuit has placed the burden on the government.")(emphasis in

original).[8]  However, nothing in <u>Kneipp</u> supports petitioner's
position.[9]

    In addressing the Court's inquiry as to who bears the
burden of showing or disputing any continuing risk of danger,
respondent begins first with petitioner's patently outrageous
misrepresentation that "he was 'outted' as a Confidential
Informant by the Government during Agent Lemon (and agent
Pettigrew's) open hearing testimony". Second Supplemental
Memorandum, p.6, n.7.  To begin with, it was petitioner who
called both DEA special agents as witnesses and conducted the
direct examination of them, though it is also true the
testimony of the agents did nothing to support or advance
petitioner's claims.  TR. Volume 1, p. 17; TR., Volume 2, p. 3.

    What is more, petitioner expressly agreed in open court
that any testimony of the DEA agents would be upon the
understanding that a previously executed waiver signed by
petitioner allowing the disclosure of petitioner's identity as

---

[8] <u>Kneipp</u> reversed a grant of summary judgment against
plaintiffs, determining that "the evidence submitted was
sufficient to raise a triable issue of fact as to whether the
police officers affirmatively placed Samantha in a position of
danger." <u>Kneipp</u>, 95 F.3d at 1211.  The decision contains no
authority supporting petitioner's assertion that the government
bears any burden of proof.

[9] The <u>Kneipp</u> decision is additionally inapposite because it
explicitly dispensed with the "shocks the conscience" element
required by the First Circuit's <u>Rivera</u> case, <u>see</u> <u>infra</u>.
Demonstration of that element is characterized by the First
Circuit as an "onerous" burden for the proponent of a
substantive due process claim.  <u>See</u> <u>Kneipp</u>, 95 F.3d at 1207

a cooperating source and relating details remained in effect.
TR., Volume 1, p. 19 (Mr. Carmel-Montes, responding to the
Court's inquiry whether he has a problem with such
understanding: "No, I have no problem with that.").

Petitioner himself has been the sole agent of what
publicity has continued to attend his present claim.  Indeed,
his present claim may accurately be said to be based now *upon*
that self-generated publicity.

First, as set out above, petitioner cooperated voluntarily
with DEA in a controlled delivery of his Heroin to assist in
the arrest and prosecution of two confederate drug traffickers
in January 1986.  Once petitioner later again came into the
custody of the former INS, petitioner then filed an unsealed
habeas corpus action in the Northern District of Florida in
1998,[10] which disclosed his identity as a former cooperating
source for Federal law enforcement. Petitioner made no request
to that court to protect this information from general
exposure.  TR., Volume 3, pp.  21-4.

Petitioner then executed a written consent to be
interviewed and photographed at his place of INS detention in
Florida, by the Boston Globe in early 1999, id., p. 21, and
during that interview petitioner himself again disclosed the

---

("We believe that the . . . shocks the conscience standard is
limited to police pursuit cases".).

[10] No. 5:98cv00210RH (N.D. Fl. 1998).  That case was dismissed
for lack of subject matter jurisdiction.

fact of his previous cooperation with Federal law enforcement. Id., p. 26. An article including such disclosure with a posed photograph of petitioner appeared in a February 1999 edition of the Boston Globe. Petition, Attachment 14.

During petitioner's removal proceedings before an Immigration judge in 1999, it was petitioner himself who subpoenaed DEA Special Agent Lemon to testify.  See Exhibit 6, Transcript of Hearing in Removal Proceedings, p. 60. Petitioner, represented by previous immigration counsel, also executed a waiver of the confidentiality that otherwise would have prevented DEA Special Agent Lemon's testimony.  Id., p. 67-9.

Petitioner then filed the instant action in this Court, again as an unsealed case, despite the detailed assertions provided on petition of his identity as a former cooperating source for Federal law enforcement.  On April 13, 2005, two days after the April 11, 2005, hearing held before this Court, petitioner executed a written consent to again be interviewed, photographed, or otherwise recorded, this time by an Associated Press journalist.  TR., Volume 3, p. 24.

Petitioner was subsequently interviewed by an Associated Press journalist, further disclosed the details of his habeas corpus claim based upon his former identity as a cooperating source, and thereafter several articles were published in the Boston Globe, Boston Herald, and elsewhere based upon

14

Associated Press and Boston Globe reporting.  All articles recited petitioner's claim and his identity as a former cooperating source, or "informer" for Federal law enforcement.

In sum, petitioner has no one to thank but himself if his publicity as a former cooperating source is any greater now than it was in 1986.  If there is any risk of danger or continuing danger -- and none was demonstrated beyond speculation at trial -- it is a risk that has been created, promoted, and continually regenerated by petitioner himself, apparently in order to bootstrap the plausibility of the "danger" element of his state created danger theory, from all that appears of record.

Since petitioner's January 1986 face-to-face controlled delivery of his Heroin cargo to the two criminal confederates who traveled from New York to Boston to claim it, *every* subsequent exposure of petitioner's identity as a former cooperating source was due directly to petitioner's own affirmative acts, and *no* subsequent exposure of that identity was due to any action of the government or lack of confidentiality by the government.  Petitioner concedes that he was told be DEA not to discuss his identity as a cooperating source.  TR., Volume 3, p.21.

In Rivera v. State of Rhode Island, 402 F.3d 27 (1st Cir. 2005), the First Circuit recently set out in some detail the standard for establishing a substantive due process claim

generally, and discussed in particular terms the viability of the so-called "state created" danger exception to the general rule, set out in Deshaney v. Winnebago County Dept. of Social Services, 489 U.S. 189, 197 (1989), that the government's "failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause."

The Rivera court held that in order to establish a substantive due process claim "the plaintiff must first show a deprivation of a protected interest in life, liberty, or property." Rivera, 402 F.3d at 33-4. In this connection, the court remarked that "[I]t is not enough to claim the government action shocked the conscience." Id. at 34. Next, if deprivation of a protected interest is established, then "the plaintiff must show that the deprivation of this protected right was caused by government conduct." Id. (emphasis added).

In view of the chronicle of petitioner's unabated campaign of self-publication of his former identity as a confidential source, the "onerous" burden of proof is upon him to establish that there was a deprivation of a  protected right "caused" by the government, and that any action by the government in this case was 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'" Rivera, 402 F.3d at 36, quoting County of Sacramento v. Lewis, 523 U.S. 833, 847 (1998).

But, there is no substantive due process right not to be deported or removed for aliens who have been ordered deported or removed, and Executive actions such as removing aliens ordered removed from the United States that "do no more than comport with valid statutory commands are simply <u>are not the stuff from which substantive due process violations can be fashioned</u>." <u>Herrera-Inirio v. INS</u>, 208 F.3d 299, 309 (1st Cir. 2000).

Petitioner simply ignores the long-established precedent that deportable or removable aliens have no substantive due process right to remain in the United States. <u>Harisiades v. Shaughnessy</u>, 342 U.S. 580, 586-587 (1952); <u>see also</u> <u>United States v. Oboh</u>, 92 F.3d 1082, 1087 (11th Cir. 1996) (en banc) ("We also note that defendants 'subject to deportation' have no constitutional or statutory right to remain in this country.") (citing <u>Harisiades</u>, 342 U.S. at 586-587); <u>Jean v. Nelson</u>, 727 F.2d 957, 967-968 (11th Cir. 1984) (en banc) (recognizing only limited procedural due process rights for aliens subject to deportation).

Insofar as removable aliens have no Constitutional right to remain in the United States, any substantive due process challenge to deportation is directly contrary to long established Supreme Court precedent. <u>Id.</u> <u>See</u> <u>also</u> <u>Sad v. INS</u>, 246 F.3d 811, 819 (6th Cir. 2001) ("[A]liens illegally in the United States do not have a fundamental right to remain",

citing Harisiades v. Shaughnessy, 342 U.S. 580, 586-87 (1952));
Doherty v. Meese, 808 F.2d 938, 944 (2nd Cir. 1986)("there is
no substantive due process right not to be deported."); Linnas
v. INS, 790 F.2d 1024, 1031 (2d Cir. 1986)("Congress has broad
authority over the status of aliens, and there is no
substantive due process right not to be deported. See e.g.,
Galvan v. Press, 347 U.S. 522, 530-32, 74 S.Ct. 737, 742-44, 98
L.Ed. 911 (1954); Harisiades v. Shaughnessy, 342 U.S. 580, 590-
91, 72 S.Ct. 512, 519-20, 96 L.Ed. 586 (1952); Basset v. United
States Immigration and Naturalization, 581 F.2d 1385, 1386-87
(10th Cir. 1978).").

Moreover, even assuming that a "state created danger"
theory of constitutional due process were to be recognized in
this circuit, the First Circuit has held that "Executive
actions that do no more than comport with valid statutory
commands simply are not the stuff from which substantive due
process violations can be fashioned." Herrera-Inirio v. INS,
208 F.3d 299, 309 (1st Cir. 2000), citing Kleindienst [v.
Mandel], 408 U.S. [753 (U.S. 1972)] at 770, 92 S.Ct. 2576)
(emphasis added).[11]

---

[11] See 8 U.S.C. §§ 1227(a) et seq. (describing classes of
deportable aliens that "shall, upon the order of the Attorney
General, be removed".).  Petitioner's conviction for
Importation of Heroin renders him deportable from the United
States.

Moreover, the First Circuit in Herrera-Inirio
characterized any other approach to substantive due process
analysis in the immigration-enforcement context as "contrary to
precedent". Herrera-Inirio, 208 F.3d at 309. Nonetheless, the
court observed that *even if* it "analyzed the situation under
the type of substantive due process analysis that
characteristically attaches to executive action outside the
immigration context . . . . [t]he removal order in this case,
while strong medicine, in no way sinks to the level of
'outrageous, uncivilized, and intolerable' conduct, Hasenfus v.
LaJeunesse, 175 F.3d 68, 72 (1st Cir. 1999), nor does it 'shock
the conscience,' Evans v. Avery, 100 F.3d 1033, 1038 (1st Cir.
1996)."). Id. See also Edwards v. INS, 2003 WL 22097780, *3
(E.D. Pa. 2003) ("Allowing removal to be stayed based on [the
state created danger exception] doctrine would conflict with
both immigration statutes and the Convention Against Torture,
and would be an extension of the concept of substantive due
process that has not previously been accepted by the United
States Supreme Court or any court of appeals.").

Petitioner's reliance upon the unpublished Rosciano v.
Sonchik, No. CIV 01-472-PHX-FJM, 2002 U.S. Dist. LEXIS 25419
(D. Ariz., Sep. 10, 2002), is unavailing. Petitioner's Second
Supplemental Memorandum, p.8. To begin with, Rosciano is in
conflict with the First Circuit jurisprudence that "Executive
actions that do no more than comport with valid statutory

commands simply are not the stuff from which substantive due process violations can be fashioned". Herrera-Inirio, 208 F.3d at 309.  In addition, there was no discussion in Rosciano of the line of authority elsewhere that establishes that deportable or removable aliens have no substantive due process right to remain in the United States. See e.g. Harisiades v. Shaughnessy, 342 U.S. 580, 586-587 (1952).  Nor was there even any determination whether government behavior was "truly outrageous, uncivilized, and intolerable", Hasenfus, 175 F.3d at 72.  Finally, even Rosciano itself recognized that its result was made "[u]nder the unique and compelling facts presented in this case," which included the undisputed facts that drug traffickers murdered petitioner's brother, and that petitioner's sister died under suspicious circumstances after being informed by a drug lord that she would not be forgiven for her discovered cooperation, in concert with that petitioner, with law enforcement.

In circumstances more similar to petitioner's claim, in Momennia v. Estrada, 268 F.Supp.2d 679, 687 (N.D. Tx. 2003), where an alien claimed his assistance to the FBI would place him in danger if deported back to Iran, the district court observed that "the petitioner faced no danger until he was ordered removed . . . [and] [t]herefore, his informant activities prior to that date are irrelevant" to the question whether government action was responsible for creating or

20

increasing any danger to the petitioner.  See also Mada-Luna v. Fitzpatrick, 874 F2d 816 (9th Cir. 1989)(Unpublished Disposition)("Even were there jurisdiction to hear the case, Luna has shown no substantive due process rights which are violated by his deportation. His sole claim is that he will be killed by Mexican drug runners if this country deports him to Mexico. But the immigration policies of the United States threaten him with no harm; it will be the responsibility of another sovereign, Mexico, to furnish him protection. We have no reason to challenge Mexico's ability to act."); Callis v. Sellars, 931 F.Supp.2d 504, 520 (S.D. Tex. 1996)("By agreeing to participate in the sting and to call Sellars as part of that process, Plaintiff was partially responsible for creating the danger to which she was exposed."); Williamson v. City of Virginia Beach, Va., 786 F.Supp. 1238, 1253 (E.D. Va. 1992) (no § 1983 liability for minor informant's suicide due to stress of receiving threats where recognized risk is retaliation against the informant or his family); Sadeghi v. Conforti, (E.D. Pa. 2001) (2001 WL 34355650, * 2) ("Absent any valid agreement to protect plaintiff from deportation or to place plaintiff in the Witness Protection Program, we find that plaintiff can not establish a constitutional violation entitling him to damages.").

Finally, even if non-immigration enforcement substantive due process standards were imported for application to this

case -- and so "contrary to precedent", <u>Herrera-Inirio v. INS</u>, 208 F.3d at 309 -- the enforcement of petitioner's final order of removal against him on the case facts hardly suggests "'outrageous, uncivilized, and intolerable'" conduct.  <u>Id</u>.

Accordingly, petitioner has failed to carry his burden to state any claim upon which relief may be granted, and this case should be dismissed.

V.    THE IMPLICATIONS OF THE "S" VISA CLASSIFICATION UNDERMINE ANY CLAIM TO THE EXISTENCE OF CONSTITUTIONALLY PROTECTED RIGHT OF PETITIONER NOT TO BE DEPORTED.

In <u>Herrera-Inirio v. INS</u>, 208 F.3d 299, 309 (1st Cir. 2000) the Court recognized that the Executive actions in seeking removal in that case "were precisely aligned with the purpose of the statute and well within its fair intendment." So too, in the instant case, is execution of petitioner's removal order in alignment with the removal statute, even if petitioner were able to shoulder his onerous burden and demonstrate some present danger caused by the government.

In this connection, the Court should take notice of the existence of the "S" nonimmigrant visa classification, and the implications of its creation by Congress. The "S" nonimmigrant classification is described at 8 U.S.C. § 1101(a)(15)(S)(i) (inter alia, alien in possession of "critical reliable information concerning a criminal organization or enterprise" who "has supplied or is willing to supply such information to Federal or State court", and "whose presence in the United

States the Attorney General determines is essential to the success of an authorized criminal investigation or the successful prosecution of an individual in the criminal organization or enterprise").

Congress therefore has foreseen and addressed the desirability in certain cases of proving a mechanism for certain informants to lawfully reside in the United States under such terms as provided by statute. Those terms, through the regulations of the Attorney General, require that any "S" visa application must be made only by a law enforcement agency and it is left to administrative discretion, in the end, whether or not to approve any such application.[12] Moreover, Congress has expressly provided that the number of aliens who may be issued "S" visas "may not exceed 200" in any fiscal year. 8 U.S.C. § 1184(k)(1).

Congress has also explicitly commanded that those specified classes of deportable aliens that are *not* eligible for statutory relief from deportation or removal "shall, upon order of the Attorney General, be removed". 8 U.S.C. § 1227(a). Implicit in the immigration statute's elaborate scheme providing for the various grounds for removal and for reliefs from removal is the understanding that if an otherwise

---

[12] The request for an "S" visa can be filed only by a Federal or State law enforcement agency on behalf of an otherwise qualifying alien, 8 C.F.R. § 214.2(t)(4) (2004), and is approvable only as a matter of administrative discretion. 8 C.F.R. § 214.2(t)(1) (2004).

removable alien is not eligible for relief as provided by
Congress, that alien is subject to removal.  In enacting a
provision -- the "S" visa -- that provides for lawful status
for *some* informants in the exercise of administrative
discretion and caps the annual number of such visas at 200,
Congress necessarily accepted that some other criminal
informants would not be granted a lawful status and therefore
would be removed as otherwise directed by statute.

Similarly, Congress provided for the possibility of
statutory relief for some aliens under some circumstances who
could establish that their "life of freedom" would be
threatened in the country to which removal would be ordered. 8
U.S.C. § 1231(b)(3)(A).  Though Congress could have provided
that *any* alien whose "life or freedom" would be threatened for
*any* reason should not be removed, Congress limited statutory
relief from removal to only certain aliens who would face those
threats "because of the alien's race, religion, nationality,
membership in a political social group, or political opinion".
Id. (Emphasis added).

Moreover, even this limited category of relief-eligible
aliens, whose "life or freedom" is in danger if removed to a
certain country, was further restricted by Congress to
eliminate relief for aliens within this group who were
themselves persecutors, or who had been convicted of certain
crimes, or who are national security risks. 8 U.S.C. §

1231(b)(3)(B)(defining exceptions to eligibility).  It follows
that, for a removable alien whose life or freedom was
threatened in the designated removal country for reasons *other
than* those set out in 8 U.S.C. § 1231(b)(3)(A), or for a
removable alien whose life or freedom was indeed threatened in
the removal country for the reasons specified in §
1231(b)(3)(A) but who nonetheless is excluded from the relief
of that section by the disqualifications set out in §
1231(b)(3)(B), Congress has directed nevertheless that the
alien be removed to from the United States to that country.

The same is true of course for aliens, such as petitioner,
whose CAT[13] applications have been denied for failure to
establish the necessary elements of CAT eligibility.

The instant petitioner does not dispute that he is a
removable alien, i.e., that he was apprehended Importing Heroin
and later convicted for that offense, and that he is now
subject to a final administrative removal order.  The Executive
action aimed at effecting petitioner's removal from the United
States is therefore "precisely aligned with the purpose of the
statute and well within its fair intendment", Herrera-Inirio v.
INS, 208 F.3d at 309, and petitioner's removal to Nigeria in
fact is directed as contemplated by the immigration statute.

Accordingly, the First Circuit's observation that

---

[13] Convention Against Torture and Other Cruel, Inhuman or
Degrading Treatment or Punishment, Dec. 10, 1984, G.A. Res.

"[e]xecutive actions that do no more than comport with valid statutory commands simply are not the stuff from which substantive due process violations can be fashioned", id., applies, and petitioner' claims should be dismissed.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By:  s/Frank Crowley
FRANK CROWLEY
Special Assistant U.S. Attorney
Department of Homeland Security
P.O. Box 8728
J.F.K. Station
Boston, MA 02114
(617) 565-2415

## CERTIFICATE OF SERVICE

I hereby certify that I caused true copy of the above document to be served upon counsel for petitioner by mail on May 31, 2005.

s/Frank Crowley
FRANK CROWLEY
Special Assistant U.S. Attorney
Department of Homeland Security
P.O. Box 8728
J.F.K. Station
Boston, MA 02114

---

39/46, Annex, 39 U.N. GAOR Supp. No. 51, at 197, U.N. Doc. A/RES/39/708 (1984), 23 I.L.M. 1027 (1984) ("CAT").