UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
                                    )
FRANK IGWEBUIKE ENWONWU             )
                                    )
        Petitioner,                 )
                                    )
        v.                          )   CIVIL ACTION
                                    )   NO. 05-10511-WGY
MICHAEL CHERTOFF, Secretary of      )
Department of Homeland Security,    )
BRUCE CHADBOURNE, Interim Field     )
Officer Director for Detention      )
and Removal, Boston Field           )
Office, Bureau of Immigration       )
and Customs Enforcement,            )
DEPARTMENT OF HOMELAND SECURITY,    )
ANDREA J. CABRAL, Sheriff,          )
Suffolk County House of             )
Correction                         )
                                    )
        Respondents.                )
                                    )
```

ORDER OF TRANSFER
REPORT AND RECOMMENDATION

YOUNG, C.J.                                          July 12, 2005

**Arrested by ICE agents on September 13, 2004, his procedural and substantive due process rights violated, Frank Enwonwu has today endured 303 days of imprisonment even though there are no criminal charges pending against him. He seeks the Great Writ of Habeas Corpus established in clause 39 of Magna Carta (1215) and enshrined in our own United States Constitution. U.S. Const. art. I, § 9, cl. 2. For 217 years, through boom and bust, insurgency, civil war, and terrorist attack, this Court--the oldest United States District Court in America--has carefully and prudentially administered the Writ of Habeas Corpus to secure the rights of the individual against overreaching by the executive.**

Mr. Enwonwu commenced his action in this Court on March 17, 2005, had an initial hearing 25 days later, and a full evidentiary hearing two weeks after that. This Court took the matter under advisement and commenced a detailed and reflective analysis of an evidentiary record both complex and deeply disturbing.

Then on May 11, 2005, the Congress stripped this Court of jurisdiction to act in this pending case and all others like it. Though such direct congressional interference in a pending case is virtually unprecedented in all our history, this surprising mandate has gone utterly unnoticed by our people. Evidently, only where an American jury sits to validate the separation of powers among the three branches is trial court jurisdiction immune from such peremptory congressional action.

How can this be in modern day America?

Mr. Enwonwu is an immigrant alien.

He has no right to trial by jury in this type of case and Congress does not much care about immigrant aliens, even those who, after endangering themselves assisting our law enforcement efforts to stem the international drug trade, are deported into the hands of the very drug traders upon whom they have informed.

Does this shock your conscience as an American? If so, read on and dispassionately judge for yourself:

This habeas corpus petition stems from the Board of Immigration Appeals' ("BIA") reversal of the Executive Office for Immigration Review's ("Review Office") grant of deferral of removal under the Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment ("Convention Against Torture") to petitioner Frank Enwonwu ("Enwonwu"). Enwonwu challenges the BIA's decision and subsequent denial of his motion to reopen on procedural due process grounds, claiming

that he was not given notice of the executive's appeal from the Review Office's decision.  Enwonwu also challenges the BIA's order of removal itself on substantive due process grounds.

## I.   FINDINGS OF FACT

### A.   Substantially Undisputed Facts

The following facts are not substantially disputed.  Where significant disputes exist, the Court has resolved them in subsection B below.  Mr. Enwonwu is a 56 year old native and citizen of Nigeria whose immigration history began in 1972 when he was admitted to the United States as a student.  Executive's Mem. in Supp. of Mot. to Dismiss ("Exec. Mem.") [Doc. No. 4] at 3.  On March 30, 1976, deportation proceedings were initiated against Enwonwu after his student visa expired.  Id.  Enwonwu left the United States of his own volition following an order of the Review Office permitting his voluntary departure.  Id.  In 1980, Enwonwu briefly vacationed in the United States for two weeks.  Tr. of Hr'g of 4/29/05 ("Tr. of 4/29/05") [Doc. No. 18] at 26.  Enwonwu returned to the United States again on January 20, 1986, arriving at Logan International Airport in Boston, Massachusetts with a tourist visa.  Pet. for Writ of Habeas Corpus ("Pet'r Mem.") [Doc. No. 1] at 6.  Upon his arrival, United States Customs officials interrogated and searched Enwonwu.  Id.  The search revealed that Enwonwu was concealing approximately five ounces of heroin within his body.  Id.

3

Enwonwu was transporting the heroin for a Nigerian military officer named Lieutenant Charles ("Charles").  Tr. of 4/29/05 at 27.  Enwownu agreed to smuggle the heroin into the United States and deliver it in exchange for a payment of $5,000.  Tr. of Hr'g of 5/2/05 ("Tr. of 5/2/05") [Doc. No. 19] at 12.  Enwonwu claims he received the heroin two hours before his flight out of Nigeria when he and approximately ten other individuals were given small packages.  Aff. of Frank I. Enwonwu ("Enwonwu Aff.") [Doc. No. 9] ¶¶ 20-21.  Upon receiving his package, Enwonwu was instructed by Charles to insert it into his rectum.  Id. at ¶ 22.  Enwonwu complied.  Id. at ¶ 25.

After Enwonwu successfully concealed the package, Charles handed him $300 and a telephone number he was to call when he arrived in the United States.  Id. at ¶ 26.  Charles then transported Enwonwu to the airport where they were waived through by customs agents and police officers who were participants in the drug trafficking organization.  Tr. of 5/2/05 at 12; Hr'g of 4/29/05, Ex. 6, Tr. of Review Office Hr'g ("Ex. 6") at 122.[1] Prior to his departure, Charles took Enwonwu's car as collateral to be returned following the successful delivery of the heroin.  Tr. of 5/2/05 at 12.  Although Enwonwu wanted to leave the car

---

[1] Both parties agreed that this Court may assign to the administrative record of proceedings before the Review Office and BIA, whatever evidentiary weight it deemed appropriate, including the transcripts of proceedings.  Tr. of Hr'g of 4/27/05 ("Tr. of 4/27/05") [Doc. No. 17] at 9.

4

with his cousin, Charles insisted on keeping it as "ransom" until Enwonwu returned.  Ex. 6 at 122.  Several of Enwonwu's possessions, including his driver's license, were in his car.  Id.

    Following the discovery of heroin, Special Agent Herbert Lemon ("Agent Lemon" or "Lemon") of the Drug Enforcement Administration ("DEA") was called to the scene.  Pet'r Mem. at 6.  Agent Lemon informed Enwonwu that he had run a criminal background check on him and noted that he did not appear to have a criminal record.  Tr. of 4/29/05 at 27.  Agent Lemon then asked Enwonwu how he had found himself in the present situation.  Id.  Enwonwu explained to Lemon that he had become involved with drug traffickers in Nigeria and had reluctantly agreed to serve as a courier for Charles.  Id.  Agent Lemon then inquired as to whether Enwonwu was willing to help convict Charles noting that the DEA was "really looking for the big guys who sent [Enwonwu] on this trip."  Id.; Tr. of 5/2/05 at 14 (indicating that Lemon asked Enwonwu whether he was "ready to help [him] convict Mr. Charles").  Further, according to Enwonwu, Lemon stated that if his story turned out to be true and he cooperated, Enwonwu would avoid prosecution and receive protection from Charles and his confederates.  Enwonwu Aff. ¶ 42, 44.

    Enwonwu also claims that Agent Lemon promised that in exchange for his cooperation he would not be sent back to

Nigeria. Id. at ¶ 42. But see infra section I(B). Lemon cautioned, however, that if Enwonwu was lying and wasting everyone's time there would be no deal. Id. at ¶ 43. According to Enwonwu, he accepted the offer and, to prove to Lemon that he was telling the truth, produced the telephone number given to him by Charles which number he was to call upon his arrival. Tr. of 4/29/05 at 28; Tr. of 5/2/05 at 15. Agent Lemon subsequently arranged for Enwonwu to place a call to that number which connected to Charles' room at a Lagos, Nigeria hotel. Tr. of 4/29/05 at 28.

As instructed by Agent Lemon, Enwonwu informed Charles that he had "arrived [in] Boston safely." Enwonwu Aff. ¶ 46; Tr. of 4/29/05 at 28. An "excited" Charles ordered Enwonwu to call him the next morning for precise instructions on how to complete the delivery. Id. at 28-29. Agent Lemon and another DEA agent who had recording equipment and listening devices connected to the telephone listened to the call Enwonwu made to Charles. Id. Following the phone call, Enwonwu was taken to a detention facility and told by DEA agents that he would be picked up the following day. Id. at 29.

The next morning, Agent Lemon retrieved Enwonwu and brought him to a Holiday Inn in Boston where he was checked into a room with several DEA agents. Id. At the scheduled time, Enwonwu placed another telephone call to Charles which the DEA agents

again recorded.  Id. at 30.  Charles informed Enwonwu that two
individuals were being sent from New York to receive the heroin.
Id.  Enwonwu then provided Charles with a contact telephone
number (given to him by Agent Lemon) that the New York
individuals were to call when they arrived in Boston.  Id.

       When the individuals from New York later called Enwonwu,
they informed him that they would be in Boston the following day.
Id. at 31.  Enwonwu spent that evening at the Holiday Inn under
DEA protection.  Ex. 6 at 124.  The following morning, the New
York individuals called Enwonwu again to tell him the time and
place of their rendezvous.  Tr. of 4/29/05 at 31.  The individual
with whom Enwonwu spoke informed him that they were to meet at a
coffee shop near the Holiday Inn at noon.  Enwonwu Aff. ¶ 56.
Enwownu briefly described what he was wearing so that they would
be able to recognize him.  Id.  After Enwonwu completed the call,
Agent Lemon introduced him to a female DEA agent who would be
posing as Enwonwu's companion.  Tr. of 4/29/05 at 31.  Lemon
instructed Enwonwu that upon meeting the individuals he was to
lure them to the car being driven by the undercover agent in
order to complete the putative transaction.  Id.

       When Enwonwu entered the coffee shop later that day, two men
gestured for him to come over to them.  Id. at 32.  According to
Enwonwu, he could tell by their physical appearance that "they
were Nigerians [or a]t least they were Africans." Id. When

7

Enwonwu walked over to the men he informed them that his
girlfriend was outside in a car along with the heroin.  Id.  The
men followed Enwonwu to the car where they sat in the back seat
and Enwonwu and the undercover DEA agent sat in the front.  Id.
Once in the car, one of the men handed Enwonwu $5,000 and the
undercover agent handed them the package of heroin.  Id.

Upon receiving the heroin, one of the men grew suspicious of
a tear in the package that had been covered with a piece of tape.
Id. at 32-33.[2]  Before Enwonwu could respond, the car was
surrounded by DEA agents and police "with their weapons drawn."
Id.  Enwonwu and the two men were taken into custody.  Id. at 34.
During the arrest Enwonwu "started yelling" to create the
impression that he did not "know what was going on."  Id.  After
Enwonwu was taken into custody, he was brought back to the
Holiday Inn and debriefed.  Id., Enwonwu Aff. ¶ 72.  A few hours
later, Agent Lemon informed him that the two New York contacts
had begun to cooperate and had informed him that they had been
sent by their "big boss" in Ohio.  Tr. of 4/29/05 at 34.  Agent
Lemon then requested Enwonwu's further cooperation and asked him
to place a call to the individual in Ohio whose telephone number
the New York individuals had given him.  Id. at 34-35; Ex. 6 at
125.

---

[2] Enwonwu believes that the package was torn by the DEA when
it tested the contents of the package.  Id. at 33.

Agent Lemon instructed Enwonwu to tell the Ohio contact that he decided not to sell the heroin for the agreed upon price of $5,000. Tr. of 4/29/05 at 34-35. Rather, Enwonwu was to insist on $10,000. Id. at 35. Enwonwu agreed to cooperate and placed the call as instructed. Id. In speaking to the individual, Enwonwu learned that he too was Nigerian. Id. The man informed Enwonwu that he was from a town just sixty miles from Enwonwu's hometown of Onitsha. Id. As instructed, Enwonwu informed the man that he would not deliver the heroin unless he received $10,000. Id. at 35, 36.

The man became irate and expressed his anger over the fact that Enwonwu had become so greedy after "they" had just given him his "first opportunity" in the drug business. Id. at 36. Enwonwu replied that this was not a question of greed and pointed out that Charles had taken his car. Id. This conversation went on for approximately twenty more minutes. Id. The Ohio individual became increasingly angry and cursed at and threatened Enwonwu. Id. At the end of the conversation, Enwonwu and the individual agreed that they would speak again the next day and attempt to renegotiate. Id. Enwonwu remained in DEA custody that evening at the Holiday Inn. Id.

The following day at noon, Enwonwu was instructed to call the Ohio individual again and "to really stall him." Id. at 36-37. During the call, Enwonwu remained insistent on receiving

9

more money and told the man that he "did not care how much he threatened" him.  Id. at 37.  As the conversation progressed, the Ohio individual offered Enwonwu $8,000 for the heroin which Enwonwu refused.  Id.  Within moments, Enwonwu heard "commotion" from the other end of the telephone, "like people busting into the room."  Id.  Enwonwu then heard the man shouting just before the line went "dead."  Id.  The DEA agents listening in the room with Enwonwu began "high fiving each other" and "making statements that made [Enwonwu] believe" that the Ohio individual had been "busted."  Id.  Agent Lemon congratulated Enwonwu and told him that he had been "very, very helpful to them."  Id.[3]

Agent Lemon informed Enwonwu that he would be set free within one to two weeks but that he would be detained until then. Enwonwu Aff. ¶ 80.  On January 28, 1986, Enwonwu was arraigned before Magistrate Judge Joyce Alexander of the United States District Court for the District of Massachusetts and charged with importing or attempting to import heroin in violation of 21 U.S.C. §§ 952, 960, and 963.  Hr'g of 4/27/05, Ex. 1, Certified Copy of R. of Crim. Proceedings against Frank I. Enwonwu ("Ex. 1") at 14.  On the advice of his court appointed attorney, Enwonwu pleaded not guilty.  Enwonwu Aff. ¶ 84.  On January 30,

_____

[3] Agent Lemon later informed Enwonwu that when the DEA attempted to locate Lieutenant Charles, it learned that the phone number he had been reached at no longer existed and that he was no longer staying at the hotel where Enwonwu called him.  Tr. of 5/2/05 at 20.

1986, Enwonwu was indicted on those charges.  Ex. 1 at 10.  The indictment contained a second count charging Enwonwu with possession of heroin with intent to distribute in violation of 21 U.S.C § 841(a)(1).  Id. at 11.

Following a request by Agent Lemon, the United States Attorney's Office consented to Enwonwu's pretrial release.  Tr. of 4/27/05 at 31-32; Pet'r Mem. at 6.  On February 5, 1986, Magistrate Judge Alexander issued an order permitting Enwonwu's pretrial release to Douglass Clott, a friend of Enwonwu's from his student days in Boston.  Pet'r Mem. Ex. 4, Order on Release of 2/5/86; Tr. of 4/29/05 at 39.  On March 21, 1986, as part of an agreement with the United States Attorney's Office, Enwonwu pleaded guilty to the charge of importing heroin in exchange for the dismissal of the possession with intent to distribute charge.  Pet'r Mem. at 7.  Enwonwu received a five-year suspended sentence and was placed on three years of probation.  Ex. 1 at 1.  One of the conditions of Enwonwu's probation was that he not serve as a government informant.  Id. at 2.  Despite the terms of his probation, the DEA continued to use Enwonwu's services as an informant both before and after the termination of criminal proceedings against him.  Tr. of 4/29/05 at 42-43.

DEA agents informed Enwonwu that because the individuals he betrayed were part of a large drug trafficking organization, his life was in danger and he needed to be careful.  Ex. 6 at 132-33.

11

Accordingly, Enwonwu was given a DEA 24-hour hotline number. <u>Id.</u> at 132. Agent Lemon told him immediately to call the number if he encountered a suspicious situation. <u>Id.</u> at 133.[4]

According to Enwonwu, he reported to the DEA office in Boston several times per week. Tr. of 4/29/05 at 42. Initially, Enwonwu dealt only with Agent Lemon but eventually dealt with various agents. <u>Id.</u> at 42-43. The DEA sought information from him regarding "drug activities going on in Nigeria." <u>Id.</u> at 42. Enwonwu claims that he provided the DEA with everything he knew about the current status in Nigeria, including information about the corruption of the Nigerian government and how heroin came into Nigeria. Ex. 6 at 126-27.

Specifically, Enwonwu informed the DEA that Pakistan was the primary source of heroin in Nigeria. <u>Id.</u> According to Enwonwu, Nigerian soldiers brought the heroin back from "Samhaus," Pakistan where they were sent for military training. <u>Id.</u> Enwonwu further informed the DEA that members of the military recruited Nigerians to transport the heroin to the "United States or to [Great] Britain for a fee." <u>Id.</u> Additionally, Enwonwu provided the DEA with the names of "prominent businessmen" that

---

[4] Enwonwu called the number on one occasion when he thought someone was following him. Ex. 6 at 133. He spoke to Agent Lemon who told him to call back in ten minutes if he was still being followed. <u>Id.</u> A few moments later, Enwonwu realized that he was not being followed and he and Lemon agreed that it had been a "false alarm." Enwonwu Aff. ¶ 117; Ex. 6 at 133.

were widely known to be involved in the Nigerian drug trade.  Id.
Each day that he came to the DEA office, Enwonwu was asked to
think for hours of every name or address that he could connect to
the drug trade.  Id.[5]  Enwonwu was compensated by the DEA for
these services.  Tr. of 4/29/05 at 43.  Specifically, Enwonwu
testified that Agent Lemon periodically made $200 cash payments
to him.  Id.[6]

    In addition to working for the DEA, Enwonwu also cooperated
with the Immigration and Naturalization Service ("INS").  Tr. of
4/29/05 at 39.  While Enwonwu was working for the DEA, Agent
Lemon introduced him to agents at the INS, whose office was
located in the same building.  Id. at 39-40.  When Enwonwu met
with INS agents he was asked in what type of employment he was
interested.  Id. at 40.  Enwonwu replied that because he used to
drive a cab as a student in Boston, he was interested in that
type of work.  Id.

    The INS subsequently issued Enwonwu a work authorization
document and sent him to Boston Police headquarters to meet with

_____

    [5] Enwonwu was in a position to supply this information
because while living in Nigeria he was the public relations
manager of the largest hotel in the city of Onitsha.  Ex. 6 at
135.  "All the big army officers around the area and the big drug
cartels live in Onitsha . . . ."  Id.  Further, Enwonwu claims
that many of the "big drug dealers" frequented the hotel.  Id. at
127.

    [6] According to DEA records, Enwonwu was paid a total of
$1,600 for his services.  Hr'g of 4/27/05 , Ex. A, DEA Report of
11/6/86 ("Ex. A").

a Captain Devine who was to issue Enwonwu a hackney license.  Id.

Additionally, the INS extended the period of time that Enwonwu

could voluntarily remain in the United States to the end of the

year.  Pet'r Mem. Ex. 7, Employment Authorization.  Following the

issuance of Enwonwu's hackney license, he was hired by the

Checker Cab Company where he worked for the next six years.  Id.

The INS, according to Enwonwu, also assigned him to one of their

agents for periodic reporting.  Tr. of 4/29/05 at 44.  The INS,

Enwonwu claims, provided him with photographs and addresses of

Nigerian individuals that he was to "check on" and provide

feedback on.  Id.; Ex. 6 at 128.  According to Enwonwu, these

individuals' precise whereabouts were unknown to INS, which was

"looking for" them.  Id. at 128.[7]  While working as a cab driver,

Enwonwu also provided the DEA with the names of Nigerians living

in the United States that he had learned were involved with

illegal drugs.  Id. at 129.

To carry out his tasks as a government informant, Enwonwu

asked many questions of fellow Nigerians that he "met at the taxi

park[,] especially at the airport."  Tr. of 4/29/05 at 45.

Enwonwu claims that these individuals grew suspicious of him and

_____

[7] Enwonwu also testified that at one of his meetings with
the INS, he was given an I-485 adjustment of status form.  Tr. of
4/29/05 at 44.  Enwonwu maintains that the form was already
filled out with his information and that he was asked simply to
sign it.  Id.  Enwonwu claims that he was then told that his
"green card would be ready in a short while."  Id.

began to speculate as to his motives. <u>Id.</u> Enwonwu later learned that he had created "a lot of enemies" because the people he had been inquiring of had put "two and two together." <u>Id.</u> That is, according to Enwonwu, the Nigerians he had been questioning knew that he had been arrested and wondered why he never served time for his offense. Ex. 6 at 133. Enwonwu claims that given the types of questions he had been asking, these individuals figured out that he had "made a deal with the [g]overnment." <u>Id.</u>

In addition to aiding the DEA and INS as an informant, Enwonwu also cooperated by testifying in 1986 before the grand jury that indicted the two New York individuals arrested in the controlled drug purchase. Tr. of 4/27/05 at 40 (cross examination testimony of Agent Lemon). Although the identities of those individuals are currently unknown to Enwonwu, counsel for the executive informed this Court that Joshua Adegoke Ogunniren ("Ogunniren") and George Amarkwei Brock ("Brock") were arrested in that operation. Executive's Resp. to Order Regarding Subsequent Arrests [Doc. No. 13]. Although counsel for the executive was unaware of the ultimate outcome of that criminal case, based on the names it provided, this Court was able to secure information from its own search of the records of the United States District Court.

In proceedings before Judge Robert E. Keeton in May of 1986, Ogunniran and Brock were each sentenced to two years

15

imprisonment after pleading guilty to charges of conspiracy to possess heroin with intent to distribute in violation of 21 U.S.C § 841(a)(1). This Court takes judicial notice of the facts contained in those records. Fed. R. Evid. 201. <u>See, e.g.</u>, <u>Kowalski</u> v. <u>Gagne</u>, 914 F.2d 299, 305 (1st Cir. 1990) ("[I]t is well-accepted that federal courts may take judicial notice of proceedings in other courts if those proceedings have relevance to the matters at hand"). The current whereabouts of Ogunniran and Brock are unknown to this Court.[8]

Several months after Enwonwu had been acting as an informant for the DEA and INS, Enwonwu's probation officer began inquiring about his sources of income. Tr. of 4/29/05 at 46. Enwonwu indicated that in addition to his income from taxi driving, he was also receiving money from the DEA and INS for his services as an informant. <u>Id.</u> at 46-47. Upon hearing this information, the probation officer sternly reminded Enwonwu that serving in such a capacity violated the terms of his probation. <u>Id.</u> at 47. Enwonwu agreed immediately to stop those activities to avoid the probation officer's report of his violation. <u>Id.</u>; Enwonwu Aff. ¶¶ 123-24.

---

[8] According to counsel for the executive, "[i]t appears" from a review of Department of Homeland Security records that "one of the men was deported, re-entered illegally, and was deported again, most recently to Ghana. The location of the other is unknown at present." Executive's Second Supplemental Mem. ("Exec. Mem. III") [Doc. No. 23] at 8-10 n.7.

When Enwonwu was later contacted by DEA agents for
information, he informed them that because of the terms of his
probation, he could no longer assist them.  Ex. 6 at 138.
According to Enwonwu, the agents continued to seek his assistance
for another few weeks but eventually stopped after his persistent
refusals.  Id. at 139.  According to DEA records, Enwonwu's
status as an informant officially terminated in November 1986,
nearly ten months after he initially cooperated.  Ex. A.

Believing that the United States Government was "at peace"
with the fact that he was no longer serving as an informant,
Enwonwu resolved to continue making his living as a taxi driver.
Enwonwu Aff. ¶¶ 126, 129.  In 1991, Enwonwu successfully
completed his probation and began a new career as a nursing
assistant.  Pet'r Mem. at 8; Tr. of 4/29/05 at 48.  After
Enwonwu's probation officer suggested that he petition the INS
for his green card, Enwonwu made such a request in writing but
received no reply.  Enwonwu Aff. at ¶ 131.

In April 1997, the INS began implementing the 1996
amendments to section 241 of the Immigration and Nationality Act
("INA") which retroactively classified past drug-related offenses
as "aggravated felonies," the commission of which render an alien
removable from the United States.  8 U.S.C. §§ 1101(a)(43),
1227(a)(2)(A)(iii); Pet'r Mem. at 8.  Enwonwu became injured in
June 1997 and applied for disability benefits from the Social

17

Security Administration.  Enwonwu Aff. ¶ 133; Tr. of 4/29/05 at

50.  At the behest of the Social Security Administration, Enwonwu

visited the INS to "adjust [his] status in order to qualify for

disability benefits."  Enwonwu Aff. ¶ 133.

Shortly after Enwonwu identified himself at the INS office

he was arrested and placed in removal proceedings before the

Review Office "as an alien known to be a trafficker in controlled

substances and as an immigrant without an immigrant visa, under 8

U.S.C. §§ 1182(a)(2)(A)(i)(II), 1182(a)(2)(C), and 1182(a)(7)(A),

respectively."  Exec. Mem. at 4; Enwonwu Aff. ¶ 134.  Enwonwu's

removal proceedings were presided over by Immigration Hearing

Officer Leonard Shapiro ("Hearing Officer Shapiro" or the

"hearing officer").  Pet'r Mem. at 8.  Enwonwu retained an

attorney to represent him in these proceedings.  Enwonwu Aff. ¶

138.  Enwonwu asked his attorney to contact the DEA to inform

them that, despite their alleged agreement, he was being

deported.  Id.

Enwonwu's attorney contacted Agent Lemon and discussed with

him the possibility of Enwonwu being issued an "S" visa, a

special visa available to aliens who provide the government with

reliable information regarding criminal enterprises in the United

States.  8 U.S.C § 1101(a)(15)(S); Ex. 6 at 13; Pet'r Mem. at 8 &

n.5.  The DEA subsequently agreed to interview Enwonwu regarding

the possibility of issuing him such a visa.  Ex. 6 at 13.  Upon

18

receiving this information, the hearing officer granted the parties leave to explore this possibility. Id. at 29.

At the request of Agent Lemon, DEA agent Anthony Pettigrew ("Pettigrew") interviewed Enwonwu at the Hillsborough County Jail in New Hampshire where Enwonwu was being detained. Tr. of 4/29/05 at 13-14. According to Pettigrew, Enwonwu could not provide any new information that was "useful to open a DEA investigation." Id. at 17. Agent Pettigrew subsequently informed Enwonwu's attorney that Enwonwu had not provided him with enough information to "go forward." Id. at 19. Thus, an "S" visa was never issued to Enwonwu and his deportation proceedings resumed.

Following a summary hearing on August 28, 1997, the hearing officer "sustained the claims in the INS charging documents and ordered that Enwonwu be removed back to Nigeria." Pet'r Mem. at 8; Ex. 6 at 267-68. Thereupon, Enwonwu promptly appealed his removal to the BIA. Pet'r Mem. at 9. "While [Enwonwu's] appeal was pending, [he] wrote numerous letters to both the DEA and the INS pleading with them to remember their promises and reminding them that [his] life was at stake." Enwonwu Aff. ¶ 150. That is, Enwonwu feared that he would face deadly retribution in Nigeria for his cooperation with the DEA. Id. at ¶ 137; Tr. of 5/2/05 at 26. Enwonwu's appeal was denied on June 10, 1998. Pet'r Mem. at 9. Following the denial of his appeal, Enwonwu was

19

transferred to the Krome Detention Center in Miami, Florida. Id.; Enwonwu Aff. ¶ 153.

Enwonwu subsequently filed a petition for a writ of habeas corpus in the United States District Court for the Northern District of Florida. Pet'r Mem. at 9. Enwonwu's petition was denied for lack of jurisdiction. Id. Enwonwu also filed a motion to reopen his case with the BIA so that he could pursue relief under the Convention Against Torture. Enwonwu Aff. ¶ 152. Under the Convention Against Torture, a signatory country is prohibited from returning an alien "to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture . . . ." Foreign Affairs Reform and Restructuring Act of 1998, 8 U.S.C § 1231 (1998); see also 8 C.F.R. §§ 1208.16(c)(4), 1208.17, 1208.18. While Enwonwu awaited a ruling on his motion, his plight was detailed in a February 14, 1999 Boston Sunday Globe article after he agreed to be interviewed. Pet'r Mem., Ex. 14, Teresa Mears, As INS Jails Fill, A Release Plan Surfaces, Boston Globe, Feb. 14, 1999, at A16; Tr. of 5/2/05 at 26. The article mentioned the fact that Enwonwu cooperated with the DEA and that he feared for his life. Mears at A16.

On June 2, 1999, the BIA granted Enwonwu's motion to reopen and allowed him to pursue relief under the Convention Against Torture. Enwonwu's case was remanded back to the Review Office

20

in Boston where Hearing Officer Shapiro again presided.  Pet'r
Mem. at 10.  Over the course of Enwonwu's three-day Convention
Against Torture hearing, testimony was taken from Agent Lemon,
Enwonwu, and Professor Michael Watts of the University of
California, Berkeley.

Agent Lemon acknowledged that Enwonwu had cooperated with
the DEA by participating in a controlled drug purchase and by
making telephone calls to both Nigeria and Chicago.  Ex. 6 at 74-
75.  Agent Lemon specifically recalled Enwonwu making calls to
the "ultimate recipient" of the heroin.  Id. at 74.  As Agent
Lemon recalled, the individuals who came to Boston to purchase
the drugs were Nigerian nationals.  Id.  Lemon also testified
that he remembered that three individuals were arrested in
connection with the controlled buy and that some of them had
traveled from Nigeria to complete the transaction.  Id. at 74-75.

In addition to the telephone calls Enwonwu placed, Lemon
testified that Enwonwu also provided "some information about
these individuals in Nigeria."  Id. at 76.  Further, Lemon
recalled that Enwonwu and an undercover agent had met with the
prospective purchasers prior to the arrest.  Id.  When asked
whether Enwonwu provided the DEA with information about
individuals other than the three who were arrested in connection
with the controlled drug purchase, Lemon responded affirmatively
but noted that he had been instructed by the DEA Office of Chief

21

Counsel that he could not "get into particulars with respect to the information." Id. at 76-77.

Agent Lemon testified further that he did not recall Enwonwu implicating any high ranking military officials in Nigeria. Id. at 79. Lemon did recall, however, that Enwonwu indicated that the people with whom he had dealt were in Nigeria. Id. at 80. Agent Lemon also acknowledged that he introduced Enwonwu to agents at the INS to "see if Mr. Enwonwu could be of any value" to them. Id. at 88. Lemon elaborated that his understanding was that INS obtained a "taxi cab license" for Enwonwu who was going to "attempt to be of some assistance" to them. Id. Lemon testified further that he contacted an Assistant United States Attorney to ensure that Enwonwu received a suspended sentence as a result of his cooperation with the DEA. Id. at 81-82.

When asked if Enwonwu was compensated by the DEA, Lemon responded that he did not know but noted that "the majority of times" informants who cooperate in exchange for leniency in a pending criminal case "are not compensated . . . with money, but that's not to say that it did not occur." Id. at 89. Lemon denied ever promising to secure an "S" visa for Enwonwu. Id. at 105. Lemon also denied that anyone in the DEA promised asylum to Enwonwu, noting that "we're not allowed to make promises." Id. at 106-07.

22

While testifying on his own behalf, Enwonwu stated that he feared returning to Nigeria because of the retribution he would endure at the hands of the individuals connected to the drug cartel that he betrayed. Id. at 139. Enwonwu noted that members of the organization still had possession of his car and his driver's license. Id. Enwonwu added that it was a "mafia kind of thing going on in Nigeria and they will want to have revenge on me" for interfering with their business. Id.

During his testimony, Enwonwu admitted to the hearing officer that he had lied under oath to an asylum interviewer regarding the identity of the mother of his son Brian. Id. at 188-190. Enwonwu acknowledged that he untruthfully told the interviewer that a woman named Virginia Cole was Brian's mother in an effort to protect his ex-wife (Brian's actual mother) who was then living in the United States and wished not to be involved in Enwonwu's immigration affairs. Id. at 188.

The final person to testify at Enwonwu's Convention Against Torture hearing was Professor Michael Watts.[9] Professor Watts teaches geography and development studies at the University of California, Berkeley where he has been employed since 1979. Id. at 209. Professor Watts is also the director of the school's

---

[9] Professor Watts received his Bachelor of Science degree in 1972 from the University of London and received both a Master's Degree and, in 1979, a Ph.D. in geography from the University of Michigan. Id. at 208. Professor Watts was also a research fellow at the University of Ibadan in Nigeria. Id.

International Studies Institute, an organization devoted to international studies and foreign affairs. <u>Id.</u> Professor Watts' specific area of expertise focused on West Africa, particularly Nigeria. <u>Id.</u>

Professor Watts testified that he was especially interested in Nigerian "politics, economics, and resource use." <u>Id.</u> He testified that he first traveled to Nigeria in 1972, that he lived there for two years in the mid-1970's, and that had been returning "regularly" since that time. <u>Id.</u> At the time of his testimony, Professor Watts had written three books on Nigeria. <u>Id.</u> at 210. The most recent book Watts had co-written "had to do particularly with questions of the rise of the military and the military [g]overnment in that country, problems of corruption . . . and how that was shaping[] patterns of social and cultural life" in Nigeria. <u>Id.</u> at 210-11. Professor Watts also testified that he was not being compensated for his testimony. <u>Id.</u> at 228.[10]

In addition to authoring books on Nigeria, Watts drafted consultancy documents for organizations such as the Ford and Rockefeller Foundations regarding country conditions in Nigeria. <u>Id.</u> at 211. Watts also authored a report to the United Nations

_____

[10] According to Watts, he agreed to testify because he was particularly concerned about human rights abuses going on in Nigeria, a country he has lived in and "care[s] deeply about." Ex. 6 at 228.

Development Program on a similar topic.  Id.  Watts has received many research grants to study country conditions in Nigeria.  Id. at 211-12.  Some of those grants were awarded by the United States Government, the Ford Foundation, and the MacArthur Foundation.  Id. at 212.  Based on Professor Watts' background, the hearing officer qualified him as an expert on the country conditions of Nigeria.  Id. at 215.

Professor Watts testified that, in his opinion, it was likely that Enwonwu would be subject to torture should he return to Nigeria.  Id. at 217-18 (opining it was "likely that should Mr. Enwonwu return [to Nigeria,] he would experience torture as a result of the activities that he had previously been involved in").  Watts' opinion was based in large part on Enwonwu's cooperation with the DEA.  Id. at 219.  According to Professor Watts, there existed a "very serious likelihood" that the Nigerian drug traffickers with whom Enwonwu had dealt would mete out retribution against him for that cooperation.  Id. at 219, 223.  That Enwonwu's interaction with these Nigerian individuals occurred "in the mid-1980's" did not alter Watts' assessment. Id. at 223, 251.

According to Watts, the Nigerian drug trade "very clearly has actors that are drawn from the military" as well as the government.  Id. at 223.  Thus, when testifying about the Nigerian drug trade, Professor Watts made clear that he was

"simultaneously talking about the interrelationship of all three:
senior military, senior and middle level government officials,
and a sort of independent drug business, so to say." Id. at 223-
24. Because of that interconnection, Professor Watts opined,
"there would[] not only be retaliation from the drug business
side of things, but there would also be a likelihood of
imprisonment, arrest and subsequent torture from the . . .
military and [g]overnmental constituencies, insofar as they are
part of that larger drug activity." Id. at 224.

Professor Watts testified further that the Nigerian
government uses sophisticated surveillance and monitoring
apparatuses capable of identifying and tracking down individuals
like Enwonwu, even if they avoid parts of the country they
previously inhabited. Id. at 218, 224-25. In fact, Watts
testified, there are documented cases of individuals being
tracked down and arrested after being absent from Nigeria for ten
to fifteen years. Id. at 242.

According to Professor Watts, in the last twenty years
Nigeria has emerged as a "major . . . player" in the
international drug trade. Id. at 229. Watts testified that
Nigeria is a key source of heroin, accounting for two-thirds or
more of the global trade. Id. That trade, he noted, is the
source of a considerable amount of violence within Nigeria. Id.
Watts testified that there is a "great deal" of "well documented"

26

evidence of violence involving "lower operative[s]" in the Nigerian drug trade.  Id.

Specifically, there existed "enormous amounts of . . . retaliative violence" incident to that trade.  Id. at 230.  Such violence thrives, according to Professor Watts, because of Nigeria's National Drug Enforcement Agency, which he described as "an extraordinarily corrupt organization" that "shows absolutely no willingness [or] ability to . . . apprehend . . . or convict" high level drug traffickers.  Id. at 229-30.  In fact, Watts testified, that agency is often "complicit[]" with the drug traffickers.  Id. at 229.

When asked to discuss the rule of law in Nigeria, Professor Watts testified that up until May of 1999 there simply was "no rule of law."  Id. at 225.  Citing United Nations reports, Watts observed that he was not alone in reaching that conclusion.  Id. Watts observed further that Nigeria is "[o]ne of the most, if not the most," corrupt nations in the world.  Id. at 225.  Watts noted that Nigeria has a culture of "vast corruption" and "organized and unorganized violence."  Id.  Further, Watts testified, Nigeria lacks a free press and "[t]he independence of its judiciary has been totally undercut by the military."  Id. Watts observed that despite a recent democratic transition, the rule of law had not returned to Nigeria which is still dogged by problems of corruption and violence.  Id. at 225-27.

27

Recent United States State Department reports reflect that the situation in Nigeria has not much improved since 1999.  Hr'g of 4/29/05, Ex. 2, Bureau of Democracy, Human Rights, and Labor, Country Reports on Human Rights Practices--2004: Nigeria (Feb. 28, 2005) ("Nigeria Country Report") at 1-27.  The State Department observes that arbitrary violence and lethal force at the hands of police and the military continue.  Id. at 3.  Additionally, "[v]igilante violence continued throughout the country . . . ."  Id. at 2.  Further, the report observes, "[c]orruption was massive, widespread, and pervasive, at all levels of the government and society."  Id. at 17.  The report detailed flagrant violations of human rights and civil liberties by the Nigerian government that included arbitrary arrests and politically motivated killings, id. at 2, politically motivated incarcerations and disappearances, id. at 5, denials of fair public trials, id. at 9, arbitrary interferences with privacy rights, id. at 10, and restrictions on speech and assembly rights, to name a few.  Id. at 10-12.

Another recent United States State Department report discussing international narcotics trafficking notes that Nigeria remains "a hub of trafficking of persons and narcotics."  Bureau for International Narcotics and Law Enforcement Affairs, International Narcotics Control Strategy Report--2005 Country Reports: Nigeria (Mar. 2005) ("Nigeria Narcotics Report")

<u>available at</u>, http://www.state.gov/g/inl/rls/nrcrpt/2005/vol2
/html/42395.htm.  Further, the report notes, "Nigeria is a center
of criminal financial activity for the entire continent.
Individuals and criminal organizations have taken advantage of
the country's location, weak laws, systemic corruption, [and]
lack of enforcement . . . to strengthen their ability to
perpetuate all manner of financial crimes at home and abroad."
<u>Id.</u>  Despite the Nigerian government's recent attempts at
combating rampant crime and corruption, "Nigerians continue to be
plagued by crime."  <u>Id.</u>

On December 16, 1999, after the close of all the evidence,
the hearing officer granted Enwonwu deferral of removal under the
Convention Against Torture.  Ex. 6 at 5; Pet'r Mem. at 10.
Although the hearing officer "disbelieved" Enwonwu's testimony
that he identified various members of the Nigerian military as
his co-conspirators,[11] he did find that Enwonwu cooperated with
the DEA "and provided names."  Ex. 6 at 5.  The issue, according
to the hearing officer, was whether Enwonwu, "having been
convicted of a drug trafficking crime in this country, having
cooperated with the Drug Enforcement Administration, and having
been involved in smuggling narcotics into this country from

---

[11] According to the hearing officer, he discredited this
account because of Agent Lemon's testimony that "he certainly
would have remembered if a high level military official were to
have been identified" by Enwonwu.  Ex. 6 at 2.

Nigeria, would face the likelihood of torture upon his return to Nigeria." <u>Id.</u> at 3.

It was evident, the hearing officer found, that Enwonwu was "involved with others in Nigeria" who were possibly "connected to the military or the [g]overnment." <u>Id.</u> Further, according to the hearing officer, the documentary evidence established that "Nigeria is a narcotics trafficking center of major proportions . . . responsible for a significant portion of the heroin that is abused in the United States." <u>Id.</u> Additionally, the hearing officer found that the Nigerian government "has fostered a climate receptive to criminal activities and it is widely believed that corruption and criminal activity and narcotics trafficking are fostered by some of the Nigerian elite, some of whom have links to ranking Nigerian government officials, as well as the military." <u>Id.</u> at 3-4.

The hearing officer found that it is the policy and the law in Nigeria that those who have been convicted of drug trafficking crimes outside Nigeria are subject to prosecution and conviction in Nigeria for those same crimes. <u>Id.</u> at 4. Further, the hearing officer found that it had been clearly established that the Nigerian prison system is a haven for human rights abuses and that prisoners within that system are routinely tortured. <u>Id.</u> The hearing officer credited Professor Watts' testimony that Enwonwu would be highly identifiable upon his return to Nigeria

30

and that "many people who do return to that country even after ten to fifteen years are apprehended and arrested for grievances which the government might have against them which occurred a long time ago." Id. According to the hearing officer, Enwonwu would likely be identified and apprehended upon his return to Nigeria by virtue of being returned under an order of deportation. Id.

Based on all of the evidence, the hearing officer concluded that it was "more likely than not" that Enwonwu would be tortured if he was returned to Nigeria. Id. at 4, 5. The hearing officer based his ruling on two grounds. First, because of Enwonwu's conviction in the United States, he would likely be incarcerated in Nigeria and subject to torture in prison. Id. Alternatively, even if Enwonwu was not imprisoned based on his United States conviction, it was more likely than not that "because of the interrelationship of the drug traffickers, the military, and the [g]overnment, that retribution would be still sought against him because of his cooperation with the Drug Enforcement Administration." Id. at 4-5. The hearing officer noted that this "retaliation, either by the military or the [g]overnment, would amount to acquiescence by a [g]overnmental agency . . . ." Id. at 5.

Following the hearing officer's decision, Enwonwu was released. Pet'r Mem. at 10. The INS, however, reserved its

31

right to appeal the decision and Enwonwu was required to provide the Review Office with his contact address. Id.; Ex. 6 at 264. Enwonwu provided his address at the time which was: "c/o Rose O. Mgbojikwe, 39 Sheridan Drive, Apartment # 8, Shrewsbury, Massachusetts 01545." Pet'r Mem. at 10.[12] Enwonwu inquired of his attorney--Anthony Pelino ("Pelino")--about the significance of the INS reserving its right to appeal. Id. at 11. According to Enwonwu, this information was especially important to him in light of the fact that Pelino would soon be moving his practice to Arizona. Id. Pelino informed him that although the INS did not usually appeal rulings of the Review Office, it had reserved its right to do so in his case within the next thirty days. Id.

With this information in mind, Enwonwu "counted the seconds until after January 18, 2000," the last day the INS could file its notice of appeal. Id. By the end of that month when Enwonwu received no communication from either Pelino or the INS, he concluded that the matter was closed. Id. Unbeknownst to Enwonwu, however, the INS did, in fact, file a timely appeal with the BIA. Id. at 12. While it appears that notice of the appeal was mailed to Pelino, Enwonwu himself received no notice. Id. Although the BIA mailed notice of the appeal to Enwonwu, it did not indicate that his address was "c/o Rose O. Mgbojikwe." Id.

---

[12] Ms. Mgbojikwe is Enwonwu's sister with whom he was residing. Id. at 10 n.9.

32

at 12-13, 20.  As such, the notice of appeal was never delivered
to Enwonwu but instead returned to the BIA and marked "[u]nknown
at above address."  Id. at 20.

Later in 2000, after the INS filed its notice of appeal,
Enwonwu moved with his sister to a new address in Shrewsbury,
Massachusetts (27 Lebeaux Drive).  Id.  Ms. Mgbojikwe filed a
change of address form with the United States Postal Service.
Id. at 10.  Enwonwu believed that he provided sufficient notice
to the INS of his address change when he renewed his Employment
Authorization Document at the Bureau of Citizenship and
Immigration Services as he was annually required to do.  Id. at
10-11.[13]  Believing that his immigration problems had been
resolved, Enwonwu "began taking steps to regain control of his
life."  Id. at 11.

By 2003, Enwonwu had earned his realtor's licence and was
subsequently hired by ReMax Realtors in Malden, Massachusetts.
Id.  By the autumn of 2004, however, Enwonwu realized that the
sale of real estate was seasonal and decided to seek an
additional job.  Id.  To that end, on September 13, 2004, Enwonwu
visited the Bureau of Customs and Immigration Services office in
Boston to seek the necessary employment authorization.  Id.  Upon
identifying himself, Enwonwu was again arrested and detained.

_____

[13] According to Enwonwu, each time he renewed his employment
authorization, he was required to provide his current address.
Pet'r Mem. at 10-11.

33

Id. at 12.  When Enwonwu asked why he was being arrested, he was informed that the INS, now the Department of Homeland Security, had successfully appealed Hearing Officer Shapiro's 1999 deferral of removal order.  Id.

Indeed, on May 30, 2003, the BIA issued a decision vacating the hearing officer's decision and ordering Enwonwu's removal from the United States.  Pet'r Mem. Ex. 18, BIA Decision of 5/30/03 ("BIA Decision of 5/30/03").  According to the BIA:

> The Immigration Judge granted [Convention Against Torture] relief largely based on the fact that the respondent, under Nigerian law, will likely be subject to arrest, detention and prosecution on account of his drug conviction in the United States.  We have previously held that a Nigerian convicted of a drug offense in the United States failed to establish eligibility for deferral of removal because the evidence she presented regarding the enforcement of Decree No. 33 of the Nigerian National Drug Law Enforcement Agency could not meet the burden of proof for [the Convention Against Torture].  See Matter of M-B-A-, 23 I&N Dec. 474 (BIA 2002).  We therefore conclude that the mere possibility of arrest and prosecution in Nigeria does not establish that the respondent in this instance would more likely than not be subject to torture by a public official or with the acquiescence of such an official.  See 8 C.F.R. §§ 1208.16(c)(4), 1208.18(a)(7).

Id.[14]

---

[14] Apparently, the BIA ignored the hearing officer's additional conclusion that even if Enwonwu was not subject to arrest and prosecution under Nigerian law based on his United States conviction, it remained "more likely than not" that "because of the interrelationship of the drug traffickers, the military, and the [g]overnment, that retribution would be still sought against him because of his cooperation with the [DEA]" and that torture would result.  Ex. 6 at 4-5 (emphasis added).  In contrast, the case relied on by the BIA for its ruling, did not involve any claim that torture was likely as a result of the petitioner's cooperation with the United States Government as an

Following his arrest, Enwonwu's siblings contacted attorney
Pelino, who was then practicing in Arizona.  Pet'r Mem. at 12.
According to Enwonwu, Pelino claimed to have no knowledge that
the INS pursued an appeal of the hearing officer's decision.  Id.
Thereafter, Enwonwu retained new counsel to file a motion to
reopen his case.  Id.  On February 15, 2005, the BIA denied
Enwonwu's motion because it had not been filed within 90 days of
its May 30, 2003 decision.  Pet'r Mem. Ex. 20, BIA Decision of
2/15/05 ("BIA Decision of 2/15/05").  The BIA ruled that despite
Enwonwu's claim that neither he nor his attorney were notified of
the appeal, "the record indicates that the Notice of Appeal (EOIR
Form 26) was mailed to [Enwonwu]'s former attorney at the last
known address in the file."  Id.

Enwonwu initiated habeas corpus proceedings in this Court on
March 17, 2005.  In his petition, Enwonwu asserts both procedural
and substantive due process claims.  Pet'r Mem. at 18-24.  First,
Enwonwu argues, the BIA's May 30, 2003 decision and its February
15, 2005 order denying his motion to reopen deprived him of
procedural due process as he was not afforded sufficient notice

_____

informant.  See Matter of M-B-A-, 23 I. & N. Dec. 474 (BIA 2002).
Moreover, six members of the thirteen-member en banc board that
decided Matter of M-B-A-, strongly dissented from its ruling that
the likelihood of torture had not been established by evidence
regarding the enforcement of Nigerian drug laws.  Id. at 480-87
(Rosenberg, Board Member, concurring in part, dissenting in
part); Id. at 487-90 (Schmidt, Board Member, dissenting).

35

of the appeal of the hearing officer's Convention Against Torture
determination.  Pet'r Mem. at 19-22.  Second, Enwonwu argues that
the BIA's order of removal violates his substantive due process
rights because returning him to Nigeria subjects him to a
government-created danger.  Pet'r Mem. at 22-23.

On April 11, 2005, this Court granted Enwonwu's Emergency Ex
Parte Motion for Stay of Deportation [Doc. No. 7] and scheduled
an evidentiary hearing.  This Court conducted an evidentiary
hearing over the course of four days and heard testimony from
Agents Lemon and Pettigrew as well as from Enwonwu.  At the close
of the evidence on May 3, 2005, this Court took the matter under
advisement.

The first witness to testify at the evidentiary hearing was
Agent Lemon.  Unlike his 1999 testimony before Hearing Officer
Shapiro in which he testified that three individuals were
arrested in connection with the 1986 controlled heroin purchase,
Agent Lemon testified before this Court that only two individuals
were arrested.  Tr. of 4/27/05 at 26.  Agent Lemon testified
that, to his knowledge, no one was arrested in Ohio as a result
of the investigation.  Id.  Additionally, in contrast to Lemon's
1999 testimony in which he testified that he did not know whether
Enwonwu was paid for his services as an informant, Agent Lemon
testified before this Court that several $200 cash payments were
made to Enwonwu which totaled "fifteen or sixteen hundred

dollars." Compare id. at 29-30 with Ex. 6 at 89. In fact, Lemon recalled before this Court that he himself made those payments. Compare Tr. of 4/27/05 at 30 with Ex. 6 at 89.

Another inconsistency in Agent Lemon's testimony before this Court related to the nationality of the two individuals who were arrested after purchasing the heroin from Mr. Enwonwu in 1986. In 1999, Lemon testified that these individuals were Nigerian. Ex. 6 at 74. In response to a question from this Court, however, Agent Lemon stated that they were not from Nigeria. Tr. of 4/27/05 at 38 (remembering they "were on the American side"). Additionally, unlike his 1999 testimony in which he claimed to have introduced Enwonwu to INS agents "to see if [he] could be of any value" to them, Ex. 6 at 88, Agent Lemon testified before this Court that such introduction was made because he wanted to help Enwonwu obtain a "work permit." Tr. of 4/27/05 at 27-28.

Consistent with his testimony in 1999, Agent Lemon testified before this Court that Enwonwu was not promised that in exchange for his cooperation he would be permitted to remain in the United States. Id. at 37-38. Agent Lemon also testified that he did not promise Enwonwu that he would be protected from Lieutenant Charles or his confederates. Id. at 37. According to Agent Lemon, the only promise made to Enwonwu was that his cooperation would be brought to the attention of the United States Attorney in connection with the criminal case against him. Id. at 31.

37

While testifying before this Court, Mr. Enwonwu stated that he feared returning to Nigeria because of his cooperation with the United States Government which facilitated the arrest of fellow Nigerians. Tr. of 4/29/05 at 58. Specifically, Enwonwu testified that he received word from Nigeria that he was being "looked for" by a lot of people. Id. Additionally, Enwonwu attempted to put on evidence regarding violence committed against several members of his family in Nigeria. Enwonwu Aff. ¶¶ 173-74, 176-79. This Court, however, refused to admit such evidence as it constituted hearsay and does not consider it now. Tr. of 4/29/05 at 57-58, 74-75. This Court did, however, permit Enwonwu to testify to the fact of his knowledge that his cousin in Nigeria, Herbert Enwonwu, was dead. Id. at 75-76. On hearsay grounds, however, this Court did not permit Enwonwu to testify as to the circumstances of his cousin's death. Id. at 76.

In response to questions about the voluntariness of his cooperation with the DEA, Enwonwu acknowledged that although he willingly cooperated, such choice was conditioned on promises made by the DEA. Tr. of 5/2/05 at 15. As Enwonwu stated,

> Special Agent Lemon promised me I'll be safe from Lieutenant Charles and the rest of his boys. There was a condition there. Because when I left Lagos, I knew I was dealing with a lot of dangerous people and cooperating with the government to get to these people was going to put my life at risk.

Id.

38

Enwonwu noted further, "If I knew that after I cooperated with the government to get to Lieutenant Charles that the government was going to send me back to Nigeria, I'll be the damndest fool to do that." Id. When it was suggested that Enwonwu had simply cooperated to avoid a prison term in the United States, Enwonwu responded that if "protection of my life was not guaranteed, going to jail and getting . . . deported back to Nigeria was a little price to pay." Id. at 16.

Portions of Enwonwu's evidentiary hearing were observed by members of the news media. As a result, several news stories circulated about Enwonwu's case. See Hr'g of 4/29/05, Exs. 3-4. One story featured on the Nigerian news website "Nigeria Digital" noted that Enwonwu had been a government informant and that he feared for his life upon returning to Nigeria. Hr'g of 4/29/05, Ex. 4.

**B.    Resolution of Disputed Issues of Fact**

On April 29, 2005, after hearing all of the testimonial evidence, this Court ruled from the bench that it was not persuaded by a fair preponderance of the evidence that there was an actual agreement between Enwonwu and the DEA that they would not deport him in exchange for his cooperation. Tr. of 4/29/05 at 80. This Court later explained that its ruling did not foreclose a finding that less specific representations were made to Enwonwu, including an assurance that he would be protected in

39

connection with his cooperation.  Tr. of 5/2/05 at 6.  For purposes of the legal discussion that follows, in addition to the undisputed facts, this Court is persuaded of the following by a fair preponderance:

This Court finds that in addition to cooperating in the 1986 controlled heroin purchase, Enwonwu also aided the DEA by making controlled telephone calls to an individual in the midwestern United States, either in Ohio or Chicago.  Although Agent Lemon testified before this Court that he did not recall such cooperation, the Court finds his memory to be unreliable.  As discussed above, there were several inconsistencies between Agent Lemon's testimony in 1999 before the hearing officer and his 2005 testimony before this Court.

That Enwonwu contacted an individual in the Midwest is supported by his own testimony, which this Court credits, as well Lemon's 1999 testimony, portions of which this Court credits.  In 1999, Lemon testified that Enwonwu contacted the "ultimate recipient" of the heroin and that he believed Enwonwu made phone calls to Chicago.  Ex. 6 at 73-75.  That Enwonwu made calls to the "ultimate recipient" of the heroin is further supported by Agent Lemon's testimony that it is the policy of the DEA to "take the investigation as far as possible."  Ex. 6 at 74; Tr. of 4/27/05 at 24.  This Court is persuaded that the DEA's efforts went beyond simply apprehending Brock and Ogunniran and that it

40

cast a wider net which included controlled telephone calls to the intended recipient of the heroin.

This Court credits Enwonwu's testimony that the Ohio individual was an African national who became angry with and threatened Enwonwu upon learning that he had doubled the price of the heroin. The reasonable inference is available that between his first and second conversation with Enwonwu, the Ohio individual informed the traffickers in Nigeria of Enwonwu's betrayal. Further, this Court is persuaded that Mr. Brock and Mr. Ogunniran are African nationals who were likely deported back to their countries of origin after serving their sentences.

This Court further finds that representations were made to Enwonwu by the DEA regarding protection from certain dangers in connection with his cooperation. This Court credits Enwonwu's testimony that the DEA assured him that his life would be safeguarded from the drug traffickers he was being asked to betray. Although Enwonwu understood this promise to include a guarantee that he would not be deported, this Court finds that the assurance was less specific. This Court credits Enwonwu's testimony that given the dangerousness of the drug traffickers he was dealing with, he would not have cooperated without the DEA's assurances of protection. Professor Watts attested to the dangerousness of these individuals, discussing at length the cut-

throat and retaliatory nature of the Nigerian drug trade.  Ex. 6
at 217-18, 223-24, 228-30.

That these assurances were made is further supported by
Enwonwu's testimony that the DEA provided him with a hotline
number after telling him that, as an informant, his life was in
danger.  Ex. 6 at 142-43.  Additionally, Agent Lemon's
willingness to send an agent to meet with Enwonwu to discuss the
possibility of an "S" visa further supports this finding.  Ex. 6
at 13.  These meetings followed pleas from Enwonwu's lawyer and
letters from Enwonwu stating that he feared for his life.  Id.;
Tr. of 4/29/05 at 21.  While it is possible that the DEA agreed
to meet with Enwonwu out of compassion or the hope of obtaining
valuable information, this Court finds it more likely that Agent
Lemon agreed to do so out of a sense of obligation.  That is,
Agent Lemon assured Enwonwu that he would be protected from the
drug traffickers and realized that removal would subject him to
retribution at their hands.[15]

## II.  DISCUSSION

### A.    Exhaustion of Administrative Remedies

Courts are prohibited by 8 U.S.C. § 1252(d)(1) from
reviewing a final order of removal unless the alien seeking
review has exhausted all administrative remedies available to her

---

[15] That Agent Lemon could not secure an "S" visa for Enwonwu
is not surprising in light of the fact that no more than 200 such
visas can be issued per year.  8 U.S.C. § 1184(k)(1).

"as of right."  Section 1252(d)'s exhaustion requirement "applies generally to habeas corpus petitions." <u>Sayyah</u> v. <u>Farquharson</u>, 382 F.3d 20, 26 (1st Cir. 2004).  A different result "would allow an alien subjected to an adverse decision to reject the very administrative review processes established to correct mistakes and to insist, instead, upon immediate access to a federal court." <u>Id.</u>

To the extent that a claim is beyond the authority of the BIA to adjudicate, however, a petitioner need not exhaust her remedies administratively. <u>Jupiter</u> v. <u>Ashcroft</u>, 396 F.3d 487, 492 (1st Cir. 2005).  Administrative exhaustion is not required of Enwonwu's substantive due process claim because, as the First Circuit has observed, "[t]he BIA is without jurisdiction to adjudicate purely constitutional issues." <u>Ravindran</u> v. <u>INS</u>, 976 F.2d 754, 762 (1st Cir. 1992) (citations omitted).  This exception applies only to "due process claims that go beyond mere 'procedural errors,' which the BIA plainly may address." <u>Id.</u> (citations omitted); <u>see also</u> <u>United States</u> v. <u>Gonzalez-Roque</u>, 301 F.3d 39, 47-48 (2d Cir. 2002) ("While constitutional claims lie outside the BIA's jurisdiction, it clearly can address procedural defects in deportation proceedings.").

Unlike Enwonwu's procedural due process claim which attacks the adequacy of the notice provided to him, his substantive due process claim challenges the constitutionality of the removal

43

order itself in that it impermissibly subjects him to a

government-created danger.  The BIA lacks the authority to

adjudicate this claim because it raises a purely constitutional

question completely separate from matters of procedure.

Ravindran, 976 F.2d at 762.  Accordingly, administrative

exhaustion does not apply to Enwonwu's substantive due process

claim.  Jupiter, 396 F.3d at 492.

Regarding Enwonwu's procedural due process claim, counsel

for the executive contends that because Enwonwu failed to defend

against its appeal of the hearing officer's December 16, 1999

Convention Against Torture decision, "he has failed to exhaust

his administrative remedies and habeas review of the BIA's May

30, 2003, decision is barred by 8 U.S.C. § 1252(d)."  Exec. Mem.

at 19.  Counsel for the executive, however, has not cited a

single case holding that an alien's failure to defend an appeal

of a decision deferring removal constituted a failure to exhaust

administrative remedies.

In making its argument, counsel for the executive

misinterprets the function of section 1252(d)(1)'s exhaustion

requirement.  As the First Circuit noted in Sayyah, exhaustion

requires aliens to utilize administrative procedures "to correct

mistakes" that were made in "adverse decision[s]" rendered

against them.  Sayyah, 382 F.3d at 26.  "Telling a petitioner

that he must seek the remedy for an error before an

44

administrative agency . . . prior to seeking it in a habeas proceeding is not the same thing as telling him that he may not pursue the remedy in a federal habeas proceeding in any event." Id. (quoting Sundar v. INS, 328 F.3d 1320, 1324 (11th Cir. 2003) (emphasis added)).

Here, Enwonwu began the process of exhaustion by pursuing Convention Against Torture relief before the Review Office, which was granted. Thereafter, it was incumbent on counsel for the executive to appeal the decision and to persuade the BIA to vacate it. While the executive successfully carried that burden, its success does not retroactively transform the hearing officer's decision into an adverse ruling against Enwonwu requiring him to recommence his ascension of the administrative ladder. Rather, it was not until the BIA's ruling on May 30, 2003 that an "adverse decision" was entered against Enwonwu. Sayyah, 382 F.3d at 26.

Put another way, prior to the BIA's May 30, 2003 decision there simply were no further "remedies" for Enwonwu to exhaust as there was no conceivable error for him to remedy. See Sayyah, 382 F.3d at 26; Sundar, 328 F.3d at 1324. Based on the executive's reasoning, it seems that any alien who fails initially to oppose removal and then is ordered removed in absentia would forever be precluded from exhausting administrative remedies--and by extension from obtaining habeas

review.  This is not the law.  <u>See</u> <u>Kaweesa</u> v. <u>Ashcroft</u>, 345 F.
Supp. 2d 79, 101, 103-04 (D. Mass. 2004) (noting that 8 U.S.C. §
1229a(b)(5)(C) permits an alien to seek rescission of an order of
removal entered in absentia and holding that hearing officer's
refusal to rescind order may be reviewed by habeas court) (appeal
pending).

     The proper exhaustion inquiry, therefore, is whether Enwonwu
exhausted his administrative remedies <u>after</u> the BIA's May 30,
2003 decision.  As mentioned above, when Enwonwu learned of the
BIA's May 30, 2003 decision he utilized the only administrative
procedure available to him: he filed a motion to reopen his case.
Pet'r Mem. Ex. 19, Pet'r Mot. to Reopen.  The BIA denied
Enwonwu's motion because it was not filed within 90 days of its
May 30, 2003 decision and concluded that no exceptions to the 90-
day rule applied.  BIA Decision of 2/15/05 (citing 8 C.F.R. §
1003.2(c)(2)).

     Enwonwu's failure timely to file a motion to reopen
forecloses habeas review of the BIA's May 30, 2003 Convention
Against Torture decision only if such a motion is a remedy
available "as of right."  8 U.S.C. § 1252(d)(1).  This issue was
addressed by the First Circuit in <u>Hernandez</u> v. <u>Reno</u>, 238 F.3d 50
(1st Cir. 2001) which dealt with the exhaustion requirement of
section 1152(d)(1)'s predecessor, 8 U.S.C. § 1105a(c).  In
discussing an alien's untimely motion to reopen, the court noted

46

that to the extent the BIA "does provide currently available
remedies <u>as a matter of grace</u>, a court is free to require
exhaustion of such remedies–<u>not</u> because of any . . . <u>statutory</u>
<u>command</u> but simply because it makes sense."  <u>Id.</u> at 54-55
(citations omitted, emphasis added).  Three years later in
<u>Sayyah</u>, the First Circuit noted that in <u>Hernandez</u>, "we discussed
the fact that an untimely motion to reopen is a discretionary
motion but that, to the extent the BIA grants such 'currently
available remedies as a matter of grace,' courts <u>may</u> require
exhaustion of them."  <u>Sayyah</u>, 382 F.3d at 27 (quoting <u>Hernandez</u>,
238 F.3d at 54-55) (emphasis added).

     Both <u>Hernandez</u> and <u>Sayyah</u> observed that the decision whether
to grant a motion to reopen is within the BIA's discretion and
that courts may excuse a petitioner from pursuing such a remedy.
<u>Sayyah</u>, 382 F.3d at 27; <u>Hernandez</u>, 238 F.3d at 55.  Because
courts may excuse a petitioner's failure to file a motion to
reopen, such a remedy cannot be one that is available "as of
right."  8 U.S.C. § 1252(d)(1).  If such a remedy was available
as of right, courts would not be permitted to exempt it from
section 1252(d)(1)'s exhaustion requirement.  <u>Id.</u>; <u>see also</u>
<u>Panjwani</u> v. <u>Gonzales</u>, 401 F.3d 626, 631 (5th Cir. 2005) ("[T]he
BIA's broad discretion to deny or grant a motion to reopen
suggests that the initial filing of such a motion cannot be
characterized as a remedy available as of right" (internal

47

quotation marks and citation omitted)); Molina-Camacho v.
Ashcroft, 393 F.3d 937, 942 n.3 (9th Cir. 2004) ("Nor does 8
U.S.C. § 1252(d)(1) bar relief, despite petitioner's failure to
move the BIA to reopen or reconsider its decision." (citation
omitted)); Noriega-Lopez v. Ashcroft, 335 F.3d 874, 881 (9th Cir.
2003) ("[M]otions to reopen, are not 'remedies available . . . as
of right' within the meaning of 8 U.S.C. § 1252(d)(1)."
(alteration in original)) .

In any event, even if a motion to reopen was a remedy
available as of right, Sayyah and Hernandez make clear that so
long as such a remedy is pursued, even if out of time, a
petitioner may be found to have exhausted that remedy.  Sayyah,
382 F.2d at 27 (quoting Hernandez, 238 F.3d at 54-55).
Accordingly, because Enwonwu sought to reopen his case, albeit
tardily, he exhausted that administrative remedy.  Id.; Kaweesa,
345 F. Supp. 2d at 84, 99 (ruling that petitioner who filed
untimely motion to reopen with BIA nonetheless exhausted
administrative remedies).[16]

---

[16] Alternatively, the First Circuit noted in Hernandez that
a petitioner's failure timely to exhaust administrative remedies
will not bar a habeas petition where, as here, the petitioner
faces immediate deportation and "his failure to timely exhaust
may have been caused by the very incompetency complained of."
Sayyah, 382 F.3d at 26 (quoting Hernandez, 238 F.3d at 54-55).
Here, Enwonwu's failure timely to file a motion to reopen was
caused, he claims, by the defect in service.  Pet'r Mem. at 21.

Even if counsel for the executive was correct in its contention that Enwonwu is barred from challenging the BIA's May 30, 2003 Convention Against Torture decision, it would not bar him from mounting a constitutional challenge to the BIA's February 15, 2005 denial of his motion to reopen.  Cf. Panjwani, 401 F.3d at 631 (noting that BIA's denial of an untimely motion to reopen is a final, appealable order over which courts of appeal have power to review); Foroglou v. Reno, 241 F.3d 111, 113-14 (1st Cir. 2001) (entertaining challenge to BIA's denial of alien's untimely motion to reopen); see also Kaweesa, 345 F. Supp. 2d at 104 (noting that habeas courts have jurisdiction to determine whether hearing officer's discretionary denial of motion to reopen "falls within the implicit limits set by the statutory scheme and the Constitution").  While, as discussed below, there are further jurisdictional hurdles for Enwonwu to clear, exhaustion is not one of them.

**B.    Procedural Due Process Claim**

Enwonwu maintains the BIA's May 30, 2003 decision and its February 15, 2005 denial of his motion to reopen violated his procedural due process rights.  Pet'r Mem. at 18-19, 22. According to Enwonwu, because he was not provided with adequate notice that the INS appealed the hearing officer's Convention Against Torture determination, the BIA's May 30, 2003 decision was rendered in violation of his Fifth Amendment procedural due

process rights.  Id. at 22 (citing United States v. Jauregui, 314 F.3d 961, 962-63 (8th Cir. 2003)).  The BIA again deprived him of procedural due process, Enwonwu contends, when it denied his motion to reopen on February 15, 2005.  Id. at 18-19.

Enwonwu acknowledges that although the notice of appeal was mailed to Pelino (his former attorney), notice was neither served on him [Enwonwu] personally nor was a copy mailed to him.  Id. at 19.  Enwonwu points out that because the BIA failed accurately to address the notice of appeal "c/o Rose O. Mgbojikwe," it was never delivered to him.  Id. at 20.  As such, Enwonwu argues, the notice provided by the BIA fails to conform with 8 C.F.R. § 1003.3(a) which provides that "[t]he appeal must reflect proof of service of a copy of the appeal and all attachments on the opposing party."  8 C.F.R. § 1003.3(a)(1) (emphasis added); Pet'r Mem. at 19.  Thus, Enwonwu argues, "the BIA should have reopened the proceedings and afforded [him] the opportunity to be heard on the merits."  Id. at 21-22 (citing Matter of Grijalva, 21 I. & N. Dec. 27, 37 (BIA 1995)).

As counsel for the executive correctly points out, however, Enwonwu's argument fails to account for the different rules of service applicable to individuals represented by counsel.  Exec. Mem. at 9.  Counsel for the executive does not dispute that 8 C.F.R. § 1003.3(a) directs that notice be served on an opposing party but notes, however, that under 8 C.F.R. § 1292.5(a), when

an individual has legal representation, service is directed to counsel, not directly to the represented party.  Id.  According to that provision:

> Whenever a person is required by any of the provisions of this chapter to give or be given notice; to serve or be served with any paper other than a warrant of arrest or a subpoena; to make a motion; to file or submit an application or other document; or to perform or waive the performance of any act, such notice, service, motion, filing, submission, performance, or waiver shall be given by or to, served by or upon, made by, or requested of the attorney or representative of record, or the person himself if unrepresented.

8 C.F.R. § 1292.5(a) (emphasis added); Exec. Mem. at 9.

As mentioned above, Enwonwu does not dispute the fact that notice of appeal was served on Pelino, his attorney of record. Pet'r Mem. at 12, 19.  It therefore follows that under the governing regulation, Enwonwu himself was properly served with the notice of appeal.  8 C.F.R. § 1292.5(a); see also Radkov v. Ashcroft, 375 F.3d 96, 97 n.1 (1st Cir. 2004) (noting concurrence of parties that mailing of decision to petitioners' attorney was the equivalent of mailing directly to petitioners).  As counsel for the executive points out, although Enwonwu claims that he never received the notice of appeal from Pelino, no claim of ineffective assistance of counsel has been raised.  Exec. Mem. at 11.  Accordingly, Enwonwu's procedural due process claim based on insufficient notice must fail.  Bejar v. Ashcroft, 324 F.3d 127, 131 (3d Cir. 2003) (refusing to hear alien's due process claim

51

based on lack of notice where notice was received by attorney of record).

Enwonwu also faults the BIA's May 30, 2003 ruling for failing adequately to consider the findings of Hearing Officer Shapiro. Pet'r Second Supplemental Mem. of Law ("Pet'r Supp. Mem. II") [Doc. No. 16] at 2-4. As Enwonwu observes, the hearing officer credited the testimony of Professor Watts in concluding that it was more likely than not that he would be subject to torture upon his return to Nigeria. Id. at 3. The BIA's decision, Enwonwu argues, "utterly failed" to consider the hearing officer's "thoughtful analysis." Id.

Indeed, the BIA noted in its May 30, 2003 decision that the hearing officer had "granted relief largely based on the fact" that "under Nigerian law, [Enwonwu] will likely be subject to arrest, detention and prosecution on account of his drug conviction in the United States." BIA Decision of 5/30/03. The BIA vacated the hearing officer's decision solely on the ground that "the mere possibility of arrest and prosecution in Nigeria" does not establish the likelihood that Enwonwu would be subject to torture upon his return. Id.

While the BIA was correct in noting that this was a partial basis for the hearing officer's ruling, it completely ignored the alternative ground on which the decision rested. That is, even if Enwonwu was not subject to arrest and prosecution in Nigeria

52

based on his conviction in the United States, it remained "more likely than not" that "because of the interrelationship of the drug traffickers, the military, and the [g]overnment, that retribution would be still sought against him because of his cooperation with the Drug Enforcement Administration" and that torture would result. Ex. 6 at 4-5 (emphasis added). It is therefore manifest from the BIA's decision that it failed to consider the evidence adduced at Enwonwu's Convention Against Torture hearing regarding the likelihood that retribution by torture would be meted out against him as a result of his cooperation with the DEA.

The hearing officer expressly credited the testimony of Professor Watts, noting that he was "an informative, knowledgeable, and believable witness" who "clearly has an in-depth knowledge of the country conditions in Nigeria." Ex. 6 at 5. Professor Watts testified that there were two sources of potential torture stemming from Enwonwu's cooperation with the DEA: one involving "retaliation from the drug business side of things" and another arising from the "likelihood of imprisonment." Id. at 224. Watts explained that there was a "very serious likelihood" that individuals involved in the Nigerian drug trade would seek out retribution against Enwonwu. Id. at 223.

53

Professor Watts noted that there is "well-documented" evidence of violence involving "lower order . . . operative[s]" of the Nigerian drug trade. <u>Id.</u> at 229. Specifically, Watts testified that there were "enormous amounts" of "retaliative violence" within that trade. <u>Id.</u> at 230. The hearing officer credited this testimony and concluded that, given the military and governmental involvement in the Nigerian narcotics industry, such "retaliation" against Enwonwu would be with the acquiescence of a governmental agency for purposes of the Convention Against Torture. <u>Id.</u> at 4-5.

Thus, in addition to the likelihood that Enwonwu would be imprisoned and tortured based on the enforcement of Nigerian drug laws, Watts testified that such imprisonment and torture were also likely based on his cooperation with the DEA. <u>Id.</u> at 224. Additionally, because of Enwonwu's cooperation with the DEA, it was more likely than not that violent retaliation would be meted out against him by those in the drug trafficking organization whom he betrayed. <u>Id.</u> Absent from the BIA's decision is any acknowledgment of this evidence or the portion of the hearing officer's decision which relied upon it.

The decision of the BIA in this case bears a strong resemblance to its decision at issue in <u>St. Fort</u> v. <u>Ashcroft</u>, 223 F. Supp. 2d 343 (D. Mass. 2002) (Stearns, J.) <u>aff'd</u>, 329 F.3d 191, 204 (1st Cir. 2003). In <u>St. Fort</u>, the habeas petitioner was

granted deferral of removal under the Convention Against Torture
by the Review Office.  Id. at 344.  The hearing officer concluded
that the petitioner was entitled to Convention Against Torture
protection as it was more likely than not that he would suffer
torture in prison upon his return to Haiti.  Id.  The hearing
officer based his finding on State Department Human Rights
Reports, a prior BIA decision, and the petitioner's own
testimony.  Id.  The hearing officer's decision was reversed by
the BIA, which "summarily concluded that Saint Fort had presented
no evidence that he would be tortured if returned to Haiti."  Id.

As the St. Fort court observed, the BIA's evidentiary
conclusion "simply cannot be squared with the findings of the
[hearing officer] whose decision was based not only on
documentary evidence" but the petitioner's own testimony as well.
Id. at 346.  Because it was "impossible to tell" from the BIA's
decision whether it even considered the available evidence, the
court remanded the case to the BIA for "clarification of the
grounds" of its decision.  Id.  Here too, the BIA's decision
cannot be squared with the findings of the hearing officer.  In
ruling that Enwonwu failed to meet his burden under the
Convention Against Torture, the BIA addressed only the portion of
the evidence related to the enforcement of Nigerian drug laws.
See BIA Decision of 5/30/03.  The BIA did not address the
alternative basis for the hearing officer's decision: that

retribution would be sought against Enwonwu for his cooperation with the DEA.  Ex. 6 at 4-5.

The Supreme Court unambiguously has held that an administrative agency's failure to consider the evidence before it offends Fifth Amendment due process.  Anniston Mfg. Co. v. Davis, 301 U.S. 337, 357 (1937) ("The whole scheme of the administrative proceeding presupposes hearing and determination in accordance with the demands of due process.  The Board which makes its findings and renders its decision must consider the evidence and base its findings and decision upon it . . . .").  Aliens in deportation proceedings are not beyond the scope of the Fifth Amendment's due process guarantee.  Shaughnessy v. United States ex rel. Mezei, 345 U.S. 206, 212 (1953) ("It is true that aliens who have once passed through our gates, even illegally, may be expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law.");  Larita-Martinez v. INS, 220 F.3d 1092, 1095-96 (9th Cir. 2000) (collecting cases establishing an alien's due process rights) (citations omitted).

In the immigration context, "[d]ue process is satisfied only by a full and fair hearing, which requires that each case be evaluated on its own merits to determine whether the alien's factual support and concrete evidence are sufficient to meet the aliens burden of proof."  Id. at 1095 (internal quotation marks

and citation omitted).  Accordingly, due process mandates that the BIA, in "its capacity as reviewing tribunal," consider "all relevant evidence submitted on appeal."  Id.  As the BIA failed properly to address the evidence before it, this Court recommends that the case be remanded to the BIA for reconsideration in light of all the evidence relied upon by the hearing officer.  See St. Fort, 223 F. Supp. 2d at 346.

It bears noting that the BIA is required to grant significant deference to the hearing officer's findings of fact and credibility determinations.  Hossain v. Ashcroft, 381 F.3d 29, 32 (1st Cir. 2004) (noting "the BIA overturns a[ hearing officer]'s credibility findings, like other findings of fact, only if they are clearly erroneous"); Laurent v. Ashcroft, 359 F.3d 59, 64 (1st Cir. 2004) (observing that where a hearing officer makes a credibility determination and supports it with specific findings, a reviewing court should "treat that determination with great respect").  Under the "clearly erroneous" standard of review, the BIA "simply cannot supplant" the hearing officer's perspective with its own, "notwithstanding that the members of the [BIA], if writing on a pristine page, might have derived a different set of conclusions from the same underlying facts."  Valentin v. Hospital Bella Vista, 254 F.3d 358, 367 (1st Cir. 2001).  "To the contrary," the hearing officer's "choice between two plausible, but conflicting,

interpretations of a factual scenario cannot amount to clear error." Id.

C.  **Substantive Due Process Claim**

In addition to asserting a procedural due process claim, Enwonwu also argues that the BIA's order of removal violates his substantive due process rights. Pet'r Mem. at 22-24. According to Enwonwu, the United States Government subjected him to the risk of violent retribution in Nigeria by inducing his cooperation as an informant through its promises of protection. Id. at 23-24; Tr. of 5/2/05 at 15. Having created this dangerous condition, Enwonwu argues, the executive assumed an affirmative duty not to place him in a position where that danger would come to fruition. Pet'r Mem. at 23-24. The executive's affirmative efforts to remove him combined with its deliberate indifference to the consequences of removal, Enwonwu argues, "shock the conscience." Id.

Before addressing the merits of this argument, counsel for the executive first makes a jurisdictional argument, pointing out that under 8 U.S.C. § 1252(g), "no court shall have jurisdiction to hear any cause or claim . . . of any alien arising from the decision or action by the Attorney General to . . . execute removal orders against any alien under this Act." Executive's Supplemental Mem. in Supp. of Mot. to Dismiss ("Exec. Mem. II") [Doc. No. 11] at 3. According to counsel for the executive,

because Enwonwu does not claim any statutory entitlement to
relief from the execution of his order of removal, his claim is
barred by section 1252(g).  Id. at 3-4.  This argument is
unavailing.

Despite the language of section 1252(g), federal courts
retain "subject matter jurisdiction over habeas petitions brought
by aliens facing removal to the extent that those petitions are
based on colorable claims . . . that an alien's statutory or
constitutional rights have been violated."  Carranza v. INS, 277
F.3d 65, 71 (1st Cir. 2002) (emphasis added).  Thus, because
Enwonwu claims a violation of his constitutional rights, section
1252(g) does not deprive this Court of subject matter
jurisdiction over his habeas petition.  Id.

The executive's alternative contention that Enwonwu fails to
state a colorable claim within the scope of habeas review as
required by Carranza is equally misplaced.  Exec. Mem. II at 4-8.
Counsel for the executive is quick to highlight the distinction
between habeas review of constitutional errors and judicial
review of factual or discretionary determinations.  Id. at 6-7.
This distinction, however, is inapposite here as Enwonwu's
substantive due process claim does not challenge any factual or
discretionary determinations made by the BIA.[17]  Rather, Enwonwu

---

[17] Indeed, as mentioned above, the BIA did not have even the
institutional competence to consider Enwonwu's substantive due
process argument.  Ravindran, 976 F.2d at 762.

attacks the <u>constitutionality</u> of the BIA's order of removal insofar as it violates his substantive due process rights.  Pet'r Mem. at 23-24.  This is a proper subject of habeas review.  <u>Carranza</u>, 277 F.3d at 71.

>    **1.    State-Created[18] Danger Theory of Due Process Protection**

The Supreme Court in <u>DeShaney</u> v. <u>Winnebago County Dep't of Soc. Servs.</u>, 489 U.S. 189, 197 (1988), held that, "[a]s a general matter," the Due Process Clause does not obligate the government "to protect an individual against private violence."  This principle stems from the fact that the Due Process Clause "is phrased a <u>limitation</u> on the State's power to act, not as a guarantee of certain minimal levels of safety and security."  <u>Id.</u> at 195 (emphasis added).  Thus, "[i]ts purpose was to protect the people from the State, not to ensure that the State protected them from each other."  <u>Id.</u> at 196.  Accordingly, the failure of state-employed social workers to protect a child from violent abuse at the hands of his father did not amount to a violation of the child's substantive due process rights.  <u>Id.</u> at 191.

In <u>DeShaney</u>, however, "the Supreme Court also recognized a distinction between the case before it and other cases in which

---

[18] Although termed the "<u>state</u>-created danger theory," the analysis that follows applies equally to state and federal governmental actors because the same substantive due process analysis applies under both the Fifth and Fourteenth amendments. <u>See, e.g.</u>, <u>Reno</u> v. <u>Flores</u>, 507 U.S. 292, 301-02 (1993).

<u>the state created the risk</u> faced by the plaintiff . . . ."  <u>Soto</u>

v. <u>Flores</u>, 103 F.3d 1056, 1063 (1st Cir. 1997) <u>cert. denied</u>, 522

U.S. 819 (1997) (citation omitted, emphasis added).  In other

words, while

> there is no constitutional right to be protected by the
> state against being murdered by criminals . . . . [i]f the
> state puts a man in a position of danger from private
> persons and then fails to protect him, it will not be heard
> to say that its role was merely passive; it is as much an
> active tortfeasor as if it had thrown him into a snake pit.

<u>Bowers</u> v. <u>De Vito</u>, 686 F.2d 616, 618 (7th Cir. 1982) (Posnor, J.)

(cited with approval by the First Circuit in <u>Soto</u>, 103 F.3d at

1063 n.6).  Thus, in certain cases, "an affirmative

constitutional duty to protect" an individual from private

violence "may arise."  <u>Rivera</u> v. <u>Rhode Island</u>, 402 F.3d 27, 34

(1st Cir. 2005).

In <u>Soto</u>, the First Circuit traced the history of this

"state-created danger theory" of due process protection and

observed that it was first recognized as a viable mechanism for

establishing a constitutional claim in 1979.  <u>Soto</u>, 103 F.3d at

1064-65 (citing <u>White</u> v. <u>Rochford</u>, 592 F.2d 381, 383 (7th Cir.

1979) as "finding Due Process Clause violation where 'unjustified

and arbitrary refusal of police officers to lend aid to children

endangered by the performance of official duty ultimately

resulted in physical and emotional injury to the children'"

(alteration marks omitted)).  The <u>Soto</u> court went on to observe

that, "[i]n <u>DeShaney</u>, the Supreme Court acknowledged that state

61

actions that create dangers or render private citizens more
vulnerable to harm could amount to constitutional violations."
Id. at 1065 (citing DeShaney, 489 U.S. at 201).  At the time Soto
was decided in 1997, seven circuit courts of appeals had
recognized the state-created danger theory.  Id. (citation
omitted).[19]

Recently, in Rivera, the First Circuit revisited the state-
created danger theory of due process protection.  402 F.3d at 34-
38.  The court initially observed that in order to establish any
substantive due process claim, a plaintiff must first point to a
deprivation of a protected interest in life, liberty, or
property.  Id. at 33-34.[20]  Second, the court noted, a "plaintiff

_____

[19] In making his argument under the state-created danger
exception to DeShaney's general rule, Enwonwu also cites a
separate "special relationship" exception to DeShaney under which
the state is obligated to protect an individual from private
violence when it restrains that individual against his or her
will.  Pet'r Supplemental Mem. in Support of Writ of Habeas
Corpus ("Pet'r Mem. II") [Doc. No. 14] at 6, 8 (citation
omitted).  As the counsel for the executive correctly points out,
however, under the "special relationship" exception, it is only
the harm to which an individual's custody at the hands of the
state renders her vulnerable that the state must therefore
protect against.  Exec. Mem. III at 7 n.6.  Therefore, any danger
awaiting Enwonwu in Nigeria would not fall under the "special
relationship" exception which is inapposite here.  See Rivera,
402 F.3d at 34.

[20] In this case, Enwonwu contends that his forced removal to
Nigeria will deprive him of his life as well as his liberty
interest in being free from government sanctioned torture.  Pet'r
Mem. at 23-24.  Enwonwu's interest in his own life is a protected
interest.  See, e.g., Rivera, 402 F.3d at 34.  Equally so,
Enwonwu's interest in being free from torture is constitutionally
protected.  See, e.g., Furman v. Georgia, 408 U.S. 238, 319

must show that the deprivation of [her] protected right[s] was caused by governmental conduct." <u>Id.</u> at 34.  This is easily demonstrated, the court noted, when a government actor personally inflicts the injury complained of.  <u>Id.</u>  Although the requisite governmental conduct is "much more difficult" to establish when the injury is inflicted by a private individual, the court noted that there are "possible scenarios of government involvement with a private individual which amount to government conduct . . . ." <u>Id.</u>

The conduct complained of in <u>Rivera</u> was that the government "enhanced the danger posed by a private individual and then failed to protect against" it.  <u>Id.</u>  The <u>Rivera</u> court pointed out that in addition to demonstrating that the state created or enhanced a danger, a plaintiff must also show that state's conduct was "so egregious, so outrageous, that it may be fairly said to shock the contemporary conscience."  <u>Id.</u> at 36 (quoting <u>County of Sacramento</u> v. <u>Lewis</u>, 523 U.S. 833, 847 n.8 (1998)).

_____

(1972) (Marshall, J., concurring) (stating "there is no doubt whatever that in . . . the Eighth Amendment, our Founding Fathers intended to outlaw torture"); <u>see also</u> <u>Kane</u> v. <u>Winn</u>, 319 F. Supp. 2d 162, 193-94, 197-200 (D. Mass. 2004) (emphasizing the well-understood principle that the Eighth Amendment, as well as "customary international law," prohibit torture).  Although these alleged deprivations will not result until after the enforcement of Enwonwu's removal order, he (logically) is permitted to seek preenforcement relief to prevent such constitutional violations from occurring.  <u>See</u> <u>Auburn Police Union</u> v. <u>Carpenter</u>, 8 F.3d 886, 889 (1st Cir. 1993) (seeking declaratory relief prior to enforcement of act).

The court observed that conduct which is intended unjustifiably to injure an individual is the type most likely to rise to this level. Id. at 36 (citation omitted). "Of course, whether behavior is conscience shocking varies with regard to the circumstances of the case. In situations where actors have an opportunity to reflect and make reasoned and rational decisions, deliberately indifferent behavior may suffice to 'shock the conscience.'" Id. (citations omitted).

In Rivera, fifteen-year-old Jennifer Rivera ("Jennifer") was shot and killed at the behest of Charles Pona ("Pona") to prevent her from testifying at his murder trial. Id. at 30. Prior to her murder, Jennifer repeatedly was threatened with death should she testify. Id. at 31. When Providence, Rhode Island police detectives were notified of these threats, they "repeatedly assured [Jennifer] she would be safe." Id. On the eve of trial, Jennifer was subpoenaed. Id. at 32. Jennifer informed state attorneys and Providence police officers that she feared going to court "because she would be killed." Id. Again, Jennifer's protection was assured. Id. On the day before she was to testify, however, Jennifer was gunned down in front of her home. Id.

The complaint of Rivera's mother ("Rivera") alleged that "the defendants undertook a duty to protect Jennifer by identifying her as a witness . . .[,] promising to protect her if

64

she testified, and subpoenaing her to testify . . . 'knowing that
she was reluctant to testify without such protection because of
the repeated death threats she had received.'" <u>Id.</u>  Rivera argued
that "by failing to protect Jennifer the defendants acted with
'deliberate indifference to [Jennifer's] constitutional rights'
and that [their] conduct 'shocks the conscience.'"  <u>Id.</u> at 32-33
(alteration in original in part, added in part).  Because the
First Circuit found "no cognizable claim of a violation of [any]
constitutional right" alleged in the complaint, it upheld the
dismissal of the claim.  <u>Id.</u> at 33.

According to the court, the factual circumstances did "not
amount to the type of state creation of risk contemplated" by the
state-created danger doctrine.  <u>Id.</u> at 36.  That is, the actions
of the defendants were not the kind of "<u>affirmative acts</u>" that
give rise to the constitutional duty to protect.  <u>Id.</u> at 37
(quoting <u>Souza</u> v. <u>Pina</u>, 53 F.3d 423, 427 (1st Cir. 1995))
(emphasis added).  Rivera argued that the state's two actions in
identifying Jennifer as a witness and taking her witness
statement compelled her to testify and thus enhanced the danger
to her.  <u>Id.</u>  As the court observed, however, "[b]oth are
necessary law enforcement tools, and cannot be the basis to
impose constitutional liability on the state."  <u>Id.</u>

The court reached the same conclusion regarding the state's
action of issuing a subpoena to Jennifer noting that "[e]very

65

witness involved in a criminal investigation and issued a
subpoena to testify in a criminal proceeding faces some risk, and
the issuance of a subpoena cannot become the vehicle for a
constitutional claim against a state." <u>Id.</u>  The only remaining
affirmative acts alleged in the complaint, the court observed,
were the "defendants' assurances of protection." <u>Id.</u>  If
accepted as true, the court noted, such promises may have
subjected Jennifer to an increased risk by "induc[ing] Jennifer
into a false sense of security, into thinking she had some degree
of protection from the risk, when she had none . . . ." <u>Id.</u>

The court concluded, however, that "merely rendering a
person more vulnerable to risk does not create a constitutional
duty to protect" because such risk did not <u>cause</u> the deprivation
complained of. <u>Id.</u> at 37-38.  A different ruling, the court
commented, would permit an end run around <u>DeShaney</u>'s core holding
which requires a deprivation by state actors. <u>Id.</u> at 38.  In
short, because these actions were not the sort of "affirmative
acts" on the part of the state which give rise to a duty to
protect, Rivera's claim failed. <u>Id.</u> at 38 (citation omitted).

In contrast to the facts in <u>Rivera</u>, the requisite
"affirmative acts" were present in <u>McIntyre</u> v. <u>United States</u>, 336
F. Supp. 2d 87, 115 (D. Mass. 2004) (Lindsay, J.).  In <u>McIntyre</u>,
the estate of John McIntyre ("McIntyre"), a government informant,
filed suit against several former FBI agents.  336 F. Supp. 2d at

66

94.  The complaint alleged inter alia that one of the FBI agents,
John J. Connolly, Jr. ("Connolly"), disclosed McIntyre's status
as a confidential informant to the organized crime figures who
were the subject of McIntyre's information.  Id. at 99.  Such
disclosure, the complaint alleged, resulted in McIntyre's 1984
murder at the hands of those individuals.  Id.  The agent
defendants in McIntyre, moved for judgment on the pleadings as to
some of the constitutional violations alleged in the complaint.
Id. at 95 (seeking judgment based on qualified immunity).

In addressing McIntyre's substantive due process claim, the
court observed that under the state-created danger exception to
DeShaney's general rule, "where the government's affirmative acts
render a citizen more vulnerable to private violence," that
individual has a constitutional right to be protected from such
violence.  Id. at 113 (emphasis added).  The court noted that the
First Circuit requires government protection from private
violence "only when the government's affirmative acts place the
person in a worse position than . . . had it not acted at all."
Id. at 114 (alteration in original, internal quotation marks and
citation omitted, emphasis added).[21]

---

[21] This is merely a different way of stating Rivera's later
holding that simply rendering an individual more vulnerable to
harm is not enough; there must also be a causal link between the
government conduct alleged and the deprivation complained of.
Rivera, 402 F.3d at 34, 38.

The defendant FBI agents in <u>McIntyre</u> argued that they were entitled to qualified immunity because, in 1984, a substantive due process right under the state-created danger theory was not clearly established. <u>Id.</u>[22] The court noted, however, that before considering the issue of qualified immunity, it had to first determine "whether the alleged conduct of Connolly violated that right as to McIntyre." <u>Id.</u> According to the court, this was "not a difficult analysis" because "revealing to known murderers that one of their associates is an informant, cooperating with the government unquestionably endangers the safety of that informant." <u>Id.</u>

"Therefore, when plaintiffs allege that, in disclosing the informant status of McIntyre to Bulger and Flemmi, Connolly acted <u>affirmatively</u> to put the life of McIntyre in jeopardy, they have sufficiently alleged a violation by Connolly of McIntyre's substantive due process right to be protected from the danger of the government's own creation." <u>Id.</u> (emphasis added); <u>see also</u> <u>Monfils</u> v. <u>Taylor</u>, 165 F.3d 511, 520 (7th Cir. 1998) (affirming jury verdict finding substantive due process violation under state-created danger theory on similar facts). Thus, based on his affirmative acts, it could be fairly said that Connolly went

---

[22] The court ultimately agreed with this assessment. <u>McIntyre</u>, 336 F. Supp. 2d at 115.

beyond merely rendering McIntyre more vulnerable to harm and caused the deprivation complained of.

Counsel for the executive argues that Enwonwu's state-created danger claim fails for the following three reasons: (1) a removable alien has no substantive due process right to remain in the United States; (2) executive actions that do no more than carry out statutory commands cannot be the basis for a substantive due process violation; and (3) under the First Circuit's decision in Rivera, the government has no duty to protect Enwonwu. Exec. Mem. II at 25-26. The Court addresses each of these arguments in turn.

First, counsel for the executive argues that even if the First Circuit recognizes the state-created danger postulate of due process protection, this exception to DeShaney's general rule "must be read as limited to the non-law enforcement context of liability for deprivation[s] of [c]onstitutional rights within the meaning of 42 U.S.C. § 1983." Id. at 12. Such a limitation follows, argues counsel, because Enwonwu has "no substantive due process right not to be deported." Id. (citing Harisiades v. Shaughnessy, 342 U.S. 580, 586-87 (1952)) (additional citations omitted). This argument, however, misses the mark. Enwownu does not claim a substantive due process right to remain in the United States, but the right to live and the right to be free from state sanctioned torture, the danger of which, he alleges, the

69

executive created.  Pet'r Mem. at 22-23.  Put simply, that
Enwonwu might remain in the United States should his claim
prevail does not transform it into one seeking that result as
matter of substantive due process.

Next, the executive points out, in the context of
enforcement of final orders of removal, the First Circuit has
held that "[e]xecutive actions that do no more than comport with
valid statutory commands simply are not the stuff from which
substantive due process violations can be fashioned."  Exec. Mem.
II at 14 (quoting Herrera-Inirio v. INS, 208 F.3d 299, 309 (1st
Cir. 2000) (citation omitted)).  Here too, counsel's argument is
misguided.  First, the petitioner in Herrera-Inirio did not claim
any fundamental right encompassed by the Due Process Clause but
instead the "'right' to have a state law definition of
'conviction' applied in removal proceedings."  208 F.3d at 308
(describing the petitioner's argument as "wishful thinking").

Second, even though "[e]xecutive actions that do no more
than comport with valid statutory commands" cannot be the basis
for a substantive due process claim, Enwonwu's claim stems from
executive actions which do much "more than" that.  Id. at 309
(emphasis added).  The substantive due process claim asserted by
Enwonwu relies on the BIA's order of removal combined with: (1)
the executive's affirmative solicitation of his services as an
informant; (2) the executive's assurances of protection; and (3)

70

the executive's indifference to the risk of danger removal
creates.  Pet'r Mem. at 23-24.  Thus, were the order of removal
the sole basis for Enwonwu's claim, counsel's argument would be
germane.  Because Enwonwu's substantive due process claim relies
on <u>additional</u> executive actions "outside" the mere enforcement of
the removal order, however, that argument is unavailing.
<u>Herrera-Inirio</u>, 208 F.3d at 309.

Counsel for the executive maintains further that Enwonwu's
claim is doomed to fail under the First Circuit's decision in
<u>Rivera</u>.  Exec. Mem. II at 15-25; Exec. Mem. III at 3-11.  First,
counsel argues, Enwonwu cannot establish any constitutional
violation on its part because any danger awaiting Enwonwu was not
state-created.  Exec. Mem. III at 4.  That is, counsel for the
executive contends Enwonwu's cooperation with the DEA was done so
"voluntarily and sensibly in a wholly successful effort to avoid
any sentence to incarceration . . . ."  <u>Id.</u> at 5.  Accordingly,
counsel argues, Enwonwu's "own voluntary actions were the
proximate cause of any risk of danger to himself."  <u>Id.</u> at 6.

While Enwonwu acknowledges that his cooperation was a result
of his own conscious choice, the danger facing him was
nonetheless state-created because the executive <u>induced</u> that
cooperation by assuring his protection.  That is, although
Enwonwu agreed to aid the DEA in bringing his confederates to
justice, that cooperation was conditioned on the DEA's assurances

that his life was not at stake.  Tr. of 5/2/05 at 15.  Enwonwu knew that the Nigerian drug traffickers with whom he had dealt were extremely dangerous individuals and that cooperating with the DEA would put his life at risk.  <u>Id.</u>  This understanding was corroborated by the testimony of Professor Watts which was fully credited by the hearing officer.  Ex. 6 at 4.

In Enwonwu's own words, he would have been the "damndest fool" to cooperate without a representation from the DEA that his life would protected.  Tr. of 5/2/05 at 15.  While the counsel for the executive understandably suggests that it was Enwonwu's own desire to avoid incarceration in the United States that induced his cooperation, this Court accepts Enwonwu's testimony that if protection of his life was not assured, "going to jail and getting . . . deported back to Nigeria was a little price to pay."  <u>Id.</u> at 16.

Alternatively, the counsel for the executive argues that any danger awaiting Enwonwu was not state-created because the public awareness of his former status as a confidential DEA informant was caused by Enwonwu himself when he volunteered his story to the media and failed to file his court actions under seal.  Exec. Mem. III at 13-15; Exec. Mem. II at 24.  Indeed, because the recent media coverage of Enwonwu's plight was not a result of executive conduct, such publicity cannot be the basis for any state-created danger.  <u>Rivera</u>, 402 F.3d at 38.  Enwonwu, however,

has still carried his burden of establishing that the executive
created the danger of retribution that he faces.

Even if Enwonwu's status as a confidential informant had not
been made public, that status could nonetheless be inferred from
the events attendant to the 1986 controlled heroin purchase.
Because DEA agents were already on the scene ready to arrest the
individuals participating in the controlled buy, it was obvious
that the DEA had been made aware of the transaction in advance.
Moreover, because Enwonwu was never detained or tried with the
other two individuals who were arrested,[23] the reasonable
inference was available that Enwonwu had been "in on" the
arrest.[24]

Moreover, even if Enwonwu's status as a confidential
informant remained unknown, the executive still subjected him to
the danger he faces by instructing him to double-cross the
Nigerian drug traffickers for whom he was working.  That is, at
the behest of the DEA, Enwonwu informed the Ohio individual that
he would not deliver the heroin to the Ohio individual's henchmen
at the agreed upon price of $5,000.  Tr. of 4/29/05 at 35.
Rather, Enwonwu was made to insist on double that amount.  Id.
Such perfidy caused the Ohio individual to become irate and to

_____

[23] As reflected in the court records from their case, those
two individuals were tried together.

[24] Counsel for the executive itself acknowledges this much.
Exec. Mem. II at 25.

threaten Enwownu.  Id. 35-36.  The Ohio individual specifically
expressed his outrage over the fact that Enwonwu had become
greedy after "they" had given him his "first opportunity" in the
drug trade.  Id. at 36.  Because it is clear that this individual
was tied to the Nigerian individuals who sent Enwonwu to the
United States, it can reasonably be inferred that the Ohio
individual brought his treachery to their attention.  Those same
individuals had possession of both Enwownu's car and
identification documents.

In this Court's assessment, Enwonwu has successfully carried
his burden of establishing that the executive, in inducing his
cooperation as an informant, created a danger of violent
retribution at the hands of the individuals he betrayed.
Furthermore, the executive's affirmative act of removing him to
Nigeria where those individuals can easily access him is
sufficient to trigger a constitutional duty to protect him.
Rivera, 402 F.3d at 37 (emphasis added).  Although counsel for
the executive contends that Enwonwu has failed to show that such
danger "has not dissipated," Exec. Mem. III at 5, it cites no
precedent from within or outside the First Circuit which places
that burden on Enwonwu.  Rather, Enwonwu's burden is to
demonstrate that the state created a danger, which he has done.
Rivera, 402 F.3d at 34-35; Hasenfus v. LaJeunesse, 175 F.3d 68,
73 (1st Cir. 1999); Soto, 103 F.3d at 1064-65 (emphasis added).

74

The burden of rebutting that showing with proof that such danger
has dissipated, it seems, logically should fall on the executive.
The executive has not made that showing by a fair preponderance
of the record evidence.

In any event, a conclusion that such danger has dissipated
is directly at odds with the explicit finding of Hearing Officer
Shapiro, whose 1999 Convention Against Torture decision observed
that Enwownu faced a <u>present</u> danger of violent retribution
despite the passage of time since his cooperation.  Ex. 6 at 4-5
(emphasis added).  This finding was not disturbed by the BIA's
May 30, 2003 decision which focused narrowly the issue of the
enforcement of Nigerian drug laws in relation to Enwonwu's
Convention Against Torture burden.  <u>See</u> BIA Decision of
5/30/03.[25]  Counsel for the executive has introduced no evidence
to rebut the hearing officer's finding to which this Court
assigns significant weight.  <u>Syed</u> v. <u>Ashcroft</u>, 389 F.3d 248, 251
(1st Cir. 2004) (noting that a party seeking to overturn the
factual findings of an immigration hearing officer must
demonstrate that the contrary evidence presented was "so
compelling that no reasonable fact finder could fail to" reach a
different conclusion (citations and internal quotation marks
omitted)); <u>Hossain</u>, 381 F.3d at 32 (noting the credibility

_____

[25] Thus, the suggestion by counsel for the executive that
the BIA "rejected" the notion that Enwonwu would be tortured or
killed is simply wrong.  Exec. Mem. at 16.

findings of an immigration hearing officer will only be
overturned if "clearly erroneous").

Counsel for the executive next points out that in <u>Rivera</u> the
court noted that "necessary law enforcement tools" such as
identifying witnesses and taking witness statements "cannot be
the basis to impose constitutional liability on the state." <u>Id.</u>
According to counsel, "the use of informants and confidential
sources is exactly the [same] kind of 'necessary law enforcement
tool'" and cannot provide a basis for Enwonwu's claim. Exec.
Mem. II at 23 (quoting <u>Rivera</u>, 402 F.3d at 37). This argument
suffers from the same shortcomings as counsel's earlier argument
regarding the use of removal orders as a basis for substantive
due process claims. That is, such law enforcement tools are not
the "basis" for Enwonwu's claim. Rather, as mentioned above,
Enwonwu's claim is based on the executive's pattern of behavior
which includes its affirmative solicitation of his services as an
informant <u>and</u> (1) the executive's assurances of protection; (2)
the executive's order of removal; and (3) the executive's
complete indifference to the risk of danger that removing him
creates despite its assurances of protection.

Counsel for the executive observes further that in <u>Rivera</u>,
the substantive due process claim was "based upon immediate
threats of death to an innocent 15-year old witness, who was
subpoenaed for testimony and explicitly promised protection of

76

her life by the state if she testified, yet who was not protected by the state and was murdered as a result." Exec. Mem. II at 22. If a state-created danger claim was not recognized in that case, counsel suggests, one should certainly not be recognized here. Id. If the facts of this case were analogous to those in Rivera, counsel would be correct. This case, however, is distinguishable from Rivera.

In Rivera, the court concluded that the state-created danger claim failed because the actions of the defendants were "not the kind of affirmative acts by the state that would give rise to the constitutional duty to protect." 402 F.3d at 37 (internal quotation marks and citations omitted, emphasis added). In other words, merely rendering an individual "more vulnerable" to harm is not enough to trigger a constitutional duty to protect. Id. Thus, if, as in Rivera, the executive, after promising to protect Enwonwu from being killed by those it induced him into betraying, simply failed to do so, Enwonwu would have no claim because such unkept promises merely rendered him more vulnerable to harm and would not "cause" the deprivation. Id.

Enwonwu's claim is distinguished, however, by the added fact that the executive now seeks affirmatively to place him in an environment where he will be readily accessible to those wishing to harm him (i.e., it seeks to "throw[] him into a snake pit"). Soto, 103 F.3d at 1063 n.6 (citation omitted). Such affirmative

77

acts go beyond the realm of simply rendering him more vulnerable and can be fairly said to have causal effect. See Rivera, 402 F.3d at 37-38. Thus, this case is more akin to McIntyre where the necessary elements of a state-created danger claim were present because of the affirmative disclosure of McIntyre's identity as a confidential informant to the very people he was informing on. 336 F. Supp. 2d at 113-14.

Similarly, if in Rivera, rather than simply failing to protect Jennifer from the associates of Pona, the state removed her against her will from a comparatively safe environment to one in which those individuals could easily get their hands on her, a different analysis would have been in order. 402 F.3d at 38. Under those circumstances, Rivera would impose a duty to protect Jennifer because by placing her in close proximity to those bent on harming her, the police would have committed "the kind of affirmative acts" triggering such a duty. Id. at 37 (internal quotation marks omitted).

Although Enwonwu has established that removal will cause a deprivation of his protected rights by affirmatively subjecting him (without protection) to a state-created danger, to prevail on his substantive due process claim, such conduct must "shock the conscience of the court." Id. at 35-36. Here, the executive's deliberate indifference to the risk of death and torture its actions have caused meets this "onerous requirement". Id. at 36

78

("In situations where actors have an opportunity to reflect and
make reasoned and rational decisions, deliberately indifferent
behavior may suffice to 'shock the conscience.'"); McIntyre, 336
F. Supp. 2d at 108 (noting that official acts falling somewhere
between "negligently inflicted harm" and "conduct intended to
injure" may be found to be conscience shocking depending on the
circumstances); Builes v. Nye, 239 F. Supp. 2d 518, 526 (M.D. Pa.
2003) (holding that in its longstanding attempt to remove an
alien, the government's deliberate indifference to danger of
retribution resulting from the alien's cooperation with law
enforcement "shocks the conscience").

       For the executive to subject Enwonwu to the risk of deadly
retribution by inducing his cooperation though promises of
protection and then force him to face that retribution is utterly
egregious and intolerable.  The Constitution simply cannot permit
the executive to endanger the life of an alien, promise to
protect him, and then cast him aside like refuse when he is no
longer useful.[26]  The executive's suggestion that Enwonwu alone

---

       [26] Nor is Enwonwu's case an isolated incident as the
extraordinarily limited availability of the "S" visa
demonstrates.  Consider:
       "Jane Doe," a pseudonym, is a young, single mother.  A drug
       addict, she dealt cocaine to support her habit.  Eventually
       apprehended, she too cooperated and testified in open court
       so that the government might secure a conviction of an
       important drug lord from her homeland.  In light of her
       cooperation, the government recommends a short sentence.  As
       an alien, however, the [executive] proposes to deport her
       back to her homeland where, the [executive] admits, she will

bears responsibility for his fate because of his decision to smuggle heroin into the United States demonstrates a frightening callousness.  Exec. Mem. II at 24-25; Exec. Mem. III at 10. While the seriousness of Enwonwu's crime is not to be overlooked, that crime does not license the executive to disregard his constitutional rights much less his human dignity.  Furthermore, that Enwonwu's crime rendered him <u>removable</u> makes removal on these facts no less <u>unconstitutional</u>.  This is a man's life.

Because Enwonwu has demonstrated that his removal to Nigeria will deprive him of a constitutionally protected interest which shocks the conscience, he has shown that removal will violate his substantive due process rights.  <u>Rivera</u>, 402 F.3d at 33-34. Accordingly, this Court would grant Enwonwu's habeas corpus petition and enjoin his removal to Nigeria until such time as the executive can prove that the danger facing Enwonwu has dissipated.  While this Court reaches its conclusion based solely on First Circuit law, cases from outside the First Circuit granting habeas relief in similar circumstances provide useful analogies.

In <u>Rosciano</u> v. <u>Sonchik</u>, No. CIV 01-472-PHX-FJM, 2002 U.S. Dist. LEXIS 25419, *2-3 (D. Ariz. Sept. 10, 2002) (unpublished opinion), Maria Rosciano ("Rosciano"), a citizen of Colombia, was

---

almost certainly be killed, perhaps after torture.
<u>United States</u> v. <u>Green</u>, 346 F. Supp. 2d 259, 264 (D. Mass. 2004).

arrested for her role in a controlled heroin transaction conducted on her property.  Id. at *3.  At the request of FBI agents investigating the case, Rosciano agreed to provide information regarding the identity of the leader of the drug ring in Colombia.  Id.  Rosciano also cooperated by helping convict other parties to the drug transaction.  Id.  In exchange for her cooperation, Rosciano received a more lenient sentence for her role in the transaction.  Id.

After Rosciano finished serving her sentence, the INS commenced removal proceedings against her.  Id. at *4.  During her removal proceedings, the immigration hearing officer determined that Rosciano's life was in danger from the drug traffickers in Colombia as a result of her identification of a "major trafficker" and her role in convicting two other traffickers.  Id.  Because Rosciano had "committed a particularly serious crime," however, "she fit into an exception to the statutory protection against removal."  Id. at *4-5 (citing 8 U.S.C. §§ 1231(b)(3)(A), 1231(b)(3)(B)(ii)).  Accordingly, Rosciano was ordered removed to Colombia.  Id. at *5.

After the BIA affirmed the hearing officer's decision, Rosciano filed a petition for a writ of habeas corpus.  Id. at *5.  Rosciano argued that "having taken her into custody and induc[ing] her into becoming an informant, the government has an obligation under the Fifth Amendment not to send her to a certain

81

death." _Id._ at *7.  That is, she argued, her case fell within
the danger-creation exception to _DeShaney_'s general rule.  _Id._ at
*8.  The executive responded that "because [it] did not cause the
dangerous drug lords to exist or introduce [Rosciano] to such
people, and because [Rosciano] assisted the government
voluntarily, this is not a situation covered by the danger-
creation exception."  _Id._ at *12.

      The court granted Rosciano's petition.  _Id._ at *16.
According to the court, the executive created the danger facing
Rosciano by: (1) r[unning] the sting operation in order to place
[her] in a position in which she would cooperate;" (2) refusing
to assist Rosciano in her effort to avoid removal even though it
knew removal would place her in danger; and (3) "actively
attempting to remove her" despite its knowledge of the danger
awaiting her.  _Id._ at *12-13.  Accordingly, the court enjoined
the government from removing Rosciano to Colombia until such time
as it could show "that she is not likely to be murdered there."
_Id._ at *17.

      In _Builes_ v. _Nye_, the United States District Court for the
Middle District of Pennsylvania granted an alien's habeas
petition on similar grounds.  239 F. Supp. 2d at 526.  In _Builes_,
Jorge Builes ("Builes"), a citizen of Colombia, had been indicted
for conspiracy to distribute heroin.  _Id._ at 521.  Following his
arrest, Builes agreed to cooperate in the prosecution of two

members of the drug trafficking ring for which he had worked.
Id.  In exchange for his cooperation, Builes was given a more
lenient sentence.   Id.  Six months into Builes' sentence, he was
placed in expedited removal proceedings and ordered deported.
Id.

During his removal proceedings, the immigration hearing
officer concluded that Builes' life was in danger from Colombian
drug traffickers who had threatened him.   Id.  Additionally, the
hearing officer found that the traffickers had the power to carry
out such threats due to "the political conditions in Colombia."
Id. at 522.   The hearing officer subsequently granted Builes
deferral of removal under 8 U.S.C. § 1231(b)(3).   Id.  Following
an appeal by the INS, the BIA reversed the hearing officer's
decision.   Id.  Prior to the BIA's decision, Builes' brother and
sister were murdered in Colombia.   Id.

Relying on the state-created danger doctrine, Builes' habeas
petition alleged that the order of removal violated his
substantive due process rights.   Id. at 525-26.   The court
observed that under Third Circuit precedent, that doctrine has
four elements: (1) "the harm must be foreseeable and fairly
direct"; (2) the executive conduct must shock the conscience; (3)
there must exist "some relationship between the state and the
plaintiff"; and (4) the state actors must use "their authority to
create an opportunity that otherwise would not have existed for

the third party's crime to occur." <u>Id.</u> at 526 (quoting <u>Nicini</u> v.

<u>Morra</u>, 212 F.3d 798, 809-10 (3d Cir. 2000) and <u>Kneipp</u> v. <u>Taylor</u>,

95 F.3d 1199, 1209 (3d Cir. 1996)) (internal quotation marks

omitted).   The court found that each of these elements had been

established.   <u>Id.</u>

        The first element was met because Builes had already

received death threats and his brother and sister had "probably"

been murdered by drug traffickers.   <u>Id.</u>  Builes had established

the second element because the INS "in its longstanding attempt

to remove him" was deliberately indifferent to the known threat

to his life.   <u>Id.</u>  The third element was satisfied because Builes

was in the executive's custody.   <u>Id.</u>  Builes had demonstrated the

final element because returning him to Colombia created an

opportunity that would not otherwise exist for the drug

traffickers to kill him.   <u>Id.</u>  Accordingly, the court granted

Builes' petition and enjoined his removal until such time as he

could be removed to Colombia or some other country without being

killed.   <u>Id.</u>; <u>Builes</u> v. <u>Nye</u>, 253 F. Supp. 2d 818, 820-21 (M.D.

Pa. 2003).

        In <u>Edwards</u> v. <u>INS</u>, No. 03-286, 2003 U.S. Dist. LEXIS 15572,

at *2 (E.D. Pa. Aug. 21, 2003) <u>aff'd</u>, 100 Fed. Appx. 126 (3d Cir.

2004) (unpublished opinion),[27] Richard Edwards ("Edwards"), a

---

        [27]<u>See</u> proposed Fed. R. App. P. 32.1(a) (proscribing
restrictions on the citation to unpublished opinions that are not
similarly imposed on published opinions).  Proposed subsection

citizen of Jamaica, was convicted of several drug trafficking
offenses. As a result of a 1991 conviction, Edwards was ordered
removed from the United States. Id. at *3. Edwards, in his
habeas petition, claimed that he would be tortured and possibly
killed by political opponents if removed to Jamaica. Id. at *5.
Edwards argued that his removal should be enjoined under the
state-created danger theory. Id. at *10. Although Edwards'
petition was denied on several procedural grounds, the court also
opined that "there is no authority for extension of the [state-
created danger] doctrine to removal proceedings like the one
conducted here." Id. at *18.

Specifically, the court noted that the two cases cited by
Edwards, Builes and Rosciano, "are readily distinguishable
because the risk demonstrated in those cases came about as a

_____

(a) reads:
    No prohibition or restriction may be imposed upon the
    citation of judicial opinions, orders, judgments, or other
    written dispositions that have been designated as
    "unpublished," "not for publication," "non-precedential,"
    "not precedent," or the like, unless that prohibition or
    restriction is generally imposed upon the citation of all
    sources.
Id. As already required by some circuits, Subsection (b) of the
proposed rule provides that a copy of an unpublished opinion
cited in a court document and not available on electronic
databases must be submitted to the court. See, e.g., 1st Cir. R.
32.3(a)(3).
    But see generally Niketh Velamoor, Proposed Federal Rule of
Appellate Procedure 32.1 to Require that Circuits Allow Citation
to Unpublished Opinions, 42 Harv. J. on Legis. 561 (2004)
(identifying potential shortcomings of the proposed rule).

result of the United States Government <u>asking the petitioners to</u>
<u>serve as government informants</u> and to provide information on the
activities of certain individuals still connected with the
petitioners' countries of origin." <u>Id.</u> at *16 (emphasis added).
"By doing so," the court observed, "the government placed the
petitioners in danger in their countries of origin." <u>Id.</u>  The
court continued:

> Thus, the issue in those cases was whether the United States
> government <u>affirmatively</u> placed petitioners in danger by
> coercing or <u>inducing</u> them to provide intelligence
> information on drug traffickers in their countries of
> origin.  In the instant case the petitioner was not asked to
> provide any information on individuals in his country of
> origin or to do anything else on behalf of or at the
> insistence of the government.  Given this important factual
> difference, the court concludes that, at the very least,
> absent such conduct by the government, i.e., asking a
> petitioner to serve as an informant and to provide
> information that would put him or her at risk in his or her
> own country, the state created danger doctrine does not
> apply to a removal proceeding.  Unlike the petitioners in
> <u>Builes</u> or <u>Rosciano</u>, the danger that potentially awaits
> petitioner in Jamaica is not centered or enhanced by any
> request on the part of the United States government that
> petitioner act as a government informant or do anything
> else.

<u>Id.</u> at *16-17.

     The following year in <u>Lawson</u> v. <u>Gerlinski</u>, 332 F. Supp. 2d
735, 743 (M.D. Pa. 2004), the Middle District of Pennsylvania
continued to recognize the viability of the state-created danger
doctrine in the alien-informant context.  In <u>Lawson</u>, Patrick St.
Aubyn Lawson ("Lawson"), a citizen of Jamaica, had been indicted
on marijuana trafficking charges.  <u>Id.</u> at 738.  Lawson pleaded

guilty and was sentenced to an 87-month prison term.  Id.  While
serving his sentence, the INS initiated removal proceedings
against Lawson.  Id.  After removal proceedings had begun,
Lawson's sentence was reduced to 48 months based on his
cooperation that helped secure an indictment against one
individual and guilty pleas from three other individuals.  Id. at
738-39.

    During his removal proceedings, Lawson produced a statement
from an Assistant United States Attorney that he "and his family
were at risk of retaliation as a result of [his] cooperation."
Id. at 739.  The immigration hearing officer, however, ordered
Lawson's removal to Jamaica.  Id.  Before Lawson's appeal was
denied by the BIA, he wrote to the INS seeking "deferred action."
Id.  Lawson based his request "upon his fear for his life if
returned to Jamaica based upon the assistance he provided to the
government to secure convictions of co-conspirators."  Id.  The
INS denied Lawson's request.  Id. at 740.

    Lawson's habeas petition asserted that removal to a country
where his life was in danger violated his Fifth Amendment
substantive due process rights.  Id.  In addressing this claim,
the court first acknowledged that "all aliens within the United
States are 'persons' entitled" to substantive due process
protection.  Id. at 742 (citing The Japanese Immigrant Case, 189
U.S. 86, 100-01 (1903) and Ngo v. INS, 192 F.3d 390, 396 (3d Cir.

87

1999)).  The court next observed that Lawson had presented "some evidence of a risk of substantial bodily harm or death if removed to Jamaica." Id. at 743.  Specifically, the court noted, Lawson produced evidence that he exposed himself and his family to a risk of harm as a result of his cooperation with law enforcement. Id. at 739, 743.

The INS argued that Lawson's claim should fail because he knowingly exposed himself to the risk of harm in exchange for a reduced sentence. Id. at 743 n.11.  Having made such a choice, the INS contended, "Lawson cannot now contend that it is the United States government that is exposing him to a risk of death upon his return to Jamaica." Id.  As the court observed, however, "there is an issue of fact as to whether Lawson knowingly exposed himself to the peril he now claims," as the "record [wa]s unclear as to whether the prosecuting authorities induced cooperation from Lawson . . . ." Id. (emphasis added). Thus, the court held, a state-created danger claim may be available where the government affirmatively places an individual in danger by "coercing or inducing them to provide intelligence information on drug traffickers" in their home countries. Id. (citation omitted, emphasis added).

According to the court, "[w]hile this evidence is not as compelling as that which prompted granting relief in Builes and Rosciano, the evidence is sufficient to accord Lawson an

88

opportunity to more fully substantiate his fears and claim." <u>Id.</u> at 743.  On that basis, the court ordered that Lawson be released and that an evidentiary hearing be scheduled on his substantive due process claim.  <u>Id.</u> at 746-47; <u>see also</u> <u>Momennia</u> v. <u>Estrada</u>, 268 F. Supp. 2d 679, 683-84 (N.D. Tex. 2003) (recognizing that state-created danger doctrine may potentially prohibit removal of an alien-informant where government affirmatively places alien in danger by inducing cooperation).

Again, this Court does not rely on the foregoing cases as a basis for any of its legal conclusions, which are entirely based on First Circuit law.  Indeed, because none of the cases discussed above involved affirmative assurances of protection from the danger arising from cooperation, they are readily distinguishable in that the danger was less clearly "state-created."  This Court discusses these cases, however, to demonstrate that substantive due process protection under these circumstances is not novel.

Indeed, even had no court previously granted relief in situations like these, this Court would still be prepared to do so.  As a distinguished fellow district court judge has commented:

> Trial judges have the obligation to maintain the pressure for sound interpretation when they see grave and unnecessary injustice.  Occasionally, they will be reversed in a harsh opinion, but that possible slight to their egos cannot and should not be permitted to inhibit them.  Trial judges protected by Article III are, like their appellate court

colleagues, expected to use their independence to help
guarantee a fair and effective system of justice.

Hon. Jack B. Weinstein, <u>Every Day is a Good Day for a Judge to
Lay Down His Professional Life for Justice</u>, 32 Fordham Urb. L.J.
131, 155 (2004).

This Court should make clear that it <u>does not</u> recommend the
recognition of a new type of due process protection for aliens
facing removal to "more dangerous" nations.  That aliens are
often deported to such countries is simply a consequence of the
necessary immigration laws of the United States and triggers no
constitutional concern.  <u>See</u> <u>Herrera-Inirio</u>, 208 F.3d at 309.
This Court limits its recognition of due process protection to
the unique facts of this particular case in which (1) the
executive created the specific danger facing Enwonwu by inducing
his cooperation with promises of protection from the very source
of harm that now threatens him; (2) the course of executive
conduct culminating in removal will affirmatively place him in
the zone of danger; and (3) the executive's deliberate
indifference meets the onerous burden of shocking the conscience
of the court.

   **D.   Habeas Jurisdiction Following the Enactment of Section
        106 of the REAL ID Act of 2005**

Verbal and political attacks on an independent federal
judiciary are as old as the republic, and as healthy.  <u>See, e.g.</u>,
Mark R. Levin, <u>Men in Black: How the Supreme Court is Destroying</u>

America (Regency Publishing 2005).  We learn from our history, recoiling from extremism.  Each generation must strike anew the balance between Congress, the President, and the Judiciary.

Today, the most sophisticated attack comes replete with lengthy intellectual credentials.  See Larry D. Kramer, The People Themselves - Popular Constitutionalism and Judicial Review (Oxford Univ. Press 2004), and Mark Tushnet, Taking the Constitution Away from the Courts (Princeton Univ. Press 1999).  "Popular constitutionalism" is a well-argued critique of judicial review which apparently contends that whenever one disagrees with a court's constitutional ruling, one is free to ignore it unless one is a direct party to the lawsuit.  There is a devastating riposte by Larry Alexander and Lawrence B. Solum at 118 Harv. L. Rev. 1594 (2005) which exposes "popular constitutionalism" as nothing more than rule by executive fiat.

Still, words matter and Congress, by adjusting the jurisdiction of the lower federal courts, can effectively strip disfavored classes from full access to justice and thereby restrict, if not extinguish, cherished individual rights and liberties.[28]  This is known as "rights stripping."  This Court has had occasion to point it out before:

---

[28]As the House Majority Leader Tom Delay recently remarked, "We set up the courts.  We can unset the courts."  Miara v. First Allmerica Fin. Life Ins. Co., -- F. Supp. 2d --, 2005 WL 1463299, at *43 n.57 (D. Mass. June 16, 2005) (citation omitted).

91

[The Antiterrorism and Effective Death Penalty Act] and its
cousin . . . the Illegal Immigration Reform and Immigrant
Responsibility Act of 1996, Pub. L. No. 104-208, 110 Stat.
3009-546 (1996) (codified in scattered sections of the
U.S.C.), are recent examples of "jurisdiction stripping"
legislation, a legislative technique that descends directly
from bills proposed in the 1980s to strip federal courts of
jurisdiction over abortion and busing, Note, Powers of
Congress and the Court Regarding the Availability and Scope
of Review, 114 Harv. L. Rev. 1551, 1552 (2001).  As
commentators have noted, "jurisdiction stripping" is, in
effect, "rights stripping," Laurence H. Tribe,
Jurisdictional Gerrymandering: Zoning Disfavored Rights out
of the Federal Courts, 16 Harv. C.R.-C.L. L. Rev. 129, 129-
30 & n.1 (1981) (arguing that such measures unduly burden
constitutional rights); contra Erwin Chemerinsky, Parity
Reconsidered: Defining a Role for the Federal Judiciary, 36
U.C.L.A. L. Rev. 233, 261-69 (1988) (discussing study on
parity of state and federal courts), because it removes, in
a single stroke, the nuanced views of the 674 federal
district judges from the rich common law tradition of
evolutionary statutory interpretation and leaves the matter
solely to twelve circuit courts of appeal and the Supreme
Court. While society--acting through Congress--recoiled from
thus rights stripping women and blacks, it had no such
hesitancy concerning felons and aliens. Sadly, . . . resort
to this technique [has] become more frequent with the
concomitant erosion of the very rights a truly independent
judiciary was designed to protect.

Gonzalez v. United States, 135 F. Supp. 2d 112, 115 n.5 (D. Mass.

2001) (original alterations omitted, alterations added).

    Enwonwu's case provides a stark and stunning example of

"rights stripping" and confirms Alexander and Solum's observation

that, practically, "popular constitutionalism" is nothing more

than a euphemism for rule largely by executive fiat.

    It is constitutional bedrock that "[t]he judicial Power of

the United States, shall be vested in one supreme Court, and in

such inferior Courts as the Congress may from time to time ordain

and establish." U.S. Const. art. III, § 1.  There is but a single limit on the Congress' broad powers to establish and disestablish inferior courts, expand or trim their jurisdiction,[29] and move jurisdiction from one such court to another.  That single limit is the American jury.  "The Trial of all Crimes, except in Cases of Impeachment, shall be by Jury . . . ."  U.S. Const. art. III, § 2, cl. 3.  "In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved . . . ."  U.S. Const.

---

[29] For example, a recently proposed federal bill seeks to limit federal courts' jurisdiction over questions arising under the Defense of Marriage Act.  Marriage Protection Act of 2005, H.R. 1100, 109th Cong. § 2 (2005).  Another bill seeks to curtail federal courts' jurisdiction over questions pertaining to the constitutional validity of the Pledge of Allegiance.  Pledge Protection Act of 2005, H.R. 2389, 109th Cong. § 2 (2005).  Knowledgeable observers uniformly predict these bills are going nowhere.  See, e.g., Judith Resnik, Judicial Selection and Democratic Theory: Demand, Supply, and Life Tenure, 26 Cardozo L. Rev. 579, 646 (2005).  The reason, however, may lie not in a lack of congressional will or doubts as to constitutionality, but rather in the fact that if the federal courts are stripped of jurisdiction in any of these areas, these fields will be left entirely to the judiciaries of the 50 states, see, e.g., Murphey v. Lanier, 204 F.3d 911, 914 (9th Cir. 2000), i.e., judiciaries which the Congress plays no institutional role in confirming or funding.

amend. VII.[30]  These constitutional commands necessarily require the existence of jury trial courts to give them effect.

The American jury, that most vital expression of direct democracy extant in America today, thus functions as a practical and robust limitation on congressional power.  It is as crucial and central a feature of the separation of powers among the Congress (Art. I), the President (Art. II), and the Judiciary (Art. III), as is the Supreme Court.  See Jackie Gardina, Compromising Liberty: A Structural Critique of the Sentencing Guidelines, 38 U. Mich. J.L. Reform 345, 377 (2005) ("[T]he jury can serve . . . as a structural protection within the constitutional scheme.").  Indeed, within her proper fact-finding sphere, an American juror is the constitutional equal of the President, a Senator or Representative, or the Chief Justice of the United States.

On the criminal side, for example, it is congressional marginalization of the jury's fact-finding role that rendered the United States Sentencing Guidelines unconstitutional.  United States v. Booker, 125 S. Ct. 738, 752 (2005).  On the civil side, those lawsuits that are the functional equivalent of "[s]uits at

---

[30] Efforts to water down the plain language of the Constitution continue to this day.  Developments in the Law, The Civil Jury, 110 Harv. L. Rev. 1408, 1493-1503 (1997) (discussing proposals to limit the jury's role in complex civil cases); see also Note, The Twenty Dollars Clause, 118 Harv. L. Rev. 1665, 1686 (2005) (suggesting that the United States has "outgrown" the philosophy undergirding the Seventh Amendment).

common law" that were tried to juries at the time our
Constitution was adopted, e.g., patent cases,[31] must still be so
tried.  <u>Tull</u> v. <u>United States</u>, 481 U.S. 412, 417 (1987) (Brennan,
J.).

1.  **What Congress Did**

Despite its readiness to issue a decision in this case, this
Court now lacks jurisdiction to do so following the May 11, 2005
enactment of the REAL ID Act of 2005, Pub. L. No. 109-13, Div. B.
119 Stat. 231, 302 ("REAL ID Act").[32]  Buried within the REAL ID
Act are amendments to the Immigration and Nationality Act
("INA").  Most notably, section 106 of the REAL ID Act ("Section
106") explicitly limits habeas corpus review of removal orders to
the courts of appeals:

---

[31] In <u>Amgen, Inc.</u> v. <u>Hoechst Marion Roussel, Inc.</u>, 126 F.
Supp. 2d 69, 80 (D. Mass. 2001), this Court explained that
because the Seventh Amendment requires patent infringement claims
be tried to a jury, courts must be especially careful to avoid
conflating the "legal explication" required of a claim
construction or <u>Markman</u> hearing "with the fact finding that the
Seventh Amendment ultimately reserves for the American jury."  As
such, because the <u>Markman</u> hearing in that case arose at the
summary judgment stage, this Court conducted "two hearings
independently of each other--the <u>Markman</u> hearing being held prior
to and entirely independently of the summary judgment hearing."
<u>Id.</u>  Although combining such hearings was permissible, this Court
expressed its fear that doing so "cuts against the spirit of both
<u>Markman</u> itself and its recognition of the importance of the
fundamental divide between fact and law . . . ."  <u>Id.</u> at 80-81.

[32] The REAL ID Act is part of the much broader Emergency
Supplemental Appropriations Act for Defense, the Global War on
Terror, and Tsunami Relief, 2005, Pub. L. No. 109-13, 119 Stat.
231 (May 11, 2005).

Notwithstanding any other provision of law (statutory or
nonstatutory), including section 2241 of title 28, United
States Code, or any other habeas corpus provision, and
sections 1361 and 1651 of such title, a petition for review
filed with an appropriate court of appeals in accordance
with this section shall be the sole and exclusive means for
judicial review of an order of removal entered or issued
under any provision of this Act [the Immigration and
Nationality Act], except as provided in subsection (e) [of 8
U.S.C. § 1252].

REAL ID Act, § 106(a)(1)(B)(5).

    Section 106 took effect upon its enactment and applies "to
cases in which the final administrative order of removal,
deportation, or exclusion was issued before, on, or after the
date of enactment of this division." Id. at § 106(b).  Section
106 requires district courts to transfer to the appropriate court
of appeals, all pending habeas petitions, such as Enwonwu's,
which challenge removal orders:

If an alien's case, brought under section 2241 of title 28,
United States Code, and challenging a final administrative
order of removal, deportation, or exclusion, is pending in a
district court on the date of the enactment of this
division, then the district court shall transfer the case
(or the part of the case that challenges the order of
removal, deportation, or exclusion) to the court of appeals
for the circuit in which a petition for review could have
been properly filed under section 242(b)(2) of the
Immigration and Nationality Act (8 U.S.C. 1252), as amended
by this section [Section 106 of the REAL ID Act], or under
section 309(c)(4)(D) of the Illegal Immigration Reform and
Immigrant Responsibility Act of 1996 (8 U.S.C. 1101 note).
The court of appeals shall treat the transferred case as if
it had been filed pursuant to a petition for review under
such section 242, except that subsection (b)(1) of such
section shall not apply.

Id. at § 106(c) (emphasis added).

96

Although criminal aliens such as Enwonwu were previously prohibited from seeking direct review of removal orders in the courts of appeals by 8 U.S.C § 1252(a)(2)(C), the REAL ID Act amends section 1252(a)(2)(C) to read that "[n]othing in [this] subparagraph . . . which limits or eliminates judicial review, shall be construed as precluding review of constitutional claims or questions of law raised upon a petition for review filed with an appropriate court of appeals in accordance with this section." Id. at § 106(a)(1)(A)(iii). Counsel for the executive has moved to transfer this case to the United States Court of Appeals for the First Circuit pursuant to Section 106(c). Executive's Mot. to Transfer [Doc. No. 15].

2.  **What Congress Said**

The Conference Committee Report on the REAL ID Act reveals that Section 106 was inspired in large part by Congress' dissatisfaction with the Supreme Court's decision in INS v. St. Cyr, where it ruled that the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") and the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") did not deprive the federal district courts of jurisdiction over 28 U.S.C. § 2241 habeas petitions challenging removal orders resulting from criminal convictions. 533 U.S. 289, 314 (2001); H.R. Conf. Rep. No. 109-72, 151 Cong. Rec. H2813-01 (May 3, 2005) available at 2005 WL 102581 ("Committee Report") at H2872-H2873.

97

According to the Committee Report, <u>St. Cyr</u> had the undesirable effect of "allow[ing] criminal aliens to delay their expulsion from the United States for years." <u>Id.</u> at H2872.

Furthermore, under <u>St. Cyr</u>, "criminal aliens [were] able to begin the judicial review process in the district court, and then appeal to the circuit court of appeals." <u>Id.</u> "Criminal aliens thus [could] obtain review in two judicial forums, whereas non-criminal aliens may generally seek review only in the courts of appeals." <u>Id.</u> "Not only is this result unfair and illogical," the report noted, "but it also wastes scarce judicial and executive resources." <u>Id.</u> "Finally," the report commented, "the result in <u>St. Cyr</u> has created confusion in the federal courts as to what immigration issues can be reviewed, and which courts can review them." <u>Id.</u> According to the Committee Report, Section 106 of the REAL ID Act "address[es] the anomalies created by <u>St. Cyr</u> and its progeny by restoring uniformity and order to the law." <u>Id.</u> at H2873.

Thus, Congress has solidified its long-standing effort to ensure that "only the courts of appeals may review removal orders." <u>Id.</u> at H2872. As the Committee Report points out, Congress' goal has long been to "abbreviate the process of judicial review of deportation orders and to eliminat[e] the previous initial step in obtaining judicial review" in the district courts. <u>Id.</u> (internal citations and internal quotation

and alteration marks omitted).  According to the report, Section 106 will "give every alien one day in the court of appeals" thereby "satisfying constitutional concerns" because such review is "an 'adequate and effective' alternative to habeas corpus." Id. at H2873 (citation omitted).

### 3.   What the Drafters Meant[33]

While Congress represents that "abbreviat[ing] the process of judicial review" leaves room for an "adequate and effective alternative to habeas" review, id., the REAL ID Act is actually intended to, and has the practical effect of, "rights stripping." This Court's own examination of District of Massachusetts cases revealed that there are no less than 68 pending section 2241 habeas corpus petitions.[34]  Many of those petitions were filed by

---

[33]The Court uses the word "drafters" here to refer to those members of Congress instrumental in inserting section 106(c) into the "must-pass" wartime appropriations bill.

[34]As this Court has written to the Chair of the Court Administration and Case Management Committee of the Judicial Conference,
Despite all the efforts devoted to our in-house [electronic database] product, PACER, it's not very good.  I just returned from the national 2005 Managing Electronic Records Conference.  Two of the speakers referred to our system as "pathetic PACER."  Academic commentators agree. [Gillian K. Hadfield, Exploring Economic and Democratic Theories of Civil Litigation: Differences Between Individual and Organizational Litigants in the Disposition, 57 Stan. L. Rev. 1275, 1286 n.37 (2005) (noting shortcomings of PACER, namely its single suit code filing format and its inability to address filing errors); Elizabeth Warren and Jay Lawrence Westbrook, Contracting Out of Bankruptcy: An Empirical Intervention, 118 Harv. L. Rev. 1197, 1208-09 (2005) (indicating "[t]he PACER system created special difficulties

aliens challenging their orders of removal.  See, e.g.,
Castillo-Vasquez v. Winn, 05-40070-PBS; Dahrouj v. Ashcroft, 05-
11939-PBS; DeArujo v. Gonzales, 05-10968-RCL; Perez v. Gonzales,
05-10895-DPW; Gitau v. Chadbourne, 05-10803-GAO; Osmon v.
McDonough, 05-10771-PBS; Kibanda-Bullock v. INS, 05-10741-PBS;
Medero-Gonzales v. Department of Homeland Sec., 05-10624-MLW;
Bernard v. United States, 05-10467-RWZ; Espady v. Department of
Homeland Sec., 05-10466-NG; Chacon v. Chadbourne, 05-10465-MEL;
Abreu Cabrera v. Chadbourne, 05-10410-NG; Gallego v. Ashcroft,
05-10321-GAO; Smith v. MacDonald, 04-30205-MAP; Phillip v.
Hodgson, 04-11896-MLW; Kaweesa v. Ashcroft, 04-10513-WGY; Pinto
v. McDonough, 04-10404-MEL; Grigous v. Attorney General, U.S.A,
04-10229-MAP; Arias v. Ashcroft, 04-10171-NG; Matos v. Winn, 03-
40224-FDS; Jacquet v. Chadbourne, 03-12457-RWZ; Pena-Muriel v.
Ashcroft, 03-10984-MEL; Jean v. INS; 03-10890-MEL; and
Orumwensse-Lawrence v. Farquharson, 03-10673-MLW.

---

for separating Chapter 7 business cases from Chapter 7
consumer cases, requiring substantial[] time and effort to
select a sample . . .").]  Indeed, when I first became aware
of the mandatory transfer of pending alien removal habeas
petitions to the courts of appeals under the REAL ID Act, as
a district chief I tried to find out how many such pending
cases we had in our district. "Can't be done," said my
systems people.  It was only after a hand count of all
pending habeas petitions identified by case category number
that we could figure this out.  PACER simply is not a very
usable data base.
William G. Young, Letter to Hon. John W. Lungstrum, June 9, 2005.

Pursuant to Section 106(c) of the REAL ID Act, the executive
has already filed motions to transfer several of those actions to
the First Circuit.  These petitioners are now without the benefit
of the district courts' experience in conducting searching
evidentiary hearings and listening to their first-hand
narratives.  See Developments in the Law, The Law of Prisons, 115
Harv. L. Rev. 1838, 1865 (2002).  Instead, they will each now be
afforded their "one day in the court[s] of appeals," Committee
Report at H2873, judicial bodies more accustomed to reviewing
"cold record[s]" for legal error than hearing testimony and
evaluating evidence.  The Law of Prisons, 115 Harv. L. Rev. at
1865 (citation omitted).  One has to wonder if the REAL ID Act's
jurisdiction limiting provisions will make even constitutionally
meritorious cases, such as Enwonwu's, harder to win.  Cf. Margo
Schlanger, Inmate Litigation, 116 Harv. L. Rev. 1555, 1556, 1644
(2003) (observing that the Prison Litigation Reform Act's
restrictions of inmates' access to federal courts make even
constitutionally meritorious cases harder to file and win).

    4.    **The Drafters Disparage and Distrust the District
Courts**

The REAL ID Act imposes a chokehold on the free and proper
exercise of the writ of habeas corpus.  But it does more.  It
reveals the drafters' deep distrust of the district courts, the

nation's sole jury trial court.[35]  Consider: of the pending

habeas petitions in this District alone that involve aliens,

upwards of 32 require immediate transfer to the Court of Appeals.

Some of these petitions--Enwonwu's is an example--had already

engaged significant judicial resources.  Others no doubt had

not.[36]  Assume, to be conservative, that each of these cases had

---

[35]Other recent legislation confirms the depth and breadth of
this rift.  See Green, 346 F. Supp. 2d at 283-289 (discussing the
Feeney Amendment); Bankruptcy Abuse Prevention and Consumer
Protection Act of 2005, Pub. L. No. 109-8, § 1233, 119 Stat 23
(2005) (parties may opt to bypass the district judge altogether
to attempt to bring a bankruptcy case before the courts of
appeal).

[36] For a statistical overview of the resolution of habeas
petitions in this District as compared with the national average,
see Kane v. Winn:
    In this District, the average resolution time for cases
    decided on the merits is lower than the national average,
    but the average resolution times for other habeas cases, and
    for all categories of habeas cases combined, are higher. In
    2001, 102 habeas corpus petitions challenging state court
    convictions were filed in this District. As of April 30,
    2004, 37 of those petitions (36.27%) had been decided on the
    merits, taking an average of 415 days to resolve. That is 62
    days faster than the national average. Fifteen (14.71%) had
    been dismissed for failure to exhaust state remedies, and on
    average it took 387 days for those petitions to be
    dismissed. Thirty-seven (36.27%) had been terminated for
    other reasons (usually failure to pay a filing fee or to
    file an amended petition), and took an average of 196 days
    to resolve. Thirteen (12.75%) remain pending. If the Court
    presumes that those 13 scatter evenly around July 2, 2001
    (the midpoint of the year), and that those cases will be
    resolved by the end of this year, those cases will take an
    average of 1,278 days to resolve. If the Court presumes that
    all 13 will be dismissed without reaching the merits, then
    this District takes an average of 458 days to dispose of
    habeas petitions without reaching the merits, 190 days more
    than the national average. Because it is difficult to know
    how accurate this presumption is, a comparison of overall

engaged only a single day of district court judicial time.  How
many such cases are there nationwide?  With 94 judicial
districts, most have less judicial business than the District of
Massachusetts, but many have significantly higher caseloads
involving aliens than does this District.  The Districts of
Arizona, Central and Southern California, Middle and Southern
Florida, Eastern Louisiana, New Mexico, Eastern New York, and
West Texas are prime examples.  If one estimates that in the
entire United States there are but 1,000 such cases now to be
transferred to start afresh in twelve courts of appeals, then the
waste of the taxpayers' money approximates $25,000,000.00.[37]
This is a high price to pay for congressional distrust of a
district court judiciary thought to be "too soft on immigrant

---

disposition times may be more informative. The national
average is 345 days to dispose of a habeas petition. The
average in this District is roughly 443 days, and will
become longer if the unresolved cases are not resolved this
year. As the Court discusses below, the length of resolution
to some degree reflects the laudable practice of staying
proceedings while a petitioner exhausts unexhausted claims.
It is at least possible that this District takes longer than
average to resolve habeas cases in part because judges here
engage in this practice more consistently than in other
districts.
319 F. Supp. 2d at 217 n.87.

    [37]Current estimates place the fully distributed costs of a
United States district court session at $25,000 per court day.
See Judith Resnik, Managerial Judges, 96 Harv. L. Rev. 374, 423-
24 (1982) for the methodology employed in making this calculus.
See also United States v. Alfonso, 284 F. Supp. 2d 193, 204 n.4
(D. Mass 2003); Chappee v. Commonwealth, 659 F. Supp. 1220, 1227
n.9 (D. Mass. 1987), rev'd on other grounds by Chappee v. Vose,
843 F.2d 25 (1st Cir. 1988).

aliens." Congress instead has placed its faith in the executive and the 200 "S" visas he has to distribute.

5.   **No Jury Trial For Enwonwu**

So it is that had Enwonwu a right to a jury trial on his habeas petition, the present reallocation of jurisdiction as between the district courts and the courts of appeal would be unconstitutional as depriving Enwonwu of that constitutional right. It is only the district courts--our great American trial courts--that are empowered to summon jurors, 28 U.S.C. §§ 1863(a), 1866, empanel them, id. at §§ 1863(a), 1866, 1867, and conduct jury trials. Id. at § 1861. In short, the constitutional guarantee of the right to jury trials also guarantees a vigorous judicial branch by necessarily guaranteeing that America has jury trial courts in addition to "one supreme Court." U.S. Const. art. III, § 1. Unfortunately for Enwonwu, he is not entitled to have his habeas petition heard before a jury. Though phrased as a mere limitation of jurisdiction, Section 106 of the REAL ID Act actually has the very real effect of limiting Enwonwu's rights.

Although Congress is empowered to limit the district courts' jurisdiction, both "Congress and the courts are limited . . . in how they may restrict [the] availability of the writ of habeas corpus." Brackett v. United States, 206 F. Supp. 2d 183, 184 n.3 (D. Mass. 2002). Such writ is constitutionally protected. U.S. Const. art. I, § 9 cl. 2. Thus, "courts must be cognizant that

interpreting [the REAL ID Act] to pinch too tightly on access to the writ may create significant constitutional concerns." Brackett, 206 F. Supp. 2d at 184 n.3 (citing St. Cyr, 533 U.S. at 301 n.13; Note, The Avoidance of Constitutional Questions and the Preservation of Judicial Review: Federal Court Treatment of the New Habeas Provisions, 111 Harv. L. Rev. 1578 (1998); Gerald Neuman, Habeas Corpus, Executive Detention, and the Removal of Aliens, 98 Colum. L. Rev. 961 (1998); and Richard H. Fallon, Jr., Applying the Suspension Clause to Immigration Cases, 98 Colum. L. Rev. 1068 (1998)). The issue whether Section 106 unconstitutionally restricts the writ of habeas corpus as a functional matter is one best addressed by the courts of appeal once they see the practical effect of this wholesale dumping of these cases onto their already overburdened dockets. Therefore, this Court has no choice but to transfer this case in accordance with the Congressional mandate.

**III. CONCLUSION**

To the extent Enwonwu's petition [Doc. No. 1] challenges merely the duration of his detention, it is DENIED.

The Executive's Motion to Transfer this case pursuant to Section 106(c) of the REAL ID Act of 2005 [Doc. No. 15] is ALLOWED. Accordingly, it is hereby ordered that this action be TRANSFERRED forthwith to the United States Court of Appeals for the First Circuit.

In transferring this case, this Court makes the following recommendations:

This case should be REMANDED to the BIA for reconsideration in light of all of the evidence relied upon by the hearing officer's December 16, 1999 Convention Against Torture determination.

To the extent Enwonwu's petition challenges his order of removal on substantive due process grounds, it should be ALLOWED.

If, after reconsideration, the BIA reinstates its order of removal, this Court recommends that Enwonwu's removal to Nigeria be enjoined until such time as the executive can establish that the danger of retribution resulting from his cooperation with the United States Government has dissipated.

This Court recommends that it be ordered that any future proceedings in this matter be filed under seal.

Finally, this Court recommends that Enwonwu be released at once and the case be administratively closed.

SO ORDERED and RECOMMENDED.

/s/ William G. Young

_____

WILLIAM G. YOUNG
CHIEF JUDGE